**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RANDY JOSEPH MOORE,
　　　　　*Petitioner-Appellant,*
　　　　　v.
STAN CZERNIAK, Superintendent of
OSP,
　　　　　*Respondent-Appellee.*

No. 04-15713

D.C. No.
CV-01-01795-
AJB/JMS

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
March 10, 2005—Portland, Oregon

Filed July 28, 2009

Before: Stephen Reinhardt, Marsha S. Berzon, and
Jay S. Bybee, Circuit Judges.

Order;
Opinion by Judge Reinhardt;
Concurrence by Judge Berzon;
Dissent by Judge Bybee;
Dissent to Order by Judge Callahan;
Dissent to Order by Judge Bea

## COUNSEL

Barbara L. Creel, Office of the Federal Public Defender, Portland, Oregon, for the petitioner-appellant.

Hardy Myers, Attorney General for the State of Oregon, Mary H. Williams, Solicitor General (On the Briefs); Jennifer S. Lloyd, Attorney-In-Charge, Collateral Remedies and Capital Appeals Unit, Salem, Oregon (Argued), for the respondent-appellee.

## ORDER

The majority opinion, concurring opinion, and dissenting opinion filed on July 28, 2008, slip op. 9397, and appearing at 534 F.3d 1128 (9th Cir. 2008), are withdrawn. A new majority opinion, concurring opinion, and dissenting opinion are filed contemporaneously with this order. With the filing of the new opinion, Judge Reinhardt and Judge Berzon vote to deny the petitions for rehearing and rehearing en banc. Judge Bybee votes to grant the petitions for rehearing and rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. Fed. R. App. P. 35. Judge Graber

was recused. The petitions for rehearing and rehearing en banc are denied. No future petitions for rehearing or rehearing en banc will be entertained.

---

## OPINION

REINHARDT, Circuit Judge:

Randy Moore's taped confession was obtained by the police at the station house by means that even the state concedes were unconstitutional. It does not contest on this appeal the district court's finding that Moore's confession was involuntary. As the Supreme Court has declared emphatically, "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)). Inexplicably, Moore's lawyer failed to recognize that the confession to the police was inadmissible, even though it was unconstitutional for not one but two separate reasons.

Counsel's explanation for not filing the motion was, in his words, "two-fold." First, he thought such a motion would not have succeeded because Moore was not in custody when he gave his confession and his confession was voluntary—both clearly erroneous conclusions: the confession was impermissibly extracted as the result of a promise of leniency made by the interrogating officers, and it was also obtained in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981), as Moore had asked for counsel before making the confession but his request had been ignored. Second, Moore's lawyer erroneously thought that the taped confession was not prejudicial because Moore had told his brother and his half-brother's girlfriend about the crime. In both respects, Moore's lawyer exhibited a remarkable lack of familiarity with, or basic mis-

understanding of, controlling principles of constitutional law. As a result of his ineptitude—and, as his affidavit makes crystal clear, *not* because of any strategic reasons—he failed to make a motion to suppress the unconstitutionally obtained confession. Having determined not to file the motion, counsel advised Moore that a plea to felony murder was "the best [they] could do under the circumstances," and Moore pled no contest to that charge.

The state makes the same error as Moore's counsel. It urges that the failure to move to suppress Moore's taped confession to the police was not prejudicial because Moore had told two others about the crime, and *only* because he had done so. Unlike our highly imaginative and creative dissenting colleague, the state does *not* argue that it possessed other evidence, aside from the two other confessions, that rendered the failure to file the motion harmless. In fact, perhaps mindful of *Fulminante*'s command that, in cases such as this, reviewing courts "exercise extreme caution" before determining that the failure to move to exclude unconstitutional confessions is harmless, 499 U.S. at 296, the state does not challenge on any basis other than his statements to others Moore's assertion that the ineffectiveness of his counsel necessarily undermines our confidence in the outcome of the proceedings. Here, *Fulminante*'s dictate is all the more compelling because, unlike in *Fulminante*, where the challenged confession was made informally to a not particularly reliable layman, the confession at issue is recorded, is in Moore's own voice, and was made in the formal context of a police interrogation.

In the end, there can be no serious doubt that Moore's counsel was ineffective and that Moore was deprived of his basic constitutional rights under the Sixth Amendment, as clearly established in *Strickland v. Washington*, 466 U.S. 668 (1984). The state court, following the same rationale advanced by the State and Moore's counsel, concluded that Moore's recorded confession to the police was non-prejudicial because of his prior statements to others, a conclu-

sion that is contrary to the clearly established law of *Fulminante*. But for counsel's failure to move to suppress his involuntary confession, there is a reasonable probability that Moore would not have pled to the felony murder charge but would have instead insisted on going to trial—a trial at which he would have faced a potential sentence identical to that he received as a result of his plea bargain. Counsel's performance fell below an objective standard of reasonableness. Because we hold that the state court's rejection of Moore's federal constitutional claim was contrary to *Fulminante*, 499 U.S. 279, and constituted an objectively unreasonable application of *Strickland*, 466 U.S. 668, we reverse the district court and remand for issuance of the writ.[1]

## I.

In December 1995, petitioner Randy Moore, his half-brother Lonnie Woolhiser, and his friend Roy Salyer were allegedly involved in the assault, kidnapping, and death of

---

[1]The dissent, disregarding *Fulminante*'s commands, creates its own version of harmlessness in this case. It envisions a record that shows that the police were aware of a set of facts that would make conviction of felony murder inevitable regardless of the confession and its fruits, that counsel also knew these facts wholly aside from what his client told him, and that all the overwhelming evidence the dissent posits was obtained from sources unrelated to Moore's and his co-defendant's unconstitutional confessions. Not only is there no evidence to support the dissent's wishful thinking as to the ideal set of facts that might have been, but are not, reflected in the record, but the dissent's analysis bears no resemblance to the issues or arguments raised by the state on appeal, the facts and circumstances found by the state post-conviction court, or the grounds upon which that court based its decision. Moreover, in a last gasp effort to save an unlawful conviction, the dissent represents that counsel failed to move to suppress the unconstitutional confession for reasons—strategic ones— that counsel's own affidavit makes clear were not reasons that motivated him. We recognize that our dissenting colleague believes that Moore deserves to be convicted, but disregarding the state's arguments as well as the state court record and findings, and substituting one's own, is hardly the manner in which federal appellate courts are supposed to determine appeals.

Kenneth Rogers. After arresting Salyer and booking him in the county jail, the investigating police officers asked Moore and Woolhiser to come to the police station for questioning. The two were separated and interviews were conducted by different police detectives. Moore provided a brief statement about stopping by Rogers's motor home, waiting while Woolhiser and Salyer went in to talk to Rogers, and then leaving with Woolhiser and Salyer. After making this statement, Moore was advised of and invoked his *Miranda* rights. Subsequently, as the district court found, both Moore and Woolhiser were released on the condition that they speak with their older brother Raymond Moore ("Raymond"), and return to the station at 1:00 p.m. the following day.

The police officers had good reason for directing Moore and Woolhiser to speak with Raymond. Raymond had a personal and working relationship with the investigating officers. Moreover, these officers had been involved in the investigation of a murder charge against Raymond that resulted from a separate killing. The charge was dropped when Raymond cooperated with the officers and explained that the killing was perpetrated in self-defense. Raymond testified later that because Moore and Woolhiser told him that Rogers's death was an accident, he believed that the police officers would do the same for his brother and half-brother as they had for him, if they cooperated in the same manner he had.

The next day, after speaking with Raymond, Moore and Woolhiser spent the morning unsuccessfully trying to obtain legal representation. When they called the police station at 1:10 p.m., the police promptly ordered them to return for further questioning: "they told us that if we were not there by 3:00 they would come get us—[ ] and our family would not like the way they did it and they—we knew what they meant." In accordance with the police officers' commands, Moore and Woolhiser returned to the police station that afternoon, without counsel. They were accompanied by Raymond, and also by Woolhiser's girlfriend, Debbie Ziegler.

When the four arrived at the police station, the investigating officers began another round of questioning. Moore interrupted at the very beginning of that questioning to request counsel: "You see . . . until I, I have to be able to talk to somebody that's on my side, you know, for me, to be able to go tell nobody . . . I don't trust my judgment right now." When the police officers ignored Moore's request, Woolhiser reiterated by stating, "You know, we'd just like to talk to somebody, you know." Moore then stated that he wanted to, "[a]s quick as possible, talk to a lawyer," which was followed by Raymond's confirmation of that request: "If there was some way we could maybe get an attorney in here for a consultation." Eventually, in response, the police officers told Moore and Woolhiser that they were not entitled to counsel at that time unless they could afford it themselves. The police officers then promptly proceeded with the interrogation.

During the interrogation, the police officers told Moore and Woolhiser that they "would go to bat for [them] as long as [they] got the truth," to which Moore responded: "See that's what I want to hear." At this point, Raymond interrupted the questioning to vouch for the officers' assurances, stating that "I know in my, this is for myself, saying, there was once an officer, and I said hey, look, I want out, I did something and been doing something. I want out of this, I want a chance. And this officer said, okay, Ray, I'll go to bat for you. And that officer's your captain." Building on Raymond's account, one of the interrogating officers asked, "But he did go to bat for you[?]," to which Raymond responded, "That's exactly right . . . . I talked to him and he stood behind his word one hundred percent and he's probably one of the best friends I have in the world."

After Raymond's comments, the interrogating officers emphasized that the police could be similarly helpful to Moore and Woolhiser if they confessed. Moore first hesitated, but then indicated that he would be willing to talk. At this point, one of the officers told Moore, "Okay, so that you

know you're going to get a fair shake from us alright, I want to verify that with our DA that he is not going and [sic] turn around and jam you. I want him to tell me right now on the phone that you can change your mind and he will accept it. So there's no jammin' down the road, okay?" The officer then left to obtain the verification that the DA would not "jam" Moore so long as he confessed.

When the officer returned, he told Moore that he had spoken with the DA—"our Deputy DA actually"—and then proceeded to elicit Moore's confession. Before doing so, however, he extracted several statements from Moore regarding his custody status and the voluntariness of the confession he was about to give. In response to a series of questions, Moore agreed with the officers that he had voluntarily returned to the police station, that he was not in custody, that the police had offered nothing in exchange for his confession other than that they would make a "recommendation[ ]" to the District Attorney, and that he understood his right to counsel and was waiving it.[2] In short, as one of the interrogating officers explained: "[t]he main thing is we want everybody on this recording to know that you guys are not in custody . . . [a]nd this is not an . . . in custody interrogation type of thing."

In the recorded confession that he then made, Moore described how he, Salyer, and Woolhiser went to Rogers's home after Salyer informed the two that Rogers had stolen property from his cabin. Moore stated that Woolhiser confronted Rogers about the theft, assaulted him, and placed him

---

[2]Although the officers continued their efforts to obtain answers to their questions, they acknowledged, after their call to the District Attorney, that they had been "wrong" in earlier informing Moore that he was entitled to a lawyer only if he could afford one; immediately before Moore gave his statement, the officers stated that if Moore wanted a "court appointed attorney [he could] have one at this time," but that if he wanted to "go ahead and talk" with the officers, he could do that instead. This statement, of course, conflicts with the state's representation that Moore was not in custody.

in the trunk of a car. They then drove Rogers to a remote wooded area and began to walk him blindfolded up a hill. At some point during this walk, Woolhiser handed Moore a loaded gun. Moore explained that they had no intention of killing Rogers; they were simply going to frighten him by leaving him on top of the hill and forcing him to find his way back home. As the four climbed the hill, however, Rogers stumbled and fell back into Moore, causing the gun in his hands to discharge. As a result, Rogers died of an accidental gunshot wound to the head.

Following his confession, Moore was appointed counsel and charged with one count of felony murder with a firearm. He entered a plea of no contest, and was given a mandatory sentence of twenty-five years imprisonment, with five years to be served concurrently as a sentencing enhancement for the use of a firearm, in addition to a life term of post-prison supervision.[3] Moore appealed his sentence to the Oregon Court of Appeals, which affirmed without opinion, and to the Oregon Supreme Court, which denied review. *State v. Moore*, 951 P.2d 204 (Or. Ct. App. 1997), *rev. denied*, 953 P.2d 395 (Or. 1998).

Shortly thereafter, Moore filed a petition for state post-conviction relief, alleging, *inter alia*, that he had been denied effective assistance of counsel because his lawyer had failed to file a motion to suppress his confession. The state court held an evidentiary hearing at which Moore and his brother Raymond testified. Raymond recalled that the detectives

---

[3]Moore was sentenced under what is termed "Measure 11." Approved by Oregon voters in November 1994, Ballot Measure 11 imposed lengthy mandatory minimum sentences, with no possibility of reduction, for certain crimes against persons, including felony murder. Act effective June 30, 1995, ch. 421, sec. 1, 1995 Or. Laws 1072 (codified as amended at Or. Rev. Stat. § 137.700 (2003)) (listing crimes covered by Measure 11). Further, under such a sentence, Moore was not eligible "during the service of the term of imprisonment . . . for release on post-prison supervision or any form of temporary leave from custody." *Id.*

"made it appear" that Moore and Woolhiser were not in custody, but that it was clear from the circumstances that they were not free to leave. He also testified that he advised the pair to confess their involvement in Rogers's death because he understood that the police had promised leniency: "[B]asically what I had deducted [sic] from what they had said was that they would work for [Moore] like they had worked for me to change my life around."

Moore also testified that he understood the officers' statements to be an assurance that his crime would be charged as an accidental killing rather than felony murder. He stated that the officers "left me believing that the D.A. had agreed not to jab us down the road . . . . [W]hen the detective went and talked to the D.A. to make sure he wasn't going to jab me, I thought there was an agreement that they were going to charge me with accidental death and the D.A. had agreed to it because he didn't come back saying that he did not agree, and that's what he went there for." Moreover, Moore explained that during the interrogation, he did not feel free to leave, in part because detectives had made it clear on the evening prior to the interview that Salyer had already been charged and that they were going to be booked that day.

After the evidentiary hearing, the state court filed an unpublished order denying Moore's post-conviction petition. With regard to the ineffective assistance of counsel claim, the state court first concluded that it was reasonable for counsel to believe that a motion to suppress would be without merit. In so finding, the state court relied on counsel's affidavit, which asserted that because Moore admitted on tape that he was not in custody and "never believed that he was in custody," there was no merit to the claim that the police officers improperly denied him counsel in a custodial interrogation. The state court further found that the officers' questions regarding custody would have constituted notice to a reasonable person that he was free to leave and was not being held in custody. As a result, the state court found that there "was

no basis for filing a motion to suppress." It did not mention the involuntariness claim.

Relying solely on the affidavit of Moore's trial counsel, the state court further reasoned that even if a motion to suppress had been filed and granted, it would have been "fruitless" because Moore "had previously confessed his participation in the crime to his brother (Raymond Moore) and another friend [Debbie Ziegler]." From this, the state court concluded that Moore suffered no prejudice because "[b]oth Raymond Moore and [Ziegler] could have been called as witnesses to repeat petitioner's confession." It made no findings as to what Moore had told Raymond or Ziegler about the crime or as to the specific facts to which they might have been able to testify. Specifically, the state court did not determine whether Moore simply confessed to the two laymen that he had killed the victim accidentally, or whether his informal confession covered all of the elements required to prove a felony murder. The state court found only that Moore had "confessed" to them. Based on the above, the state court held that counsel's failure to file a motion to suppress his taped confession did not constitute ineffective assistance of counsel. The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *See Moore v. Palmateer*, 26 P.3d 191 (Or. Ct. App. 2001), *rev. denied*, 30 P.3d 1184 (Or. 2001).

In December 2001, Moore petitioned the United States District Court for the District of Oregon for a writ of habeas corpus. He raised, *inter alia*, the ineffective assistance of counsel claim that was denied in the state courts. Adopting the magistrate judge's findings and recommendation, the district court found that the state court was not unreasonable in concluding that Moore was not in custody at the time of his request for counsel, but that he had "confessed to Rogers' murder based on [a] false promise" of leniency, which "rendered [his] confession involuntary." Nevertheless, the court concluded that "counsel's failure to seek suppression did not necessarily fall

below an objective standard of reasonableness" because of Moore's prior confessions to Raymond Moore and Debbie Ziegler and the potential adverse testimony of Salyer.[4] On that basis, the district court ultimately held that the post-conviction court's conclusion that there had not been a constitutional violation was "neither contrary to, nor an unreasonable application of, *Strickland v. Washington*."

This appeal followed. Because the state does not contest the district court's finding that Moore's confession was involuntary, and because we conclude that the state court unreasonably erred with respect to its finding of "no prejudice," we

---

[4]We consider the issues regarding Raymond Moore and Debbie Ziegler later in our opinion. We note here, however, that the district court clearly erred with respect to Salyer. There is no evidence in the record to suggest that the state could have or would have relied on Salyer's testimony. Certainly, it makes no such assertion on appeal. Indeed, until the district court made the *sua sponte* determination regarding Salyer, no interested party— the state court, Moore's trial counsel, or the state itself—had suggested that the taped confession was non-prejudicial because of Salyer's potential testimony. Moreover, in light of the Supreme Court's recognition of the inherent unreliability of a co-defendant's testimony, the state would certainly not have believed that, without Moore's taped confession, Salyer's testimony could have given it the same chance of obtaining a conviction. *See, e.g., Lee v. Illinois*, 476 U.S. 530, 545 (1986) ("[A] codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."); *see also Crawford v. Washington*, 541 U.S. 36, 59 (2004) (explaining that *Lee v. Illinois* "is not . . . contrary" to modern Confrontation Clause jurisprudence). Under these circumstances, it was mere supposition for the district court to suggest that Salyer would be able to offer sufficient inculpatory testimony to render the failure to suppress Moore's formal confession non-prejudicial. Most important of all, however, there can be little doubt that Salyer would not have testified against Moore but would have taken the Fifth Amendment, as he faced a trial himself on charges arising from the same incident. Even had Salyer been convicted before Moore's trial began, he would in all likelihood have taken the Fifth because he continued to challenge his conviction all the way through 2005, when his federal habeas petition was denied, *see Salyer v. Belleque*, 2005 WL 555403 (D. Or. Mar. 4, 2005).

reverse. We hold that the state court's adjudication of Moore's claim "resulted in a decision that . . . involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), and remand to the district court with instructions to grant the writ of habeas corpus.

## II.

This court reviews *de novo* the district court's decision to deny a petition for a writ of habeas corpus. *See DePetris v. Kuykendall*, 239 F.3d 1057, 1061 (9th Cir. 2001). Factual findings relevant to the district court's decision to grant or deny the petition are reviewed for clear error. *See Solis v. Garcia*, 219 F.3d 922, 926 (9th Cir. 2000). Moore's federal habeas petition was filed after April 24, 1996, and is therefore governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. *Woodford v. Garceau*, 538 U.S. 202, 210 (2003). Under AEDPA, we may grant habeas relief only when the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).[5] "[C]learly established Fed-

_____

[5]Although we can overturn a state court's decision only if it is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, decisions from this court and other circuits are of persuasive weight in regard to "whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and . . . what law is 'clearly established.' " *Duhaime v. DuCharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). This is especially true if the fact pattern of the lower court decision is substantially similar to the case being decided. *See Ouber v. Guarino*, 293 F.3d 19, 26 (1st Cir. 2002) ("To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue." (internal quotation

eral law" includes only the Supreme Court's "applicable holdings," not its dicta. *See Carey v. Musladin*, 127 S. Ct. 649, 653 (2006). There need not be a narrow Supreme Court holding precisely on point, however—a state court can render a decision that is "contrary to" or an "unreasonable application" of Supreme Court law by "ignoring the fundamental principles established by [that Court's] most relevant precedents." *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1671 (2007).

A state court's decision is " 'contrary to' federal law if it fails to apply the correct controlling Supreme Court authority or comes to a different conclusion . . . [from] a case involving materially indistinguishable facts." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an "unreasonable application" of Supreme Court law if "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694. The Supreme Court has held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

The substantive federal law guiding our inquiry is supplied by *Strickland v. Washington*, 466 U.S. 668 (1984), which is "clearly established Federal law" under AEDPA. *Williams*, 529 U.S. at 391. To prevail on a claim of ineffective assistance of counsel under *Strickland*, Moore must demonstrate both that his counsel's representation was deficient—in other

---

marks and citation omitted)). Prior decisions of this court that make it clear that we are applying clearly established Supreme Court law or that a particular application of Supreme Court law is unreasonable constitute binding precedent on that point. Otherwise, were an identical case to come before us the following month, we would have to undertake the identical analytical exercise all over again, instead of simply relying on the fact that we had just done so and had already resolved the question.

words, that it "fell below an objective standard of reasonableness"—and that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687-88, 692. To show prejudice, Moore must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[6] *Id.* at 694. In the context of a plea bargain, we specifically ask whether there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have gone to trial rather than accept the plea bargain offered by the state. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Because Moore's claim involves the failure to suppress a confession, the prejudice question is governed by *Fulminante*, 499 U.S. 279, the guiding Supreme Court precedent on the harmlessness of an erroneously admitted confession. As *Fulminante* commands, we must "exercise extreme caution" before determining that the failure to move to suppress a coerced confession was nonprejudicial. *Fulminante*, 499 U.S. at 296.

## III.

We address *Strickland*'s performance prong first. In Part III.A, we consider whether Moore's attorney rendered deficient performance in failing to file a motion to dismiss Moore's confession. Moore's counsel provided two reasons why he did not file such a motion: first, he believed that a motion would not be meritorious, and second, he believed that even if a motion were to succeed, it would make no difference to the outcome because Moore had confessed informally to

---

[6]For *Strickland* claims, it is unnecessary to conduct a harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002) ("We need not conduct a harmless error review of *Strickland* violations under *Brecht* . . . , because '[t]he *Strickland* prejudice analysis is complete in itself; there is no place for an additional harmless-error review.' " (quoting *Jackson v. Calderon*, 211 F.3d 1148, 1154 n.2 (9th Cir. 2000))); *see also Kyles v. Whitley*, 514 U.S. 419, 435-36 & n.9 (1995).

two lay persons. As noted above, the state does not dispute on appeal that a suppression motion would have been meritorious. Thus, the sole issue as to deficient performance is whether counsel's conclusion that a motion to suppress Moore's formal, taped confession would have been purposeless in light of his two informal confessions "fell below an objective standard of reasonableness." Because this question is essentially one of prejudice, our deficient performance analysis turns largely on whether counsel's failure to move to suppress the taped confession affected the outcome of the plea process. We conclude, in Part III.B, that it did. Thus, because both of counsel's stated reasons for not filing the motion were patently erroneous, and because the detailed, taped confession Moore gave to the police was highly damaging, we hold that counsel's performance "fell below an objective standard of reasonableness" and, as such, was constitutionally deficient. For the reasons explained below, we also hold that the state court's conclusion that counsel's failure to file the motion was not prejudicial was contrary to *Fulminante* and constituted an unreasonable application of *Strickland* and *Hill*.

### A.    *Deficient Performance*

The Supreme Court has clearly established that "a single, serious error may support a claim of ineffective assistance of counsel"—including counsel's failure to file a motion to suppress. *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986). In applying the deficient performance prong of *Strickland* to cases in which the alleged ineffective assistance consists of counsel's failure to file such a motion, the Court has stated that the underlying claim—the claim purportedly requiring suppression—must be "meritorious." *Id.* at 375, 382; *see also Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) (same). However, "the failure to file a [meritorious] suppression motion does not constitute *per se* ineffective assistance of counsel." *Kimmelman*, 477 U.S. at 384; *see also id.* at 382 ("Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim

[involving counsel's failure to file a motion to suppress], a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief."). Rather, to satisfy *Strickland*'s performance prong, the habeas petitioner must show that his counsel's failure to file the meritorious motion to suppress "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Where, as here, the state asserts that filing a motion to suppress, even if meritorious, would have served no useful purpose because other evidence in its possession would establish the same facts, our inquiry with respect to deficient performance substantially overlaps with our inquiry regarding prejudice.[7]

In his affidavit, Moore's trial counsel stated two reasons and two reasons only for his decision not to file a motion to suppress (or, as counsel put it, his reasons for not filing a motion were "two-fold"): First, counsel believed that such a motion "would be unavailing"—i.e., not meritorious— because Moore "was not in custody at the time he gave the recorded interview and . . . the statement was voluntary." Second, counsel believed that, even if a motion to suppress Moore's confession were meritorious, filing it would make little difference because Moore "had previously made a full confession to his brother and to Ms. Ziegler, either one of whom could have been called as a witness at any time to repeat his confession in full detail." We hold that both of counsel's reasons for not filing the motion—that the motion was not meritorious on either ground, and that, even if it were, it would have served no purpose because of the other confessions—were erroneous. Given the highly damaging nature of Moore's taped confession to the police and the

---

[7]The dissent characterizes our holding in this case as mandating that defense counsel must file any meritorious suppression motion. *See, e.g.*, dis. op. at 9838, 9841, 9850 & 9851 n.10. As the text notes, *Kimmelman* rejects that proposition, and so do we. As our later discussion indicates, *see infra* nn. 16, 20, there may be a valid reason why a competent lawyer might not file a potentially meritorious suppression motion, but Moore's counsel offered none here.

unconstitutionality of that confession, we hold that counsel's failure to move to suppress the confession "fell below an objective standard of reasonableness" and thus constituted deficient performance, and that the state court's conclusion to the contrary was contrary to *Fulminante* and an unreasonable application of *Strickland*.

1. The state has conceded that a motion to suppress Moore's confession on involuntariness grounds would have been meritorious.

[1] Moore urges two grounds on which a motion to suppress his confession would have been meritorious: first, that his confession was procured during a custodial interrogation, after Moore had invoked his right to counsel, in violation of *Edwards v. Arizona*, 451 U.S. 477; and second, that his confession was involuntary, having been extracted as the result of a promise of leniency made by the interrogating officers. The state court concluded that a motion to suppress on the *Edwards* ground would not have been meritorious because Moore "was not in custody when he gave his statement." It did not, however, address the involuntariness question.[8] On federal habeas review, the district court agreed with the state court with respect to the *Edwards* issue but found that a motion to suppress would have been meritorious on the involuntariness ground.[9] Critically, the state does not challenge the

---

[8]It is unclear why the state court failed to address the involuntariness ground. Nevertheless, both parties agree that this issue was raised at the state court and therefore that it is properly before us.

[9]Specifically, the district court found that

[a] reasonable person in [Moore]'s position would have concluded that an offer of leniency had been extended in exchange for a confession. It is clear [Moore ] subjectively believed that this offer was made, and confessed to Rogers' murder based on this false promise. The false promise of leniency, made entirely believable by the continual references and comparison's to [Raymond]'s prior situation, rendered [Moore]'s confession involuntary.

district court's determination on appeal. Thus, although we
would ordinarily review the district court's factual findings
for clear error, here we simply accept as correct the district
court's finding that Moore's confession was involuntary—
and, consequently, that a motion to suppress would have been
meritorious on that ground.[10] Accordingly, we will not engage
in an extensive discussion as to why a motion to suppress
would also have been meritorious if based on the ground that
Moore was in custody and had asked for, but not been
granted, his right to counsel prior to the interrogation. How-
ever, because counsel's error on this ground buttresses our
conclusion that his performance was highly deficient, we set
forth briefly in the footnote appended hereto the reasons we
conclude that counsel's failure to file on the *Edwards* ground
was also objectively unreasonable.[11]

---

[10]We note, however, that had the state contested the district court's vol-
untariness determination, we could not conclude that the district court had
erred, let alone clearly erred, in finding that Moore's confession was made
in response to a false promise that the charges against him would be
reduced if he confessed to accidentally killing Rogers. The officers repeat-
edly told Moore that they would "go to bat for him" if he confessed. More
important, the officers reminded Moore of the experience of his brother
Raymond, whose murder charges had been dismissed at their instigation
when Raymond explained that the killing was accidental, and used Ray-
mond's own personal reaffirmation of the events to convince Moore that
his treatment would follow in the same vein. Throughout the interrogation,
the officers implied that if he agreed to talk, Moore would receive the
same treatment his brother did—that is, that the charges against him would
be dropped, or, more likely, reduced from murder to a lesser offense. The
officers also purported to clear the arrangement with the District Attorney,
reassuring Moore that he would be taken care of as long as he told the
truth. Given these facts, we fully agree with the district court's conclusion
that the officers created an implied promise that Moore would not be
charged with intentional murder or felony murder if he confessed to Rog-
ers's accidental killing, and that this promise was "sufficiently compelling
to overbear [Moore's] will." *United States v. Leon Guerrero*, 847 F.2d
1363, 1366 (9th Cir. 1988); *see Haynes v. Washington*, 373 U.S. 503,
513-14 (1963).

[11]Counsel's rationale for not moving to suppress on the *Edwards* ground
was that Moore was not in custody when he was interrogated and con-

2. Counsel's failure to file a meritorious motion to suppress Moore's confession "fell below an objective standard of reasonableness" and thus constituted deficient performance.

**[2]** Having determined that a motion to suppress Moore's confession, had it been filed, would have been meritorious, we must now consider whether counsel's failure to file such a suppression motion was objectively unreasonable. We conclude that it was.

**[3]** Counsel's only explanation for not filing a motion to suppress, aside from his erroneous conclusion that such a motion lacked merit, was that he believed that suppressing Moore's taped confession to the police would be futile because Moore had also confessed to his brother and half-

---

fessed after he unsuccessfully invoked his right to counsel. The record clearly demonstrates the contrary, however. Moore had already been subjected to a custodial interrogation the previous day, a fact the state does not dispute. He was released from custody only on the condition that he return the following afternoon, when, the police told him, he would be formally booked. Moore was further informed the next day that if he and Raymond did not arrive at the station on time, the police "would come get [them] . . . and [their] family would not like the way they did it." At the station, the police told Moore that Salyer had already been charged and indicated that he too would be formally arrested and charged later that day. Faced with these facts, it is clear that a reasonable person in Moore's position—i.e., a person who knows that he is a prime suspect in a killing, that he will be booked, charged with murder, and placed in jail later that day, and that his co-defendant had already been charged—would not have believed that he was free to leave. Thus, there can be no doubt that Moore was in fact in custody when he was interrogated and confessed, *see Yarborough v. Alvarado*, 541 U.S. 652, 661-63 (2004); *United States v. Leyva*, 659 F.2d 118, 120 (9th Cir. 1981), and that a motion to suppress on this ground would also have been meritorious. In concluding that Moore was not in custody, counsel erroneously and unreasonably relied on Moore's post-invocation statements and subjective opinion in violation of the clearly established law of *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984) (per curiam), and *Stansbury v. California*, 511 U.S. 318, 323 (1994).

brother's girlfriend, and that "either one of [them] could have been called as a witness." Counsel's explanation is essentially an argument about prejudice: he did not file a motion to suppress, he asserts, because doing so would have made no difference in light of Moore's confession to his brother and to Ziegler. For reasons we explain in the prejudice section of this opinion, *infra* Part III.B, we reject counsel's determination that suppressing Moore's formal, taped confession to the police was purposeless because of the two informal confessions.

**[4]** Counsel's decision not to file a motion to suppress was doubly erroneous: he both failed to recognize the clear merit of that motion on two grounds and failed, notwithstanding the clear teaching of *Fulminante*, to assess properly the damaging nature of the tape-recorded formal confession. Thus, because we squarely reject both reasons Moore's counsel offered to explain his decision not to file a motion to suppress, and because the confession unconstitutionally obtained by the police was so critical to the prosecution and so damaging to Moore, we hold that counsel's failure to file a motion to suppress the confession "fell below an objective standard of reasonableness" and, accordingly, constituted deficient performance. The state court's opposite conclusion was contrary to *Fulminante* and constituted an unreasonable application of *Strickland*.

The dissent argues that counsel's performance was not deficient because "[e]ven assuming the involuntariness of Moore's confession, counsel gave a detailed explanation why pursuing the plea was in Moore's strategic interest." Dis. op. at 9852. Whatever "strategic interests" the dissent might project onto counsel's thought process post hoc, counsel's "detailed explanation," put forward in his affidavit, makes clear these were *not* the considerations upon which he based his decision not to file a motion to suppress. As explained above, counsel provided only two reasons for that decision, both of

which were erroneous and objectively unreasonable.[12] At no time did counsel suggest that he did not file the motion to suppress because he was concerned about the effect that doing so would have on Moore's plea deal or for any other "strategic" reason, and neither the state court nor the district court even hinted that counsel's failure to file the motion was based on any such consideration. Nor did the state itself so suggest at any time during this litigation and, of particular significance, it does not do so on this appeal. Only our dissenting colleague offers such a contention, and does so initially on this appeal and directly contrary to the facts in the record.

All the "strategic interests" the dissent says counsel might have relied on—namely, counsel's calculations regarding the

---

[12]Counsel's explanation of why he did not move to suppress Moore's confession is set forth in its entirety at paragraphs 3 and 4 of his affidavit. This explanation is as follows:

> 3. I did not file a Motion to Suppress. My reasons for doing this were two-fold. First of all, petitioner's interview with the police, which was taped and transcribed, a copy of the transcription is attached to this affidavit, makes it abundantly clear that Mr. Moore was not in custody. He never believed that he was in custody and admitted to me that he realized he was not in custody when he and his brothers and another friend voluntarily came to the police department to give the recorded statement. The law as I understood it then and now is exemplified by *State ex rel Juv. Dept. v. Loredo*, 125 Or App 390, and *State v. Smith*, 310 Or 1.

> 4. In addition, however, Mr. Moore had previously given a full confession to his brother Raymond Moore and to a woman named Debbie Ziegler. Mr. Moore and I discussed the possibility of filing a Motion to Suppress and concluded that it would be unavailing, because in the first place, he knew he was not in custody at the time he gave the recorded interview and that the statement was voluntary, and in the second place, he had previously made a full confession to his brother and to Ms. Ziegler, either one of whom could have been called as a witness at any time to repeat his confession in full detail.

No other portion of counsel's affidavit offers any reason for his failure to file the motion. *See* Appendix B.

charges Moore likely would have faced had he foregone the plea and his probability of success at trial—were factors counsel set forth in a wholly unrelated portion of his affidavit, calculations that related to a wholly different question. These "strategic interests" were offered by counsel not in explanation of his failure to file the motion to suppress, but solely in justification of his *advice to Moore to enter into the plea bargain*. Given counsel's specific explanation for his decision not to file a motion to suppress, that decision necessarily preceded and ultimately played a part in counsel's calculations regarding the plea offer. Those calculations were influenced by his decision on the motion, and are only as good as that decision.[13] Thus, we must consider whether counsel's decision not to file a motion to suppress Moore's confession met the "objective standard of reasonableness" required of competent counsel.[14]

---

[13]In its effort to present counsel's suppression decision as contemporaneous with the plea negotiations, the dissent asserts that "[c]ounsel simply could not have moved to suppress a confession at any time before the plea" because "Moore was never indicted, but [rather] pled no contest to an information negotiated as part of the plea." Dis. op. at 9849-50. The fallacy of this reasoning is obvious: there is no doubt that had Moore's counsel decided to suppress the confession prior to entering plea negotiations he would have been able to do so. He need not have "*threaten[ed]* to file such a motion in the plea negotiations," *id.*; he simply could have waited for the clearly forthcoming charges to be filed, at which point he could have moved to suppress the confession. Instead, he decided, incorrectly, that a suppression motion would be unmeritorious, and, after making that erroneous conclusion, proceeded to plead his unindicted, uncharged client to felony murder. Counsel's determinations throughout the process were based on the erroneous premise that his client would be confronted with a recorded confession to the police that would assure a conviction regardless of all else. Such a course of conduct falls far short of "meticulous, informed representation." *id.* at 9849.

[14]For this reason, the dissent's invocation of *McMann v. Richardson*, 397 U.S. 759 (1970), is misplaced. Moore's challenge is not to counsel's plea advice, as was the case in *McMann*, but to counsel's failure to file a motion to suppress. This challenge to the failure to file a motion is a valid *Strickland* claim clearly recognized by the Supreme Court in *Kimmelman*. *See Van Tran v. Lindsey*, 212 F.3d 1143, 1156 (9th Cir. 2000) ("The Supreme Court has held that counsel's failure to file a motion to suppress

In quoting at length the remainder of Moore's counsel's affidavit—the passages that are unrelated to counsel's failure to file the suppression motion—the dissent attempts to obfuscate the issue by equating counsel's failure to file the motion with his advice to accept the proposed plea agreement. *See* dis. op. at 9847 (discussing the "strong and obvious strategic reasons to *take the plea and forego the suppression motion*"); dis. op. at 9848 ("[C]ounsel's advice to *forego the motion and take the plea* was based on numerous considerations other than these two factors."); dis. op. at 9850 (discussing the "obvious strategic reasons . . . that counsel had *to advise Moore to take the plea*"). As counsel's affidavit makes plain, however, while the decision not to file the motion to suppress influenced counsel's separate advice to take the plea, the two decisions were distinct and the former was not influenced by the latter. *But see* dis. op. at 9849-50.

The deficiency in the dissent's reasoning becomes all the more apparent once we actually consult the record. The dissent argues that counsel's "strategic" decision to pursue a plea agreement was reasonable because "counsel feared severe

_____

evidence can provide the basis for a claim of ineffectiveness." (citing *Kimmelman*)), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003). We have repeatedly recognized such *Kimmelman*-type *Strickland* claims ever since *Kimmelman* was decided more than twenty years ago, *see Ortiz-Sandoval*, 323 F.3d at 1170; *Van Tran*, 212 F.3d at 1156-57; *Lowry v. Lewis*, 21 F.3d 344, 345-47 (9th Cir. 1994); *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991), and we have done so in cases in which the defendant pled rather than going to trial, *see Weaver v. Palmateer*, 455 F.3d 958, 972 (9th Cir. 2006); *Langford v. Day*, 110 F.3d 1380 (9th Cir. 1997), *amending on denial of reh'g and reh'g en banc* 102 F.3d 1551 (9th Cir. 1996). Here, as in *Langford* "the focus is not on an attorney's advice to plead guilty; it is on [the attorney's performance] . . . regarding possible defenses." *Langford*, 102 F.3d at 1386. As such, apart from the fact that *McMann*'s standard of attorney competence was the precursor to *Strickland*'s deficient performance prong, *see Strickland*, 466 U.S. at 687, *McMann* is simply inapposite to this case, which is about suppression, not plea advice.

consequences if his client went to trial." Dis. op. at 9846. Specifically, in the dissent's version of the record, the severe potential consequences included a possible "conviction of *aggravated* murder, [which] would have subjected Moore to the possibility of the death penalty or life imprisonment without the possibility of parole." *Id.* at 9847 (emphasis added). However, as is the case with much of the dissent, the "severe consequences" that Judge Bybee retrospectively injects into counsel's thought process were *not* the consequences that counsel actually contemplated. To the contrary, as counsel's affidavit makes clear, he "believed [that] if [Moore] went to trial he would be found guilty of assault, kidnapping, and murder (as was his codefendant, Roy Salyer, who chose trial as an option)." Appendix B at ¶ 17. Counsel feared that if Moore did not plead no contest, he would end up with the same sentence Salyer received after trial, but Moore and Salyer received *exactly the same* sentence: mandatory twenty-five year prison terms under Oregon's Measure 11. *See supra* n. 3; *see also Salyer v. Belleque*, 2005 WL 555403, at *1 (D. Or. Mar. 4, 2005). Therefore, the "severe consequences" that Moore's counsel feared, as opposed to those dreamed up by the dissent, amounted to precisely the same consequences that Moore actually faced under the "negotiated" plea agreement. Given this outcome, the dissent's reliance on the "reasonableness" of counsel's plea advice is doubly curious—not only does counsel's affidavit make clear that his decision regarding the motion to suppress was unrelated to his subsequent plea negotiations, but counsel hardly won a bargain that "was the best [he] could do under the circumstances," dis. op. at 9847, seeing as, by counsel's own admission, the plea bargain resulted in the same mandatory sentence that counsel thought would be the likely outcome of a full trial. In short, Moore's plea gained him nothing, just as counsel's failure to move to suppress the confessions was only to his client's detriment.

*Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009), does not suggest a contrary result. *Knowles* holds that trial counsel need not pursue a defense that he "reasonably conclude[s] . . .

[is] almost certain to lose." *Id.* at 1421. *Knowles* further explains that this is true even if the defendant has nothing to lose by presenting that defense. *Id.* at 1422. *Knowles* is entirely inapplicable here because Moore's counsel did not "reasonably conclude" that the motion to suppress was "almost certain to lose." Even the state has conceded that a motion to suppress Moore's confession would have succeeded. Further, Moore's counsel did not "reasonably" reach his erroneous conclusion, as he was entirely ignorant of the relevant law. Had Moore's counsel been reasonably informed about the law, he would have learned that Moore was almost certainly in custody at the time of his confession, *see supra* note 11; that Moore's confession was almost certainly involuntary, *see supra* note 10; and that the admission of Moore's confession would, as *Fulminante* explained, be deeply prejudicial notwithstanding Raymond and Ziegler's potential testimony, *see infra* pages 9795-98. In short, Moore's counsel failed to suppress the confession because he was ignorant of clearly established law regarding custody, volition, and the prejudicial effect of a defendant's confession. The incorrect, uninformed, and unreasonable decision made by Moore's counsel is a far cry from the Supreme Court's recognition in *Knowles* that a reasonable decision by counsel as to the merits of a defense does not constitute ineffective assistance.[15]

---

[15]Our dissenting colleague appears to believe that *Knowles* is relevant because, in *Knowles*, the Court requires no strategic justification for counsel's decision beside his reasonable conclusion that an insanity defense was certain to fail. Although a strategic reason may not be necessary for failing to make a motion that has no merit, it is certainly necessary when counsel fails to make a meritorious motion. As explained above, Moore's counsel did not forego the suppression motion for strategic reasons. Instead, he offered two reasons for failing to make the motion. One, he believed that the motion would fail. Two, he believed that suppression was worthless due to Raymond and Ziegler's potential testimony. Both reasons were based on counsel's ignorance of the law.

In crafting a strategic justification for trial counsel's failings, the dissent suggests that Moore "had a lot to lose" by rejecting the state's plea offer because "by going to trial he risked losing a lenient plea agreement and getting a far more severe sentence." Dis. op. at 9842. The record belies this claim: Moore's co-defendant Salyer went to trial on the same charges that Moore's counsel believed Moore would face, and Salyer received a sentence identical to Moore's.

The dissent's attempt to elide the issues and obfuscate counsel's reasons for failing to file a critical motion is directly contrary to what counsel himself stated under oath. So that no reader will be misled as to exactly what counsel's reasons were—and were not—for failing to file a motion to suppress, we attach as Appendix B to the opinion a full and complete copy of counsel's affidavit. Even if the objective of not impairing plea negotiations might have been a reasonable strategy supporting some other counsel's decision not to file a motion to suppress in some other case, it was simply not a reason that influenced Moore's counsel or that his counsel considered as a basis for his decision.[16] Nor has the state ever argued, or the state court ever suggested, at any level, that counsel had any such strategic consideration in mind. This is

---

[16]To be sure, we have held that a defense counsel's decision not to file a meritorious motion may constitute a reasonable strategic choice where counsel did so in order "not . . . to upend plea negotiations." *Weaver v. Palmateer*, 455 F.3d 958, 972 (9th Cir. 2006). That rule is of no relevance here, however. In such cases, the defendant had made clear in advance that he desired to plead rather than go to trial; thus, we emphasized, because the lawyer's conduct was *motivated* by his client's express wishes, his decision not to file a suppression motion so as to preserve the plea negotiations was a reasonable strategy. *Id.* (holding that counsel's failure to file a motion to exclude lineup identifications was reasonable "in light of [the defendant's] desire to plead guilty and avoid multiple public trials"); *Langford*, 110 F.3d at 1387 (holding that counsel's failure to pursue suppression of a confession was not deficient performance where the defendant had "insiste[d] . . . that he wanted no motions to suppress or other types of delay to interfere with his intended plea of guilty"); *see also Stankewitz v. Woodford*, 365 F.3d 706, 720 n.7 (9th Cir. 2004) ("An attorney's performance is not deficient where[ ] . . . it reflects a reasonable strategic choice that aligns with his client's wishes."). In this case, there is no suggestion, let alone any evidence, that Moore expressed a desire to plead guilty and avoid trial, or to forego the filing of his meritorious suppression motion, prior to counsel's decision not to file such a motion, nor did counsel ever suggest that his reason for not filing the motion was that it would have jeopardized or adversely affected plea negotiations. To the contrary, counsel's affidavit makes clear that his reasons for not filing the motion had nothing to do with the prospective plea negotiations. *See infra* Appendix B at ¶¶ 3-4.

simply another argument that our dissenting colleague has for the first time conjured up on appeal. We may not as appellate judges manufacture such arguments from scratch, especially where, as here, the facts in the record are directly contrary to the theory we are seeking to create on behalf of one of the parties. *See Alcala v. Woodford*, 334 F.3d 862, 871 (9th Cir. 2003) ("We will not assume facts not in the record in order to manufacture a reasonable strategic decision for [the defendant's] trial counsel."). The dissent's suggestion that counsel's decision not to file a motion was motivated by strategic considerations concerning the plea negotiations "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of [his] deliberations prior to" deciding against filing the motion. *Wiggins*, 539 U.S. at 526-27.

**[5]** Where the issue is whether counsel's performance was ineffective, we must decide that question based on what counsel's reasons for his decisions actually were, not on the basis of what reasons he could have had for those decisions. Thus, just as we may not second-guess a lawyer's reasonable tactical or strategic decisions, *Strickland*, 466 U.S. at 689, we may not deem unreasonable actions to have been "the result of reasonable professional judgment," *id.* at 690, by grounding them in considerations that were not, in fact, the lawyer's reasons for acting or failing to act. *See Kimmelman*, 477 U.S. at 385 ("The trial record in this case clearly reveals that Morrison's attorney failed to file a timely suppression motion, not due to strategic considerations, but because, until the first day of trial, he was unaware of the search and of the State's intention to introduce the bedsheet into evidence."); *Tomlin v. Myers*, 30 F.3d 1235, 1239 (9th Cir. 1994) (rejecting counsel's justification for his failure to move to suppress unconstitutional lineup identification evidence—that he did not believe it would be excluded—where counsel "did not indicate that that was the basis on which he chose not to object"). Here, as in *Kimmelman* and *Tomlin*, the record makes clear that counsel failed to file a motion to suppress not for strategic reasons but because of his ineffective performance of his

duties. As counsel himself explained, his failure to file a motion was based solely on his assessment of the motion's likelihood of success and his judgment that failing to suppress Moore's formal, taped confession to the police would be harmless in light of the two informal confessions that Moore allegedly had made to laymen. Because that assessment was grossly erroneous and clearly "fell below an objective standard of reasonableness," we hold that Moore's counsel's performance was constitutionally deficient under *Strickland*.

## B.    Prejudice

**[6]** It has long been clear that *Strickland*'s prejudice prong requires no more than a "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *id.* (holding that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome"). In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court confirmed that *Strickland*'s prejudice standard applies in the plea context; it held that prejudice in that context turns on "whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59. "In other words," the Court wrote, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

**[7]** We are confronted here with a very clear and specific argument by the state as to why the failure of Moore's counsel to move to suppress the taped confession Moore made while in custody in the police station was not prejudicial. The argument is not, as our dissenting colleague wishes it were, that the police had so much evidence against Moore that Moore's formal confession was unlikely to affect the result. Had that been the state's contention, we would have had very different briefs, very different oral arguments, and a very dif-

ferent majority opinion, although not a different result. It is not the function of appellate judges, however, to decide cases that the parties have not presented to them. Here, the state's sole argument as to prejudice is straightforward and succinct: "[P]etitioner previously had confessed 'the whole story' that he told police to his brother and told another friend, Debbie Ziegler, 'what had happened.' Either of those people could have been called as witnesses to repeat the confession . . . . In light of this, petitioner failed to show . . . that he was prejudiced by counsel's decisions." State's Br. at 18. The state's argument mirrors Moore's counsel's explanation for why he did not file the motion, *see* Counsel's Affidavit at 2 ¶4 (concluding that a motion to suppress "would be unavailing" because Moore "had previously made a full confession to his brother and to Ms. Ziegler, either one of whom could have been called as a witness . . . to repeat his confession in full detail"), as well as the state court's conclusion as to prejudice, *see* State Court decision at 6 ¶8 ("Both Raymond Moore and the friend could have been called as witnesses to repeat petitioner's confession. A motion to suppress would have been fruitless.") (citing Counsel's Affidavit) (citation omitted). Critically, at no point does the state argue—nor did the state court hold—that counsel's failure to file the motion was not prejudicial because the state had other evidence in its possession that would have caused Moore to accept the plea rather than go to trial. The state's argument and the state court's decision are limited exclusively to the contention that Moore had confessed to two lay persons and for *that* reason the exclusion of his formal confession to the police would have made no difference to Moore's decision to plead. As a result, our analysis is limited to the specific question whether the existence of an informal "confession" to two lay witnesses makes counsel's failure to move to suppress Moore's formal, taped confession to the police non-prejudicial.[17]

---

[17]Were we to consider the arguments regarding prejudice created *ex cathedra* on appeal by the dissent, we would in all likelihood reject them.

The state court found, as a matter of fact, that because Moore "had previously confessed his participation in the crime to his brother . . . and another friend," both of these individuals "could have been called as witnesses to repeat petitioner's confession." It then concluded, as a matter of law, that because "[b]oth Raymond Moore and the friend could have been called as witnesses to repeat petitioner's confession . . . [a] motion to suppress," even if successful, "would have been fruitless."[18] Assessing the state court's decision under AEDPA, we conclude that its prejudice determination constituted "an unreasonable application of[ ] clearly established Federal law" under 28 U.S.C. § 2254(d)(1).

Even granting the factual assumption underlying the state court's prejudice determination—*i.e.*, that Raymond and Ziegler would have testified to a version of Moore's informal confession—its determination that counsel's failure to suppress the formal taped confession was not prejudicial because Moore had previously told his relative and a relative's girlfriend about his participation in the killing of the victim was contrary to clearly established Supreme Court law. Indeed, the Supreme Court squarely rejected a markedly similar argument in *Arizona v. Fulminante*, 499 U.S. 279, a case that is, *a fortiori*, controlling here.[19]

---

So as not to leave the dissent's extensive presentation of the case it has created on behalf of the state *wholly* unanswered, we have commented in a summary fashion in Appendix A, *infra*. We note, here, however, that the legal obstacles Judge Bybee's enormously creative argument faces are insurmountable for some of the reasons we have set forth herein, as well as for the reasons set forth in that Appendix.

[18]The district court echoed the state court, adding only, on its own initiative, that co-defendant "Salyer's demonstrated willingness to cooperate with the police" also prevented any error by Moore's counsel from prejudicing his defense.

[19]The dissent finds it significant that petitioner does not cite *Arizona v. Fulminante* in his brief, *see* dis. op. at 9837-38, 9860 n.15, 9864, equating our reliance on this Supreme Court precedent with the dissent's effort to

**[8]** In *Fulminante*, the defendant confessed, while in prison, to a paid informant who offered protection from "tough treatment" in exchange for the confession; he also confessed to the informant's wife following his release from prison. 499 U.S. at 283-84 (internal quotation marks omitted). Fulminante claimed that the confession to the informant was coerced and that its admission at trial violated his rights under the Fifth and Fourteenth Amendments. *Id.* at 284. The state supreme court, not unlike the state court here, found that the admission of the defendant's coerced confession was harmless because an "admissible second confession . . . rendered the first confession . . . cumulative." *Id.* at 296. The state court in *Fulminante* concluded that "due to the overwhelming evidence adduced from the second confession, if there had not been a first confession, the jury would still have had the same basic evidence to convict." *Id.* at 297 (quoting *State v. Fulminante*, 778 P.2d 602, 611 (Ariz. 1988)) (internal quotation marks omitted). The Supreme Court unequivocally rejected this argument. The Court held that because "the two confessions reinforced and corroborated each other . . . one confession was not merely cumulative of the other," *id.* at 299, and therefore concluded that the error was not harmless, *id.* at 297. *Fulminante* stands for the proposition that the admission of an

---

judicially manufacture a new record on appeal. However, it is clear that the petitioner never waived the issue of prejudice or the argument that Moore's confession was prejudicial despite the existence of the other "confessions." To the contrary, this issue was central to the litigation below. Where a party has "raised the issue" and the opposing party has had an opportunity to offer arguments in response, the Court of Appeals is not prohibited from relying on Supreme Court precedent simply because a party failed to cite that particular "legal authority to support their contention." *Lake v. Lake*, 817 F.2d 1416, 1424 (9th Cir. 1987); *cf. Puerta v. United States*, 121 F.3d 1338, 1341-42 (9th Cir. 1997) ("An argument is typically elaborated more articulately, with more extensive authorities, on appeal . . . and there is nothing wrong with that.").

additional confession ordinarily reinforces and corroborates the others and is therefore prejudicial.[20]

**[9]** Here, too, the formal confession to the police would reinforce and corroborate the informal confessions. But, here, the prejudice is far greater than with the type of confessions involved in *Fulminante*. Unlike in *Fulminante*, the unconstitutional evidence here did not involve simply a second recitation by a second lay witness of an account of an informal confession. Rather, here the evidence that counsel should have sought to exclude was a *formal taped confession* in which Moore himself described in detail, in his own words and his own voice, his participation in a killing in response to detailed questioning by trained investigators in the police station. Such a formal confession would, without question, be far more persuasive to a jury than Moore's statements to two lay witnesses—statements that Moore's brother Raymond and his half-brother Lonnie's girlfriend might or might not have been willing to recount, but that would in any event have lacked the flavor, details, specificity, and completeness of the taped confession. There can be little doubt that a taped recording of a defendant's confession taken with all the requisite formalities by police officers and played to a jury that hears the defendant's confession in the defendant's own words from his own lips (or even from a reading of a transcript of his confession)

---

[20]Contrary to the dissent's contention, we do not "adopt a per se rule that the improper admission of a confession is prejudicial." Dis. op. at 9865. We recognize that *Fulminante* held that the erroneous admission of a confession is *subject* to harmless error review; it did not, however, hold that such an error *is ordinarily harmless*. To the contrary, the Court emphasized that "[i]n the case of a coerced confession . . . the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise *extreme caution* before determining that the admission of the confession at trial was harmless." *Fulminante*, 499 U.S. at 296 (emphasis added). Here, for reasons we explain at length in the text, such an exercise of caution compels the conclusion that the admission of Moore's coerced, uncounseled, formal confession would have been highly prejudicial.

is in no way comparable in its impact on the jury, and is indeed far more inculpatory in substance and effect, than a recitation by a layperson of the defendant's informal and unrecorded account of the incident[21] —in this case, a recitation by witnesses sympathetic to the defendant who would undoubtedly be reluctant to do unnecessary harm to his case and whose testimony, to the extent that it might be adverse, would be subject to rigorous cross-examination by defense counsel whose efforts at impeachment they would be inclined to support.[22] Admission of Moore's formal, tape-recorded

---

[21]The dissent's argument that the facts of this case bear a closer resemblance to the facts of *Milton v. Wainwright*, 407 U.S. 371 (1972), than to those of *Fulminante* is simply not correct. *See* dis. op. at 9869 n.22. In *Milton*, as the dissent notes, the petitioner had already made three full confessions, which were held to be admissible. *Milton*, 407 U.S. at 373-74, 376-77. The petitioner challenged the admission of a fourth confession, made to an undercover officer posing as an incarcerated murder suspect in petitioner's cell. *Id.* at 375. In a case in which the petitioner has already made three confessions—one that was recorded and two that were in writing and signed by the petitioner—it is relatively clear that a fourth confession made orally to another person will not be prejudicial. In the present case, however, the challenged confession was the only full and formal confession, the only confession that was memorialized in any manner, let alone in the form of a taped recording; further, as discussed *infra*, it is unclear whether the two prior informal confessions would have been adduced at trial or how effective they would have been. Moore's taped confession would have been the only full account of the events relating to the actual kidnapping and shooting, as well as the only totally credible account, not subject to challenge on cross-examination. To treat it as simply corroborative would be grossly disingenuous.

[22]In applying *Strickland*'s prejudice prong, we also note that this court has refused to hold non-prejudicial the wrongful admission of a critical piece of evidence even when other, substantially similar statements would have been admissible. *See, e.g.*, *Bockting v. Bayer*, 408 F.3d 1127, 1127 (9th Cir. 2005) ("Even if [the six-year-old alleged sexual abuse victim's] statement to the mother was, for argument's sake, considered admissible, the detective's description of Autumn's interview was *so significant as corroborating evidence that its admission had a substantial and injurious effect* or influence in determining the jury's verdict." (emphasis added)), *amending on denial of reh'g* 399 F.3d 1010, 1022, *rev'd on other grounds sub nom. Whorton v. Bockting*, 127 S. Ct. 1173 (2007).

confession would certainly have "reinforced and corroborated" the informal accounts reported by two lay witnesses. *Fulminante*, 499 U.S. at 299. The state court's finding that a motion to suppress a recorded confession to the police would have been "fruitless" due to the fact that Raymond or Ziegler "could have been called as witnesses to repeat [Moore's] confession" was without question contrary to clearly established federal law as set forth in *Fulminante*[23]

The probability that Moore would not have pled to a felony murder charge with a mandatory twenty-five-year sentence had his counsel filed a motion to suppress the taped confession is more than "sufficient to undermine confidence in the outcome" under *Strickland*. Without Moore's formal, taped confession, the state's case would have been far weaker. As the Supreme Court held in *Fulminante*, "[a] confession is like no other evidence." 499 U.S. at 296. The *Fulminante* Court emphasized the weight of a defendant's confession: A "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." *Id.* (quoting *Bruton*, 391 U.S. at 139-40 (White, J., dissenting)) (omission and alteration in original); *see also Taylor v. Maddox*, 366 F.3d 992, 1017 (9th Cir. 2004) ("[W]e are mindful of the Supreme Court's admo-

---

[23]*See Stapleton v. Wolfe*, 288 F.3d 863, 868 (6th Cir. 2002) (holding under AEDPA that a finding of lack of prejudice under analogous circumstances was contrary to *Fulminante*). Unlike the instant case, *Stapleton* involved multiple accomplice statements rather than more than one confession. However, relying on *Fulminante*, the Sixth Circuit held that because "Stapleton's jury could have believed that [one accomplice's] statements and [the other accomplice's] taped statements 'reinforced and corroborated each other,' " the admission of the second accomplice's taped statements, which violated Stapleton's Confrontation Clause rights, was not harmless error. *Id.* (quoting *Fulminante*, 499 U.S. at 299). The *Stapleton* court also held that the state court had "reached a decision contrary to clearly established federal law"—namely, *Fulminante*. *Id.*

nition as to the devastating power of confessions." (citing *Fulminante*, 499 U.S. at 296)). When that confession is recorded on tape and played to a jury, which hears it in the defendant's own voice, or when the defendant's own words are transcribed and read directly to the jury, the confession is of course far more harmful than that recounted by a lay witness —a witness who is subject to cross-examination on the basis of the accuracy of his recollection or even on the basis of his veracity, bias, or self-interest—who simply tells the jury what the defendant purportedly said in an unrecorded informal discussion.

It is likely that, without the benefit of Moore's formal, tape-recorded confession to the police officers, the state would not have been able to secure a plea on the basis of the informal confessions. Even assuming that the prosecution was confident that Raymond or Ziegler would have testified at a trial, it is far from clear what those witnesses would have said or to what extent their testimony would have been persuasive to a jury, although it is certain that their second-hand reports would not have been nearly as damaging as Moore's own taped confession. Critically, the state court made no findings as to the contents of what Moore had told Raymond or Ziegler or what details they might have been able to recount at trial. Thus, the record falls far short of establishing that the potential testimony of Raymond and Ziegler would have been sufficient to cause Moore to accept so harsh a plea agreement— especially because Raymond would likely have been a hostile witness and there is little evidence that Ziegler could have contributed anything.[24] In addition, as noted already, the plea

---

[24]In its quest to construct a record supportive of its reasoning, the dissent claims that "[w]e do not need to fret much about what Raymond Moore would have testified had he been called at trial . . . because the record contains Raymond's testimony at the state court post-conviction evidentiary hearing." Dis. op. at 9853. However, at the time of the plea neither the state nor defense counsel had interviewed Raymond in order to determine what he knew about the events. Moreover, Raymond offered

agreement accepted by Moore did nothing to reduce his sentence, as his co-defendant received an identical mandatory minimum sentence after going to trial. Accordingly, exercising "extreme caution," as *Fulminante* requires us to do, *Fulminante*, 499 U.S. at 296, we cannot conclude that counsel's failure to move to suppress Moore's formal, taped confession was harmless.

---

the testimony that the dissent quotes on his brother's *behalf* in order to help win his freedom; there are significant reasons to believe that, in the context of a trial, Raymond would not have been willing to help convict his brother. Raymond was not only Moore's brother, but also served as an advocate for Moore and his co-defendant before and after the interrogation. Indeed, at the post-conviction hearing, Raymond revealed that he felt just as betrayed by the police and District Attorney as did Moore when they failed to "go to bat" for him. Furthermore, even if the state had subpoenaed Raymond to testify, knowing him to be a hostile witness, it is unlikely that it would have been able to elicit much of the information it desired from him.

As for Ziegler, there is *no* evidence regarding precisely what Moore told her about the crime, and it seems unlikely from the record that he told her much. The interrogation transcript shows only the following question and answer: "Debbie, since you're here and you've listened to their story, when did you first find out about this?" "Today." Ziegler also stated, "I didn't know [about Rogers's death] until we'd read the paper and I still didn't know the actual thing." There is no further record of what Ziegler knew.

The dissent asserts that the state court explicitly found that Moore made a full confession to Ziegler because it stated at one point that "[t]he Court believes trial counsel's affidavit" and because that affidavit asserted that a "full confession" had been made. Read in context, however, the state court declared only that it believed the affidavit as to one particular assertion it contained—that Moore's counsel had reviewed Moore's statement—not that it believed every single statement contained in the affidavit, including those that it did not discuss until three pages later when for the first time it mentioned Moore's alleged confession to Ziegler. In any case, the state court entirely ignored the "relevant" and "highly probative" conflicting evidence consisting of Ziegler's statements at the interrogation, rendering its factfinding process "defective" and unworthy of our deference under AEDPA. *See Taylor*, 366 F.3d at 1000-01.

The dissent criticizes our application of *Fulminante*, arguing that it actually "supports the exact opposite conclusion" from our holding. Dis. op. at 9865. Specifically, the dissent contends that *Fulminante*'s description of the weight of confessions applies to Moore's informal confessions to Raymond and Ziegler as well and that, consequently, *Fulminante* supports the conclusion that Moore's formal, taped confession was not prejudicial because the two lay confessions also carried unique weight. *Id.* In advancing this argument, the dissent entirely misses the point of *Fulminante*. In that case, the Supreme Court held that the admission of the coerced confession was prejudicial *notwithstanding the availability of another confession to a lay witness*. Under the dissent's logic, the other confession Fulminante made to a lay witness would have rendered his coerced confession non-prejudicial, and his case would have come out the opposite way: his conviction would have been affirmed, not reversed. But that, of course, was *not* the outcome of *Fulminante*.

Indeed, our application of *Fulminante* is fully consistent with this court's recent en banc decision in *Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008) (en banc), an AEDPA case involving a confession obtained in violation of the defendant's Fifth Amendment right to silence. In *Anderson*, we held that the state court had unreasonably applied the clearly established law of *Miranda v. Arizona*, 384 U.S. 436 (1966), in concluding that the police's continued interrogation, which resulted in the defendant's confession, after the defendant had stated, "I plead the Fifth," did not violate the Fifth Amendment. *Anderson*, 516 F.3d at 790-91. In determining that the *Miranda* violation was not harmless, we did not even consider the other evidence the state had presented to tie the defendant to the crime, or whether the confession would have repeated such evidence. Rather, relying on *Fulminante*'s guidance that a "defendant's own confession is probably the most . . . damaging evidence that can be admitted against him," *id.* at 792 (quoting *Fulminante*, 499 U.S. at 296) (internal quotation marks omitted), we concluded that the "prejudice from

Anderson's confession cannot be soft pedaled" because the "confession was central to the conviction," *id.*

[10] As in *Anderson*, Moore's formal, taped confession was central to the state's ability to secure a plea. The count to which Moore pled carried an extremely harsh mandatory minimum sentence as a result of the recent passage of a state ballot measure. There is at least a reasonable probability that, had his confession to the police been suppressed, Moore would have insisted on going to trial rather than pleading to the offense to which he did, an offense that carried with it so severe a mandatory sentence—the same 25 year Measure 11 sentence that his co-defendant Salyer received after going to trial.[25] In light of these considerations, the only reasonable conclusion is that Moore has established *Strickland* prejudice.[26]

* * *

[11] Our task on habeas is to examine the state court's decision under the standards established by AEDPA. The state court held that counsel's failure to move to suppress Moore's taped confession was not prejudicial for the sole reason that he had also confessed to two lay witnesses. In reviewing that decision, we have, following the law, based our analysis on the decision itself and the arguments made by the state on

---

[25]The dissent misses the point when it observes that "Moore obtained the lowest sentence available under Oregon law for felony murder." Dis. op. at 9836-37. Without Moore's confession and the other evidence it produced, Moore likely would not have been convicted of, or even charged with felony murder, but rather would have faced some lesser charge.

[26]After the involuntary confession was suppressed, the state might well have offered a more generous plea bargain. Moore need not show that he would have rejected any and all plea bargains the state might have offered. Under *Hill*, it is enough that there is a reasonable probability that he would have chosen trial over the plea bargain he was actually offered. Accordingly, we need not consider whether Moore could also establish prejudice by showing a reasonable probability that he would have obtained a better plea bargain had his attorney moved to suppress his confession.

appeal. The state argued before the district court and this court, consistent with its argument to the state court, and consistent with the state court's decision, that Moore's counsel's performance was not prejudicial for one reason and one reason only: Moore had confessed to Raymond and Ziegler, who could have been called as witnesses, thereby rendering the suppression of the confession of no practical significance. As discussed *supra*, that argument is wholly lacking in merit and the state court's conclusion that Moore was not prejudiced by counsel's failure to file a motion to suppress is objectively unreasonable under clearly established Supreme Court law. *Fulminante* permits no such construction of the law, and such a misconstruction is unreasonable under any standard.

To reach the opposite conclusion, the dissent once again develops its own set of facts and its own arguments— arguments that were never conceived of by the state nor suggested before the state court, the district court, or this court, a set of facts and arguments to which the petitioner has never had an opportunity to respond. The case now presented on the state's behalf for the first time has been created in its entirety by our extremely able, talented, and experienced colleague; it is based on the testimony of witnesses and evidence never mentioned or relied upon by the state in its arguments regarding prejudice. Further, the dissent creates and relies upon testimony that it assumes inevitably would have supported the state's case, without any evidence in the record as to the substance or availability of such testimony, or, even more important, its *admissibility*.

No court in this case has undertaken the formidable factual inquiry necessary to determine the admissibility—and in some instances, substance—of the evidence upon which the dissent relies. The record discloses little about how and when most of this evidence became known to the state, making it impossible for us to determine whether that evidence is, as seems likely, a "fruit of the poisonous tree"—a product of Moore's confession. To make this determination would

require us to find a multitude of facts for the first time on appeal, a function that we are neither equipped nor permitted to perform. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 497 (1991) (observing that a federal appellate court "lack[s] the factfinding and record-developing capabilities of a federal district court").

Even apart from concerns about inappropriate appellate factfinding, we simply decline to base our decision on arguments and theories that the state has never offered, and which it has therefore forfeited. It would work great prejudice to the petitioner were we to affirm the denial of his habeas petition on the basis of such speculative arguments and assertions offered for the first time by a member of this court— arguments and assertions to which Moore has had no occasion, opportunity, or reason to respond. Without any indication from the state as to what evidence it may have possessed and why that evidence may have rendered counsel's failure to suppress the confession harmless, it is simply impossible for a petitioner to respond to the state's "evidence" or "arguments."

Our prior decisions disapprove of such practice. Indeed, under our precedent, the state has *doubly* forfeited the fact-bound alternative theories of prejudice that our dissenting colleague creates and advances on its behalf. Not only did the state forfeit any such contentions by not raising them on appeal, but it first forfeited these theories in federal court by failing to raise them in the district court. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996) ("The decision to consider an issue not raised below is discretionary, and such an issue should not be decided if it would prejudice the other party."). The Supreme Court has explained that this forfeiture rule "is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tri-

bunal is alone competent to decide" and that "it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Hormel v. Helvering*, 312 U.S. 552, 556 (1941). The forfeiture rule (sometimes erroneously called the waiver rule) applies equally to arguments, factual assertions, and legal theories that were not urged below. *See Gieg v. DDR, Inc.*, 407 F.3d 1038, 1046 n.10 (9th Cir. 2005) (holding that appellees had waived argument not raised below); *Int'l Union of Bricklayers & Allied Craftsman Local Union v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404-06 (9th Cir. 1985) (finding waiver of factual assertions not raised in the district court); *see also A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 337-39 (9th Cir. 1996) (declining to consider legal theory that would require further development of the factual record).

**[12]** In this case, the state's failure to raise below the argument that counsel's failure to move to suppress the taped confession was harmless for reasons other than the existence of the two informal confessions precludes us from considering that argument on this appeal. Moore has had no opportunity to introduce evidence on the crucial question of which parts of the case the dissent now creates for the state are based on "fruits of the poisonous tree." Nor has he had any opportunity to challenge any contention the state might advance that such evidence was obtained independent of any connection with the confession, or to examine any prosecution witness who might testify to that effect. Finally, as some of the evidence is not even in the record, he has not had the opportunity to challenge the dissent's assertion that such evidence actually exists.

The state forfeited these arguments a second time by failing to raise them before this court. In *Stuard v. Stewart*, 401 F.3d 1064 (9th Cir. 2005), we squarely rejected the notion that this court could create arguments for the state that it did not raise on appeal. *See id.* at 1067 (holding in an AEDPA case that

"we are not going to construct an argument for the state sua sponte, depriving [the defendant's] counsel of a fair chance to respond to it"). We ordinarily will not consider arguments not raised by a party in its opening brief, especially where doing so would prejudice the opposing side. *See United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992); *see also* Fed. R. App. P. 28(a)(9), (b). "We apply that rule with some vigor against criminal defendants; we should be no less vigorous in applying it against the government." *United States v. Ziegler*, 497 F.3d 890, 901 (9th Cir. 2007) (Kozinski, J., dissenting from denial of rehearing en banc) (citation omitted). The state court's failure to recognize that Moore's confession was obtained unlawfully, along with its and the state's exclusive reliance on the other "confessions" to establish prejudice, resulted in the court's not making *any* determination as to whether all, or what parts of, the evidence on which the dissent now relies was obtained as a result of the unlawful confession and was thus inadmissible in evidence. *See* Appendix A, *infra*, at 9811-12. Nor, for similar reasons, as we have noted, did the district court undertake any such inquiry. Although it seems likely that the evidence on which the dissent relies (to the extent that it exists at all) was principally obtained as a result of Moore's confession,[27] we cannot determine those facts here. Because no factual determination has ever been made as to the "fruits of the poisonous tree" and because the state has repeatedly failed to offer, and has thereby forfeited, any argument that some unproven potential evidentiary case as a whole might have rendered counsel's deficient performance non-prejudicial, we cannot and do not here consider the dissent's extensive evidentiary analysis.

---

[27]For example, the first two dramatic sentences of the dissent, in which Judge Bybee purports to describe the facts of the case, parrot the statement provided by Moore's counsel in his effort to defend himself against charges of incompetence. It appears that Moore's counsel inferred these facts from statements his client had made and from Moore's half-brother's confession, both of which were inadmissible. It is likely for this reason that the state did not offer any of the arguments that Judge Bybee now makes.

Rather, we are left only with determining whether the difference between the weight of Moore's statements to his brother and his half brother's girlfriend and his formal taped confession to the police is such that the exclusion of the latter undermines our confidence that Moore would have entered into so harsh a plea agreement. Considering only the arguments that are properly before us, we hold that Moore has established *Strickland* prejudice.

## CONCLUSION

Moore's counsel inexplicably failed to file a motion to suppress—a motion that could easily have been based on either of two grounds, each of which was meritorious and each of which would in all likelihood have resulted in the suppression of his confession and its fruits. The state does not contest the finding that Moore would have prevailed on one of them—that his confession was involuntary. The reasons offered by counsel for his conduct were both limited and unmeritorious (and bear no resemblance to the reasons suggested by the dissent). His inexcusable failure to move to exclude the confession afforded the state the opportunity to prosecute Moore on the basis of the most damaging inculpatory evidence that can be introduced against a defendant, and thereby to exact a no-contest plea to the egregious offense of felony murder with a mandatory twenty-five-year sentence. We conclude that Moore was prejudiced by his counsel's failure to file the suppression motion and that, because counsel's performance fell below an objective standard of reasonableness, he received ineffective assistance of counsel under *Strickland*. A contrary ruling would necessarily constitute an unreasonable application of clearly established Supreme Court law. Neither *Fulminante* nor *Strickland* is susceptible of an objectively reasonable interpretation, even though erroneous, that would support a determination that counsel's performance in this case was competent or that Moore suffered no prejudice as a result of his representation.

Ignoring Moore's request, the state court failed to consider whether the confession was involuntary on the ground that his will was overborne by improper promises of leniency. The district court found, however, that Moore's confession was made involuntarily. Because the state does not challenge that determination on appeal, it has conceded that a motion to suppress on involuntariness grounds would have been meritorious. Despite the merit of such a motion, Moore's counsel failed to move to suppress what was "probably the most probative and damaging evidence that [could] be admitted against him," *Fulminante*, 499 U.S. at 296 (quoting *Bruton*, 391 U.S. at 139 (White, J., dissenting)). He did not fail to make the motion for any strategic reasons but simply because he understood that Moore had told two other persons what had happened on the day in question and concluded that as a result the admission of his formal taped confession to the police would be harmless. Given that the failure was in fact highly prejudicial, counsel's conduct fell below an objective standard of reasonableness and therefore was "deficient" under *Strickland*. A contrary decision would constitute an objectively unreasonable application of clearly established Supreme Court law.

The state court held that Moore was not prejudiced by his counsel's conduct because informal confessions to two lay witnesses could have been introduced. In doing so, the state court erred unreasonably. Its determination that the taped confession was harmless was contrary to clearly established Supreme Court law as set forth in *Fulminante*.

**[13]** It is likely that, but for counsel's failure to file a suppression motion, Moore would have not entered into the plea agreement that required him to plead no contest to a felony murder charge with a severe mandatory twenty-five-year sentence—the same sentence received by a co-defendant after trial. As a result, our confidence in the outcome is undermined. Accordingly, Moore is entitled to a writ of habeas corpus directing the state to permit him to withdraw his plea or

to release him from custody.[28] Accordingly, we reverse the district court and remand for the issuance of the writ.

**REVERSED AND REMANDED.**

---

[28]The dissent condemns our holding as not having "accomplished" anything for Moore, speculating that "[i]t is quite possible that Moore will be worse off for having prevailed here." Dis. op. at 9882, 9883. It is not this court's place to make paternalistic judgments about whether a particular holding is "good" for a party. Moore made a choice to bring a habeas challenge as is his right. Having been granted the writ, Moore can determine for himself whether withdrawing his plea is in his best interest. Our sole responsibility is to determine whether Moore's constitutional rights have been violated in a manner that warrants granting habeas relief under AEDPA. That we have done.

## APPENDIX A

In this Appendix we will discuss the facts and theories that our dissenting colleague has created and advanced on behalf of the state—facts and theories not relied on by the state court, not suggested by the state in the district court, and not argued to this court by either party—facts and theories advanced for the first time by an appellate judge, in contravention of all the rules of appellate procedure. Here, we will explain why, even had the state not forfeited the alternative theories of prejudice the dissent creates for it, we would reject them on the merits.

With respect to Moore's co-defendant, Salyer, although the district court believed that he "apparently provided detectives with the details of the crime when he took them to the location where the shooting occurred," there is no evidence in the record as to what information he conveyed to them. Salyer never gave a sworn statement, never testified, and was never cross-examined. There is simply no way of knowing precisely what Salyer's testimony might have been, especially under the stress of cross examination. More important, as we explained in footnote 4 of the opinion, it is almost certain that Salyer would not have testified against Moore in any event but would have taken the Fifth Amendment instead, as he too was facing trial for his involvement in Rogers's death.[29] In fact, Salyer was ultimately tried and his appellate and post-conviction proceedings did not end until long after the date on which Moore would have gone to trial had he not pled. *See Salyer v. Belleque*, 2005 WL 555403 (D. Or. Mar. 4, 2005) (denying Salyer's federal habeas petition).

---

[29]Of course, without the ability to put Salyer on the stand, the state would not have been able to introduce any statements he might have previously made, as doing so would have violated Moore's Sixth Amendment right to cross examine adverse witnesses. *See Bruton v. United States*, 391 U.S. 123, 127-28 (1968).

The dissent argues that the state's felony murder case was "airtight" even without Moore's confession to the police, his alleged confession to Raymond and Ziegler, and the testimony of his co-defendants. Dis. op. at 9855, 9858. This is simply not so. This dissent goes on at length about all of the damning facts that are "undisputed" or "indisputable" in this case. Many of these "undisputed" facts, however, appear to be drawn by the dissent from the factual basis the state offered at Moore's plea colloquy and sentencing. *See, e.g.*, dis. op. at 9857 ("[T]he car's license plates had been covered over with duct tape."). These facts, of course, became "undisputed" only after Moore had decided to plead no contest. The fact that Moore did not object to factual assertions made by the state's attorney at his plea colloquy, after he had decided not to contest the charges (because doing so not only would have served no purpose but would also have been hopeless with his formal confession in the record), does not mean that, without Moore's illegal confession and its fruits, the state would have been able to prove the assertions beyond a reasonable doubt at trial.

More important, nearly all of the evidence the dissent discusses would have been inadmissible at trial because it derived either directly or indirectly from Moore and Woolhiser's involuntary confessions. In particular, the authorities learned about the existence and identities of the witnesses at Woolhiser and Ziegler's residence—who, the dissent insinuates, could have been called to testify to Salyer's "ranting and raving" and the trio's plan to scare Rogers—as a result of the illegal confessions. It is also from the confessions that the police learned about the "multiple witnesses" who allegedly saw Moore, Salyer, and Woolhiser arrive at and later return to Rogers's residence.[30] Dis. op. at 9858. The police found the gun, too, because Woolhiser agreed during the unlawful inter-

---

[30]The day before the interrogation at issue, Moore told police that "some guy" was present outside Rogers's motor home, but never commented on the presence or identities of any other witnesses.

rogation to show the police "exactly" where it was located. And while the record contains no explanation regarding how the police located the car, which contained additional physical evidence, in California, it seems highly likely that they did so using information supplied by the defendants after they had "let the cat out of the bag" by giving their involuntary confessions.

Had Moore's counsel filed a motion to suppress on the ground the state concedes is meritorious, and had that motion succeeded, which is highly probable, all of this evidence would likely have been excluded as "fruits of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471 (1963). The fruits of involuntary confessions—including those that are extracted with promises of leniency—may not be admitted at trial. *See Kastigar v. United States*, 406 U.S. 441, 453 (1972) ("We hold that . . . immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination . . . . Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords [the protection required by the Fifth Amendment]. It prohibits prosecutorial authorities from using the compelled testimony in *any* respect . . . ." ); *see also United States v. Patane*, 542 U.S. 630, 644 (2004) (plurality opinion) ("[T]he Court requires the exclusion of the physical fruit of actually coerced statements . . . ." ); *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1048 (9th Cir. 1990). Thus, a successful motion to suppress would have triggered the "fruits of the poisonous tree" doctrine, rendering inadmissible all evidence obtained as a result of Moore's confession.

Nor would Woolhiser's confession—which was obtained during the same coercive interrogation as Moore's—or its fruits be admissible against Moore. *See Douglas v. Woodford*, 316 F.3d 1079, 1092 (9th Cir. 2003) ("[I]llegally obtained confessions may be less reliable than voluntary ones, and thus using a coerced confession at another's trial can violate due process." (citing *Clanton v. Cooper*, 129 F.3d 1147, 1157-58

(10th Cir. 1997) ("[A] person may challenge the government's use against him or her of a coerced confession given by another person."))); *see also Clanton*, 129 F.3d at 1158 (collecting similar cases from the First, Fifth, Sixth, and Seventh Circuits). Furthermore, there is no evidence in the record, nor any assertion by the prosecution, that the physical and eyewitness evidence on which the dissent relies was obtained through a source independent from the illegal confessions or that the connection between the confessions and the evidence was "so attenuated as to dissipate the taint." *See Wong Sun*, 371 U.S. at 487 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)) (internal quotation mark omitted).[31]

The dissent's suggestion that much of the evidence on which it relies to construct the state's hypothetical and "airtight" case was based "solely on statements made by Moore, the admissibility of which has never been questioned" is unsupported by the record. *See* dis. op. at 9857 n.13. The statement by Moore to which the dissent alludes, which he made to the police the evening before his confession, does not contain nearly as much information as the dissent makes out. Moore stated only that Salyer "was talking about going and confronting [Rogers] about the break in at the cabin and he also wanted to talk to [Rogers] about the boom box and who took it." He said nothing about "ranting and raving," nothing about "scar[ing] [Rogers] out of ever committing another [robbery]," and nothing about the existence or number of witnesses who observed the defendants planning their visit to Rogers. Moore further stated that, upon arriving at Rogers's motor home, "some guy" confronted Woolhiser, but Woolhiser "walk[ed] away" and "over towards to [sic] motor home." According to Moore's statement, Salyer "was talking to [Rogers] about the stolen stuff and the punctured tires. . .

---

[31]That evidence the state could have or would have obtained from independent sources that would not be tainted by the information previously obtained as a result of the unlawful confessions is a question that is highly speculative and impossible to determine at this time on appeal.

. [T]hey only stayed at the motor home for approximately 15-20 minutes or just enough time to drink two beers." At no point did Moore discuss covering the car's license plates with duct tape, nor did he mention "other people," beyond the one person who confronted Woolhiser, being present at Rogers's home. Certainly he said nothing about kidnapping Rogers, beating him, putting him in the trunk, or shooting him. In fact, he denied doing so.

The evidentiary problems that a successful suppression motion would have created for the state are therefore quite severe. Establishing that critical evidence was discovered independently of the confessions would have presented serious if not insurmountable problems. For purposes of this habeas appeal, however, the most important point is that the state made no attempt to separate any admissible evidence from the patently excludable evidence, and no court ever undertook that task. As a result, we cannot now consider the question or make a determination on appeal, for purposes of assessing the state's case, that any of the "evidence" referred to by our dissenting colleague is admissible.

Without the fruits of Moore and Woolhiser's confessions, the prosecution would have had tremendous difficulty meeting the high burden it faced. In view of the weaknesses in the state's case, it is highly unlikely that, in the absence of his own recorded confession, Moore would have pled to felony murder. We thus cannot have any confidence that the outcome would have been the same had counsel filed a motion to suppress.

# APPENDIX B

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| RANDY JOSEPH MOORE, | Case No. 98C-15019 |
| Petitioner, | |
| v. | AFFIDAVIT OF KIM L. JORDAN |
| MITCH MORROW, Superintendent, Oregon State Penitentiary, | |
| Defendant. | |

STATE OF OREGON )
                 ) ss.
County of Josephine )

I, Kim L. Jordan, being first duly sworn on oath, depose and say:

1. I am an attorney licensed to practice law in the State of Oregon, and in that capacity I represented Randy Joseph Moore in *State of Oregon v. Randy Joseph Moore*, Josephine County Circuit Court Case No. 96CR-0118. I make this affidavit in response to petitioner's claim of inadequate assistance of trial counsel.

2. I did not fail to review petitioner's statement to the police. I read it many times and discussed it at length and in detail with Mr. Moore. He affirmed to me that it was true, and that it was accurate.

3. I did not file a Motion to Suppress. My reasons for doing this were two-fold. First of all, petitioner's interview with the police, which was taped and transcribed, a copy of the

Page 1 - AFFIDAVIT OF KIM L. JORDAN
         TRI32071/SSA/sgr

Department of Justice
1162 Court St. NE, Rm. 100
Salem, Oregon 97310-0506
(503) 378-6313

RESPONDENT'S
EXHIBIT
120
01-1745-ST

transcription is attached to this affidavit, makes it abundantly clear that Mr. Moore was not in custody. He never believed that he was in custody and admitted to me that he realized he was not in custody when he and his brothers and another friend voluntarily came to the police department to give the recorded statement. The law as I understood it then and now is exemplified by *State ex rel Juv. Dept. v. Loredo*, 125 Or App 390, and *State v. Smith*, 310 Or 1.

4. In addition, however, Mr. Moore had previously given a full confession to his brother Raymond Moore and to a woman named Debbie Ziegler. Mr. Moore and I discussed the possibility of filing a Motion to Suppress and concluded that it would be unavailing, because in the first place, he knew he was not in custody at the time he gave the recorded interview and that the statement was voluntary, and in the second place, he had previously made a full confession to his brother and to Ms. Ziegler, either one of whom could have been called as a witness at any time to repeat his confession in full detail.

5. Mr. Moore's older brother Raymond was an active church member and I investigated his church status to determine whether, under the rules of the church to which he belonged, he had the right to hear confessions and could therefore claim some privilege. Raymond Moore did not hold a position in his church that allowed him to hear confessions and therefore, in my opinion, no priest-penitent privilege applied to anything Randy Moore had previously told to his brother in their pre-police interview conversation.

6. I believe that I reviewed every aspect of the law and the facts regarding this case. I discussed the case at length with Mr. Moore and reviewed the extensive police reports, some of which are attached to this affidavit. I do not recollect any material statement of fact in the police report with which Mr. Moore disagreed. Mr. Moore always claimed his actual shooting of the victim was an accident, but there was never the smallest doubt that it occurred during a kidnap

Page 2 - AFFIDAVIT OF KIM L. JORDAN
TRI32071/SSA/sgr

Department of Justice
1162 Court St. NE, Rm. 100
Salem, Oregon 97310-0506
(503) 378-6313

which began with an assault. We discussed at length the felony murder rule. We also discussed at length the fact that he had not yet been indicted for any conduct and that it was possible that when an indictment came down from the grand jury, it could be for any charge up to and including aggravated murder. However, I made it very clear to Mr. Moore that he was not charged with aggravated murder and that in fact, the grand jury had not yet considered his case, so that the options were fully open for the district attorney to seek whatever charge or charges the district attorney thought might be justified.

7. At no time did I ever tell Mr. Moore that he could receive the death penalty if convicted "although petitioner was not charged with aggravated murder." I discussed at great length with Mr. Moore the definitions of "aggravated murder," "murder," and "felony murder." I did tell Mr. Moore that if he were charged with aggravated murder and if the jury decided that murder had been committed under ORS 163.095(e), in the course of or as a result of intentional maiming or torture," that it was not impossible that he might be convicted of aggravated murder if he were ever in fact charged with aggravated murder. At no time did I ever tell Mr. Moore that he *was* charged with aggravated murder, or that I thought he *would be* charged with aggravated murder. We simply discussed all possibilities.

8. The victim in this case had been assaulted, bloodied, bound with duct tape, placed in the trunk of a car, taken to an isolated rural location, marched into the woods while still bound, and shot. Furthermore, the victim had an extremely large protruding abdominal hernia for which he always wore a truss. I discussed with Mr. Moore the possibility that if he were ever charged with aggravated murder that the jury might, after taking into account all of the facts of the case, conceivably find that he had engaged in "torture" of a helpless and somewhat disabled victim. I did not ever tell Mr. Moore that I thought that this was going to be what he was charged with or

Page 3 -    AFFIDAVIT OF KIM L. JORDAN
            TRI32071/SSA/sgr

Department of Justice
1162 Court St. NE, Rm. 100
Salem, Oregon 97310-0506
(503) 378-6313

convicted of. I then felt that it would have been malpractice on my part not to have pointed out to him this was a possibility, however remote. I would still consider it malpractice not to have brought it to his attention, or to have attempted to assure him that this would not or could not happen to him.

9. Attached to this affidavit is a copy of the plea petition signed by Mr. Moore in connection with his plea to the final single charge of felony murder. On the face of the plea petition, it states that he is to receive "life parole" and on the addendum to the plea petition it clearly notes that "Measure 11" and ORS 137.700 apply to his case. I carefully explained to Mr. Moore and he clearly understood that "Measure 11" had been codified by the legislature and that ORS 137.700 stood independent of "Measure 11."

10. I simply never told Mr. Moore that he would retain 5th Amendment rights against self-incrimination by entering a plea of no contest. We discussed the possibility of him being called as a witness to testify against a third codefendant, Roy Salyer, because his plea would waive any right he might have against his plea would waive any right he might have against self-incrimination. Mr. Moore was willing to testify against Mr. Salyer if called as a witness. Mr. Moore understood perfectly that by entering a plea of no contest he waived any rights he might have against future self-incrimination and understood that he could be compelled as a witness against the codefendant if the State served him a subpoena to compel his testimony.

11. I did not inform Mr. Moore that he could be sentenced under ORS 137.635. He *was not* sentenced under ORS 137.635 and there was never a suggestion that he might be sentenced under 137.635. Attached to this affidavit is a copy of the sentence order in Mr. Moore's case which shows on its face that he was sentenced under Measure 11, ORS 137.700 and

Page 4 - AFFIDAVIT OF KIM L. JORDAN
TRI32071/SSA/sgr

Department of Justice
1162 Court St. NE, Rm. 100
Salem, Oregon 97310-0506
(503) 378-6313

Excerpts of Record                                    57

ORS 163.115(5)(b). Frankly, I do not know why the court made reference to 137.635 in the Judgment Order except to make it clear that Mr. Moore was not eligible for any kind of diminishment of sentence under any law whatsoever. If this created some kind of a constitutional issue by virtue of the Court entering what I believe to be empty surplus verbiage on the Sentence Order, then questionably, I did miss it.

12. I never did advise Mr. Moore that if he did not take the plea offer his brother Lonnie Wollheiser would also be charged with felony murder. Scott Titzler, the Deputy District Attorney in charge of the case made it absolutely clear that although he was making a settlement offer to Mr. Moore and his brother at the same time, and that while Mr. Moore was to be charged with murder, and his brother was to be charged with lesser offenses, the two plea offers were not contingent upon one another, but were based upon Mr. Titzler's independent evaluation of the respective cases.

13. It was clear, I believe, in everybody's mind, that Mr. Moore denied any premeditated intent to kill the victim, but that it was an accidental killing in the course of an assault and kidnapping. Under the facts it was quite clear the Mr. Moore's brother was less physically involved in the actual killing than was Mr. Moore. Mr. Moore was actually holding the gun which fired the fatal shot. Scott Titzler made it perfectly clear to me and I made it perfectly clear to Mr. Moore that the offer made to him was separate from and unconnected with the other offer made to his brother. Mr. Moore was, throughout our association, probably more concerned about his brother than about himself. Mr. Moore believed that he was guilty of murder under the felony murder rule, although he felt that it was very unfortunate and lamentable that he was guilty since he always maintained that the actual firing of the shot was an accident rather than a premeditated act. Mr. Moore felt very strongly that his younger brother, Lonnie Wollheiser, was

Page 5 -   AFFIDAVIT OF KIM L. JORDAN
          TRI32071/SSA/sgr

Department of Justice
1162 Court St. NE, Rm. 100
Salem, Oregon 97310-0506
(503) 378-6313

NOV. 27, 2007 12:15PM    FEDERAL PUBLIC DEF.  503 326 5524          NO. 3964   P. 2/2

O4 - 15713

much less culpable than he was himself and was very interested in the offer the State was making to his brother

14 Mr Moore and I discussed at great length whether it was in his best interest to try to press the case to early resolution or to waive all time constraints for speedy trial and immediate indictment in an attempt to secure the best possible resolution of the case. Mr. Moore was fully aware of his right to speedy trial, and of his right to speedy presentment to a grand jury by requesting a preliminary hearing. After full discussion with me, he voluntarily waived those rights.

15 The allegation that there is a defect in the charge because the information was filed in District Court rather than in Circuit Court is simply a misunderstanding on Mr. Moore's part of the procedural path that felony criminal charges took through the justice system at that time. All felony informations were filed in District Court at that time, and the only way to bring a felony matter to resolution in Circuit Court was by waiving presentment by requesting a preliminary hearing or by insisting on a grand jury indictment. There is no constitutional defect either in the delay or in the court in the venue in which the charges were initially presented.

16 I never coerced Mr Moore into doing anything I have been practicing law since 1967 and have always served exclusively as defense counsel. The negotiated plea which we entered into with the district attorney did not include any charges of Measure 11 assault or Measure 11 kidnapping I thought that it was the best we could do under the circumstances and I told Mr Moore this I also made it very clear every time it came up, that the decision of whether to take or to reject a plea offer was entirely Mr Moore's responsibility.

17 I informed Mr Moore that I frankly believed if we went to trial he would be found guilty of assault, kidnapping, and murder (as was his codefendant, Roy Salyer, who chose trial as

Page 6 -   AFFIDAVIT OF KIM L. JORDAN
TRI32071/SSA/sgr

an option), but I did not presume to tell Mr. Moore what he should do. I only told him what I thought the result would be of the various choices he had before him. I explained to Mr. Moore that if he chose not to accept the offer which the State had made to him, I expected that the district attorney would charge him with assault in the first degree, kidnapping, and murder, and would go to trial on those charges. At no time during our association did I ever tell Mr. Moore what he should do. I only explained to Mr. Moore as carefully as I could what I thought the result would be of his actions if he chose one option or another.

18. As I have discussed above in connection with paragraph (d)(E), I did not object to "the sentencing court's imposition of sentence under ORS 137.635." Mr. Moore was not sentenced under that statute. I did not believe that he had been sentenced under that statute. I am confident the judge did not believe he had been sentenced under that statute, and I am confident the district attorney did not believe he had been sentenced under that statute. Furthermore, Mr. Moore did not believe he had been sentenced under that statute.

19. From my thorough discussions with Mr. Moore, I know that he believed that he was being sentenced under "Measure 11" and its statutory codification, ORS 137.700. Mr. Moore understood that under the terms of "Measure 11" and ORS 137.700, he would be eligible for no early release, no halfway houses no reduction in sentence under any statute and that he could expect to serve all of the 300 months to which he understood he would be sentenced. We discussed at length his current age and how old he would be at the end of 25 years. We

Page 7 - AFFIDAVIT OF KIM L. JORDAN
TRI32071/SSA/sgr

Department of Justice
1162 Court St. NE, Rm. 100
Salem, Oregon 97310-0506
(503) 378-6313

discussed the likelihood of whether he would survive to be released. I am certain Mr. Moore had no illusions as to the law he under which he was being sentenced or as to the terms of the sentence he was going to be required to serve.

Kim L. Jordan
Attorney at Law

SUBSCRIBED AND SWORN to before me this 26 day of February, 1999.

OFFICIAL SEAL
KATHLEEN M. VAN DYKE
NOTARY PUBLIC-OREGON
COMMISSION NO. 320625
MY COMMISSION EXPIRES JULY 06, 2001

Notary Public for Oregon
My Commission Expires: _____

Page 8 - AFFIDAVIT OF KIM L. JORDAN
TRI32071/SSA/sgr

Department of Justice
1162 Court St. NE, Rm. 100
Salem, Oregon 97310-0506
(503) 378-6313

BERZON, Circuit Judge, concurring:

I concur in Judge Reinhardt's result and almost all of his opinion.

The pivotal questions are simply whether the Oregon state court was unreasonable in its determination that Moore did not (1) receive deficient representation of counsel that (2) prejudiced his case. Because the state has, by forfeiture, acknowledged that Moore's confession was involuntary for the purposes of this appeal, I see no reason to reach that issue de novo. I therefore do not concur in footnote ten of the majority opinion, which does so. Except for any references to footnote ten's voluntariness holding elsewhere in the text, I concur fully in the remainder of the opinion.

In particular, I concur in Judge Reinhardt's discussion of why Moore's counsel's failure to move to suppress his confession prejudiced Moore, in that I believe, to the extent that *Hill v. Lockhart*, 474 U.S. 52 (1985), provides the proper prejudice standard here, Moore has fulfilled it for the reasons which Judge Reinhardt supplies. I write separately, however, to note that I believe that Moore could also demonstrate prejudice more directly under *Strickland v. Washington*, 466 U.S. 668 (1984), and *Kimmelman v. Morrison*, 477 U.S. 365 (1986). Under *Kimmelman* and *Strickland*, the state court could have found prejudice if it were reasonably probable that the failure to file a meritorious motion led to an increase in jail time for Moore — through, for instance, a loss of plea bargain leverage.

While Judge Reinhardt uses *Kimmelman* to address *Strickland*'s ineffectiveness prong, both he and Judge Bybee depart from the straightforward prejudice inquiry of *Strickland*'s prejudice prong as used in *Kimmelman*, instead applying the standard used in *Hill*. On examination however, *Hill* deals with the narrow set of cases within the larger plea context in which counsel advised the defendant to take a plea (which

may have been poorly-negotiated or ill-informed) rather than go to trial, and the defendant challenges this *advice* (rather than, for instance, pre-trial motions that bore on the plea process) as ineffective assistance of counsel. To show prejudice under *Hill*, the defendant must allege that he would have gone to trial save for the counsel's bad *advice*. As *Hill* does not speak to the context of ineffective assistance with regard to pre-trial motions and how they may affect whether a particular plea offered is accepted, its prejudice standard need not be met here, even if it is available as an alternative means of showing prejudice. Put differently, *Hill* provides that, once motions practice and discovery have set the legal landscape, prejudice can be judged *without* showing a different ultimate outcome for the defendant, if counsel's advice to take a particular path through that landscape, pleading guilty, was badly wrong. *Strickland* and *Kimmelman*, instead, deal with counsel's failure to *create* a proper legal landscape — by, for instance in this case, failing to file a plainly meritorious suppression motion. Below, I discuss the *Kimmelman*/*Strickland* prejudice standard in more detail, explain why the *Hill* standard is not necessary to the disposition here, and conclude that Moore was prejudiced under either standard.

## I.   Analysis

### a.   *Strickland* and *Kimmelman*

Under *Strickland*, Moore "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the *result* of the proceeding would have been different." 466 U.S. at 694 (emphasis added). This prejudice standard is a generic one, and *ordinarily* governs ineffective assistance of counsel cases. *See, e.g., Wilson v. Henry*, 185 F.3d 986, 988 (9th Cir. 1999) (relying on *Strickland* to state the standard for a 28 U.S.C. § 2254 ineffective assistance of counsel case). Two elements of the *Strickland* standard are particularly important:

First, Moore need only show a "reasonable possibility" of a different outcome. *Strickland*, 466 U.S. at 694; *Wilson*, 185 F.3d at 988.

Second, applying *Strickland*, the Supreme Court has established that "any amount of actual jail time has Sixth Amendment significance." *Glover v. United States*, 531 U.S. 198, 203 (2001). *Glover* held that "if an increased prison term did flow from an error the petitioner has established *Strickland* prejudice."[1] *Id.* at 200; *see also Argersinger v. Hamlin*, 407 U.S. 25, 32, 37 (1972) (holding that Sixth Amendment right to counsel applies to any case where "imprisonment even for a brief period" is possible); *id.* at 37 (quoting *Baldwin v. New York*, 399 U.S. 66, 73 (1970) (stating that "the prospect of imprisonment for *however short a time* will seldom be viewed by the accused as a trivial or 'petty' matter . . . .") (emphasis added)).

Accordingly, if Moore can show a "reasonable probability" that absent his counsel's ineffective performance he would have obtained a verdict leading to less time in prison, then, applying *Strickland* and *Glover*, he has satisfied the prejudice prong of the ineffective assistance of counsel test.

*Kimmelman* makes clear that the usual *Strickland* analysis applies in the context of a lawyer's incompetent failure to file a timely suppression motion. *Kimmelman,* 477 U.S. at 383-91. Specifically, *Kimmelman* stated that to show prejudice in the suppression motion context, the defendant must demonstrate "that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Id.* at 375. We have read *Kimmelman* as establishing that "[t]o show prejudice under *Strickland* from failure to file a motion, [the

---

[1] Indeed, this conclusion was so obvious that the Court reached it unanimously and the government conceded the point. *Glover*, 531 U.S. at 202. Thus, it was very likely clearly established even before the Court decided *Glover*.

defendant] must show that . . . had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." *Wilson*, 185 F.3d at 990.

In *Kimmelman*, of course, the question was whether the defendant would have received a different verdict at trial had the evidence been suppressed. Absent a meritorious motion, the evident answer to that query is no. But *Kimmelman* does not restrict its outcome-oriented, *Strickland*-based, prejudice standard to the full trial context, and no reason appears why it should be so limited. In this case, as the course of Moore's pretrial proceedings and trial remained open, the parallel question is whether the filing of his meritorious suppression motion would have affected the plea bargain negotiations, with the "reasonable probability" that the outcome of those negotiations would have been more favorable to Moore.

Moreover, *Kimmelman* directly answers the dissent's primary objection to my analysis, that *Hill* rests on a line of cases that limit a habeas petitioner's authority to challenge, on constitutional or any other grounds, errors that preceded a guilty plea, provided that the guilty plea itself was entered with the advice of counsel who was not constitutionally ineffective. *Hill*, 474 U.S. at 56-59; *see also* Dis. op. at 9873. The cases upon which the dissent relies and which *Hill* cites — principally, *McMann v. Richardson*, 397 U.S. 759 (1970), and *Tollett v. Henderson*, 411 U.S. 258 (1973) — did not deal with circumstances in which the asserted pre-plea constitutional violation was *ineffective assistance of counsel* with regard to pre-trial practice, as opposed to constitutional violations by the court or the prosecution. As to the latter variety of pre-plea constitutional violation, we assume that the petitioner had effective assistance of counsel in determining whether or not to challenge those violations in a timely manner, and so consider any such challenge waived as part of the guilty plea. *Kimmelman* explains that where that is not the case — where the very counsel who is advising the criminal defendant is constitutionally ineffective in setting the legal

background for later proceedings, because he or she fails to file essential, meritorious pretrial motions,

> collateral review will frequently be the only means through which an accused can effectuate the right to counsel . . . . A layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance . . . ; consequently a criminal defendant will rarely know that he has not been represented competently until after trial or appeal, usually when he consults another lawyer about his case. Indeed, an accused will often not realize that he has a meritorious ineffectiveness claim until he begins collateral review proceedings, particularly if he retained trial counsel on direct appeal.

477 U.S. at 378.

In other words, where there is ineffective counsel who continues to advise the defendant past the point at which it would ordinarily be proper to make a constitutional challenge, the usual rules regarding the timing of such a challenge — in *Kimmelman*, the rule that Fourth Amendment challenges must be made at trial or on direct appeal, not during collateral challenges, *see Stone v. Powell*, 428 U.S. 465 (1976); here, the rule that any pretrial challenges to potential evidence must be made before pleading guilty (or preserved for later challenge in a conditional guilty plea) — cannot apply, because the premises upon which they rest are absent. "The Sixth Amendment mandates that the state bear the risk of constitutionally deficient assistance of counsel," not a defendant who cannot forward his rights because of counsel's incompetence. *Kimmelman*, 477 U.S. at 379.

Thus, under *Strickland* and *Kimmelman*, to show prejudice, Moore could demonstrate that the plea bargain outcome would have been improved upon by filing the meritorious

suppression motion that was not filed because of ineffective assistance of counsel.

### b. *Strickland* **and** *Hill*

Rather than apply this basic *Strickland* analysis through the lens of *Kimmelman*, Judges Reinhardt and Bybee both rely on language in *Hill*: "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 474 U.S. at 59. Judge Bybee insists that *Hill*'s standard provides the exclusive analysis for all ineffective assistance cases involving a plea. Judge Reinhardt assumes that *Hill* is the appropriate standard and makes a convincing case that Moore would have gone to trial but for his counsel's failure to file the suppression motion, thereby meeting that standard.

On the analysis I propose, however, there is no need to focus on whether the *Hill* standard is met. Essentially our problem is deciding whether it is only the *Hill* prejudice standard, which deals with some varieties of plea bargain ineffective assistance cases, or also the *Kimmelman* standard, which deals with the impact of the failure to file meritorious motions, that controls here. Neither case is *directly* on point on its facts, as *Hill* was a different kind of plea bargain case, while *Kimmelman* involved a trial. But the *Kimmelman/Strickland* standard is the *generally* applicable one, and therefore applies in the first instance here, even assuming that *Hill* provides an available alternative route. *Cf. Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1671 (2007) (holding that a state court decision is "contrary to," or an "unreasonable application of," clearly-established law if it "ignore[s] the fundamental principles established by [the Supreme Court's] most relevant precedents").

What is critical in considering whether *Kimmelman* applies is that *Hill varies* the generally applicable prejudice standard

where there is a guilty plea, to permit application of *Strickland* even where there is no indication that, by choosing trial, the petitioner would have avoided conviction or lessened his sentence. *Hill* indicates that Moore can prevail if he simply proves that he would have gone to trial had his confession been suppressed. But nothing in *Hill* precludes a petitioner who pleaded guilty from meeting the ordinary *Strickland* standard.

This commonsense conclusion is confirmed by *Hill*. *Hill* governs cases in which defendants face a binary choice between pleading guilty and going to trial, and concludes, in essence, that in that situation, the defendant need *not* meet the usual *Strickland* prejudice standard by showing that he would have been better off in terms of outcome had he gone to trial. *See* 474 U.S. at 59-60. But *Hill* does not suggest that this analysis need be the only one governing all plea bargain cases. Instead, *Hill* created an *additional* means to claim ineffective assistance of counsel, even when the alleged ineffective assistance might *not* have affected the ultimate adjudication of guilt or the sentence. It applies when the facts create such a binary choice, and the asserted prejudice is simply in foregoing a trial, regardless of the probable outcome of a trial.

The Supreme Court's discussion of *Hill* in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), reinforces this understanding. That case involved counsel's failure to file a notice of appeal, thereby forfeiting an entire proceeding just as the ill-advised defendant in *Hill* forfeited trial. Again, the two choices were between appealing and not appealing, so prejudice could only be evaluated on those terms. Furthermore, nowhere does *Roe* state that *Hill* limited *Strickland*, but only that the special prejudice rule of *Hill could* be applied to a case involving the decision to appeal. *Roe*, in fact, articulated the very difference between *Hill*-type cases — that is, advice cases — and cases such as this one. The Court stated in *Roe* that "[i]n most cases, a defendant's claim of ineffective assistance of counsel

involves counsel's performance during the course of a legal proceeding, either at trial or on appeal." *Id.* at 481. In contrast, *Roe*, like *Hill*, was "unusual in that counsel's alleged deficient performance arguably led not to a judicial proceeding of disputed reliability, but rather to the forfeiture of a proceeding itself." *Id.* at 483.

The present case, however, is not binary like *Hill* and *Roe*. Refusing to plead no contest to the murder charge before filing a motion to suppress his confession would not necessarily have set Moore on a course for trial. Rather, it would have set him on a course for preliminary motions (on suppression motions for evidence flowing from the confession and, perhaps other pretrial claims) and, then, for further plea negotiations once the motions were resolved. Thus, if Moore could show a reasonable probability that he would have obtained a better plea bargain had his attorney moved to suppress his confession, as I demonstrate below that he can, he would not need the assistance of the special prejudice rule in *Hill*. Instead, if he can meet the ordinary *Kimmelman/Strickland* prejudice standard, that is sufficient under my approach.

Put a bit differently, the prejudice standard *Hill* sets out for the binary choice circumstance is a narrow statement of the general standard set out by *Strickland* and *Kimmelman*. The prejudice inquiry for defendants in Moore's situation can, as a result, be stated in *Hill* terms, but need not be. Defendants in such circumstances are still, ultimately, choosing between pleading and going to trial, but the time period available for the choice is longer. Such defendants can credibly "show that there is a reasonable probability that, but for counsel's errors, [they] would not have pleaded guilty and would have insisted on going to trial," *Hill*, 474 U.S. at 59, in response to the plea bargain originally offered them. But they might well take a different, better plea agreement if competent counsel engages in motions practice to improve the position of the defense. So, while there is no reason to use *Hill*'s specialized language in such cases, *Hill*'s standard is still satisfied. It is far more sen-

sible, however, to address such cases directly, by applying the general *Kimmelman*/*Strickland* inquiry.

The case law does not in any way preclude this limited understanding of *Hill*. I am aware of no case — and Judge Bybee cites none — that addresses why *Kimmelman* and *Strickland* do *not* apply in circumstances like those we consider today. Many plea cases address the *Hill* situation, and so apply the *Hill* standard directly, having no reason to address *Kimmelman* and *Strickland*. Some other cases, it is true, assume (as Judge Reinhardt does today) that *Hill* also applies in the motions context when a plea bargain is involved, as well as in the advice context, but these cases do not provide support for using *Hill* as the exclusive standard in such circumstances. *See* Maj. op. at 9786-87 n.14 (discussing such cases). That we have sometimes assumed that *Hill* applies in the motions context does not justify abandoning the usual *Kimmelman/Strickland* approach in that context.[2]

---

[2]I note that if *Hill* is read to limit the prejudice standard in the motions context to the question whether there is a reasonable probability that the defendant would have pursued further court proceedings rather than taking the plea, there is no reason why that proceeding should be *trial*, rather than a suppression hearing. A guilty plea forfeits not only the merits trial but other judicial proceedings, such as an evidentiary hearing concerning whether a confession was voluntary. *McMann*, one of the underpinnings of *Hill*, certainly provides no justification for focusing on forgoing trial, rather than on forgoing other court proceedings, when assessing prejudice resulting from a guilty plea infected by ineffective assistance of counsel. The defendants in that case, under then-applicable state law, could *only* attempt to suppress their confessions *at trial*, rendering the two proceedings effectively synonymous. *See* 397 U.S. at 772-74. It is now constitutionally required that a judge rather than a jury decide the admissibility of a confession. *See id.* at 772. But if a defendant can show a reasonable probability that he would not have forfeited a hearing before a judge on the issue, save for his counsel's advice to waive that opportunity by pleading guilty, I would read the "trial" reference in Hill as encompassing that evidentiary hearing, which is just as connected to the trial itself as would be a mid-trial hearing of a similar kind.

*Hill* was not initially designed for the present circumstances, and I can see no reason why the petitioner in a case such as this one cannot at least *choose* to meet the regular *Kimmelman/Strickland* prejudice standard.

### c. Prejudice and Prosecutors

The dissent argues that the approach I describe would "place[ ] federal courts in the role of instructing state prosecutors . . . how to conduct plea negotiations," implicating federalism concerns. *See* Dis. op. at 9876. It also contends that inquiring into whether competent defense counsel could have improved the defendant's leverage to seek a better plea bargain runs against the general wisdom that courts are ill suited to "review . . . prosecutorial decisions," thereby raising separation of powers issues. *See* Dis. op. at 9876-78. These concerns have no place whatever in the current context.

I agree with the dissent that "[p]rosecutorial . . . decisions are particularly ill-suited for broad judicial oversight." Dis. op. at 9876 (quoting *United States v. Redondo-Lemos*, 955 F.2d 1296, 1299-1300 (9th Cir. 1992), *overruled on other grounds, United States v. Armstrong*, 48 F.3d 1508, 1515 n.5 (9th Cir. 1995) (en banc)). Prosecutorial discretion is, indeed, broad, although not unfettered. *See Wayte v. United States*, 470 U.S. 598, 607-08 (1985). So, if Judge Bybee were correct that my approach would give federal courts the right to dictate plea bargains and charging decisions, I would share his concerns.

But nothing in the *Kimmelman*/*Strickland* approach implicates such matters. The question is not what a prosecutor should have charged, nor what a "fair" plea bargain should have been. Rather, the question is whether, but for counsel's ineffective assistance, a defendant would have been in a better position to negotiate with the prosecutor. It, therefore, concerns the *defendant's* and *defense counsel's* choices, *defense counsel*'s judgment, and *defense counsel*'s actions, not, in the

first instance, that of the prosecutor. That this assessment requires some consideration of the defense counsel's position with regard to the prosecutor's case is inherent in *any* prejudice inquiry, whether under *Hill* or the more general framework of *Kimmelman* and *Strickland*, and does not convert asking the question into an assault on prosecutorial discretion.

I acknowledge that, as the dissent points out, the *Kimmelman/Strickland* analysis of the defendant's plea bargain leverage is "counterfactual," will be conducted "in most cases, years after the decision to offer the challenged plea bargain," and may be difficult. Dis. op. at 9875. Unlike Judge Bybee, however, I do not think that asking courts to consider these matters poses an "impossible question."[3] *See id.* First, the prejudice inquiry is *always* counter-factual — we are asking, after all, whether there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694 — and generally occurs years after the fact if it has reached an appellate court. So, that objection is not uniquely directed at the plea bargain inquiry I suggest, but is instead a critique of the prejudice inquiry generally.

Further, while the plea bargain process is complex, so is trial. To answer the prejudice question in the trial context, one must consider the weight of the present evidence, the views of the jury, the choices of the defense and, yes, the prosecutor. Yet courts, undaunted, do so. *See, e.g.*, *Schriro v. Landrigan*, 127 S. Ct. 1933, 1943-44 (2007) (considering whether a capital defendant was prejudiced by his counsel's failure to introduce mitigation evidence); *Williams v. Taylor*, 529 U.S. 362, 396-98 (2000) (concluding that a defendant was prejudiced by counsel's failure to investigate his background, which would

---

[3]One reason the dissent may think the inquiry is so difficult is that it portrays the question as whether the prosecutor *would* offer a better plea bargain, *see* Dis. op. at 9874-75, rather than whether it was *reasonably probable* that defense counsel could secure such an arrangement.

have resulted in additional mitigation evidence); *Lopez v. Schriro*, 491 F.3d 1029, 1044 (9th Cir. 2007) (holding that defense counsel's failure to object to medical evidence did not prejudice the defendant). I cannot say that assessing, for instance, whether a jury would have ruled differently on a death sentence, *see Landrigan*, 127 S. Ct. at 1943-44; *Williams*, 529 U.S. at 396-98, is so obviously easier than deciding whether a defendant would be in a better plea bargaining position as to warrant characterizing the latter question as "impossible" for courts to answer.

Nor, for that matter, is inquiring into a defendant's plea bargaining leverage self-evidently harder than determining whether "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. There, too, we must inquire into the strength of the defendant's case and the sentence the prosecutor likely would have sought (albeit at trial, rather than as part of a plea bargain). That inquiry, again, is not particularly easier than the plea bargain leverage question.

My point, in sum, is this: Leaving aside the entirely out-of-place constitutional problems that the dissent raises, the objection that the prejudice inquiry outlined here is "counter-factual," and may sometimes be difficult to apply, does not distinguish *this* prejudice inquiry from other sorts that we regularly carry out. It is not, in my view, a sufficient reason to abandon it.

### d.   Application

As I agree with Judge Reinhardt that Moore's counsel was ineffective because he failed to file a meritorious suppression motion, and had no good reason not to do so, all that remains to determine is whether this failure prejudiced Moore. Judge Reinhardt ably explains why Moore meets *Hill*'s standard for prejudice and I, assuming *Hill* is the proper standard, concur

in his application of it. Moore also meets the *Kimmel-man/Strickland* standard which I believe also applies, essentially for the same reasons that Judge Reinhardt explains in the context of *Hill*. Just as suppressing the confession would have substantially strengthened Moore's case at trial, and so would have substantially influenced Moore's decision to go to trial rather than take the particular plea offered, so too — and even more obviously, given the risk-assessment nature of plea-bargaining — would it have improved his leverage to negotiate a plea bargain with reduced jail time. There is therefore a "reasonable probability" that Moore has suffered prejudice as to the actual sentence imposed, and it was unreasonable of the state court not to find prejudice here.

## II. Conclusion

For the reasons given by Judge Reinhardt as well as for the reasons set forth in this concurrence, I conclude that the state court unreasonably failed to determine that counsel's failure to file a meritorious suppression motion constituted deficient performance, and that such deficient representation prejudiced Moore. Accordingly, I agree with Judge Reinhardt that we should grant Moore's petition for habeas corpus.

---

BYBEE, Circuit Judge, dissenting:

Randy Moore and others beat Kenneth Rogers until he bled, stripped him, bound him in duct tape, placed him in the trunk of a car, drove him to a remote location, and forced him to march up a hill at gunpoint. While marching Rogers through the woods, Moore shot Rogers—accidentally, he said —through the temple. Moore confessed to his older brother, Raymond, and his step-brother's girlfriend, Debbie Ziegler, what he had done. He then talked to police, corroborating the evidence the police had already obtained. Before Moore could be indicted, he negotiated a plea bargain under which Moore

obtained the lowest sentence available under Oregon law for felony murder. Moore's counsel, an experienced defense attorney, recommended that he accept the offer. Counsel explained that he did not think he had grounds to suppress Moore's formal confession and, even if he could have suppressed it, Raymond and Ziegler could "repeat [Moore's informal] confession in full detail." Under the circumstances, counsel thought he had secured the best deal he could get for Moore. The Oregon courts and the district court agreed.

Not so, says the majority: Moore's attorney offered constitutionally deficient advice because he advised Moore to accept the plea offer before he moved to suppress Moore's confession to the police. The majority reasons that Moore would have prevailed on a motion to suppress, and, knowing the state was without his confession, Moore would have insisted on going to trial rather than pleading guilty to felony murder. The majority dismisses counsel's explanation that there was no reason to go to trial in any event because the state had a second confession—Moore's confession to Raymond and Ziegler—by ignoring the state and the district court's findings and entering its own findings: The majority finds that "it is far from clear what those witnesses would have said," and wonders "to what extent their testimony would have been persuasive to a jury." Maj. Op. at 9799. Furthermore, the majority concludes, Raymond was "a hostile witness, [so] it is unlikely that [the state] would have been able to elicit much of the information it desired from him." *Id.* at 9800 n.24.

The majority not only entered its own findings of fact, it found its own law as well. In this AEDPA-governed case, the majority holds that the Oregon state court's decision was "contrary" to the statement in *Arizona v. Fulminante* that "a confession is like no other evidence" and is "the most probative and damaging evidence that can be admitted against [a defendant]." 499 U.S. 279, 295 (1991) (quotation marks and citation omitted). *See* Maj. Op. at 9766-67, 9780, 9794-96,

9798, 9807. The majority's reliance on *Fulminante* is twice remarkable: First, *Moore does not even cite Fulminante*, nor was it cited by the district court, the state court, or any other party. Second, the majority's repeated insistence that "a confession is like no other evidence" is its own undoing. Counsel negotiated a plea because he knew what the majority cannot bring itself to admit: Moore had confessed to two other people before he confessed to the police, and their confessions were plainly admissible and independently damaging.

In the process of second-guessing counsel, the Oregon courts, and the district court, the majority clearly establishes a dramatic proposition: After *Kimmelman v. Morrison*, 477 U.S. 365 (1986), *Strickland v. Washington*, 466 U.S. 668 (1984), and *Arizona v. Fulminante*, when a motion to suppress a confession is potentially "meritorious," counsel's failure to file the motion constitutes deficient and prejudicial conduct if there is any possibility that filing the motion would have caused a defendant to choose a trial over the plea. The majority's principle applies regardless of how many witnesses a defendant has confessed to, how many co-defendants are available to testify against the defendant, or any other evidence available in the record. *See* Maj. Op. at 9792-9807. According to the majority, if counsel has any grounds for moving to suppress a confession and there is any possibility the defendant would have gone to trial, the failure to move for suppression satisfies both prongs of *Strickland*. It is, absolutely, error and, absolutely, prejudicial.

The majority's position is unfathomable. Not only is its conclusion not supported by Supreme Court authority, *see Hill v. Lockhart*, 474 U.S. 52 (1985), it contradicts the Court's holdings. Indeed, the contrary proposition was clearly established in *McMann v. Richardson*: "In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession." 397 U.S. 759, 770 (1970). And, if we needed further

evidence, the majority's opinion contravenes the Court's most recent AEDPA decision, *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009): "[T]his Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Counsel cannot be faulted for not going to trial just because a majority of our court thinks he had "nothing to lose." *Id.* at 1419. In fact, Moore had everything to lose—he could have faced far more severe charges and even the death penalty. He got good advice from his counsel and a good deal from Oregon.

For the reasons I explain below, I would affirm the judgment of the district court denying the writ. I respectfully dissent.

## I.   WHETHER COUNSEL'S CONDUCT WAS DEFICIENT

On AEDPA review, we may only issue a writ of habeas corpus when the state court unreasonably applies "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Carey v. Musladin*, 127 S. Ct. 649, 654 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). For an ineffective assistance of counsel claim, the clearly established Federal law that governs is *Strickland v. Washington*, 466 U.S. 668 (1984), which sets forth a two-step inquiry. "In order to establish ineffective representation, the defendant must" overcome a "highly demanding" standard and "prove both incompetence and prejudice." *Kimmelman*, 477 U.S. at 381-82.[1]

---

[1]To meet the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 687-88, and overcome the "strong presumption that counsel's performance falls within the 'wide range of professional assistance,' " *Kimmelman*, 477 U.S. at 381 (quoting *Strickland*, 466 U.S. at 688-89). When the habeas petitioner alleges that his counsel was ineffective because of counsel's failure to file a motion, a necessary, but by no means

The majority finds that counsel was deficient on two grounds: Moore's statement to the police should have been suppressed, first, because it was involuntary and, second, because it was obtained in violation of *Miranda*. Oddly, the district court's finding that Moore's confession was involuntary is not challenged by the state on appeal, and I agree with the majority that the question of voluntariness therefore is not properly before us. *See* Maj. Op. at 9780-82. I note that, were the issue preserved, a persuasive argument could be made that the confession was in fact given voluntarily. Since the state—inexplicably[2]—has not pressed this issue on appeal, I proceed on the assumption that Moore has demonstrated that his confession was involuntarily given.[3] However, that the state for-

sufficient, condition for a successful showing of incompetence is that the motion would have been meritorious. *See Kimmelman*, 477 U.S. at 375, 382. And, to meet the second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

[2]The district court based its finding of involuntariness on an implied promise of leniency that the police allegedly gave to Moore. Yet, to use Moore's own words, the officers promised him "[n]othing other [than] helping the best [they] could." This offer to recommend leniency to the district attorney is inadequate to establish that "all of the attendant circumstances" indicate that " 'the defendant's will was overborne at the time he confessed.' " *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); *see also United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) ("An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect."). The record demonstrates that the police could not have promised anything other than a recommendation of leniency—and certainly could not promise a reduction of charges—because Moore had not been formally booked or charged when he made his confession.

[3]The conclusion that the state has forfeited its argument concerning the voluntariness of Moore's confession relieves us of the obligation to discuss the *Miranda* issue. It is not relevant to the rest of our inquiry—not

feited its argument concerning Moore's confession on appeal does not mean that the state has conceded the substantive merit of the issue, as the majority assumes it does. Thus the majority's claims that the state concedes both that Moore's taped confession was unconstitutional, Maj. Op. at 9766, and that a motion to suppress the confession would have been successful, Maj. Op. at 9789, are unwarranted and misleading.

Even conceding that the state has failed to challenge the involuntariness finding, I cannot concede that counsel's failure to move to suppress necessarily constitutes deficient conduct. It cannot be, as the majority today holds, that because counsel *could* have filed such a motion, he *must* have filed the motion. To the contrary, the Supreme Court recently held that an attorney is not even deficient if he declines to pursue a strategy despite there being "nothing to lose" by pursuing that strategy. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 & n.3 (2009).[4] Counsel "is not required to have a tactical reason—

even to "buttress[ the majority's] conclusion that [counsel's] performance was highly deficient." Maj. Op. at 9781-82 & n.11. The majority's discussion of the *Miranda* claim in footnote 11 is thus double dicta—resolving the Miranda claim is unnecessary to the majority's decision, and its discussion is way beyond our charge under AEDPA. Likewise is the assertion that Moore's confession was inadmissible. *Id.* at 9806 n.27. I will not prolong my dissent with further discussion of the *Miranda* claim, except to note that there is substantial merit in the state's argument that Moore was not in custody when he invoked his right to counsel and, therefore, *Miranda* did not apply. And, certainly, the state courts' decision is not an unreasonable application of any Supreme Court decisions.

[4]*Knowles* involved a defendant who plead not guilty and not guilty by reason of insanity ("NGI"). *Id.* at 1415. Counsel's strategy was to seek a second-degree murder verdict in the first stage of a bifurcated trial, and an NGI verdict in the second stage. *Id.* However, the jury evidently rejected the evidence of insanity the defendant offered in the first stage of the trial because it found him guilty of first-degree murder. *Id.* at 1415-16. Because the defendant's proffered evidence in the second stage of the trial would have been identical to the evidence offered in the first stage—before the same jury—counsel advised the defendant not to pursue the NGI plea. *Id.*

above and beyond a reasonable appraisal of a claim's dismal prospects for success" for declining to pursue a course of action. *Id.* at 1422. If anything, *Knowles* is a more extreme case than Moore's because the Court found that counsel in *Knowles* was not deficient despite advising his client not to pursue his only possible defense—the *Knowles* defendant truly had nothing to lose. In contrast, Moore's counsel elected not to move to suppress the confession because he doubted its merits and its ultimate effect. Additionally, though, unlike the *Knowles* defendant, Moore had a lot to lose: by going to trial he risked losing a lenient plea agreement and getting a far more severe sentence. Had counsel delayed negotiating a plea while waiting for Moore to be charged so a suppression motion could be filed, it might have cost Moore the opportunity to plead to such a minimal charge. If counsel in *Knowles* was not deficient despite having nothing to lose, surely Moore's counsel was not deficient when his client had much to lose.

Indeed, the majority's proposition runs directly counter to nearly forty years of established Supreme Court precedent, starting with *McMann v. Richardson*, 397 U.S. 759 (1970). The Court in *McMann* considered

> those situations involving the counseled defendant who allegedly would put the State to its proof . . . except for a prior confession that might be offered against him . . . . At least the probability of the State's being permitted to use the confession as evidence is sufficient to convince him that the State's

---

at 1420-21. The Court, in holding that counsel was not deficient, stressed that counsel "is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success for recommending that a weak claim be dropped altogether." *Id.* at 1422. The Court noted that counsel had carefully weighed the options before making an informed decision. *Id.* at 1417.

case is too strong to contest and that a plea of guilty is the most advantageous course.

*Id.* at 767-69. Of these situations, the Court had this to say:

> [A defendant's] later petition for collateral relief asserting that a *coerced* confession induced his plea is at most a claim that the admissibility of his confession was mistakenly assessed and that since he was erroneously advised . . . his plea was an unintelligent and voidable act. *The Constitution, however, does not render pleas of guilty so vulnerable. . . .* In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, *not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases.*

*Id.* 769, 770-71 (second and third emphasis added).

*McMann* is on all fours with Moore's claim.[5] Moore asserts

---

[5]The majority laments that my "invocation of *McMann v. Richardson* is misplaced" because "Moore's challenge is not to counsel's plea advice, as was the case in *McMann*, but to counsel's failure to file a motion to suppress." Maj. Op. at 9786 n.14. True enough, the claim in McMann was styled as a challenge to the voluntariness of a plea. But the *McMann* Court treated the claim as one of ineffective assistance of counsel. *See McMann*, 397 U.S. at 770 ("[D]efendants facing felony charges are entitled to the effective assistance of competent counsel . . . . [The] matter . . . should be left to the good sense and discretion of the trial courts with the admonition that if the right to counsel guaranteed by the Constitution is to serve its

that his trial counsel was ineffective in failing to file a motion to suppress Moore's confession and that he would not have pled no contest to felony murder if he had received competent assistance from counsel. Although filing the suppression motion might seem like a good tactical move now, accepting the state's plea bargain was the strategic thing to do, knowing what counsel knew at the time. Indeed, counsel's obligation

---

purpose, defendants cannot be left to the mercies of incompetent counsel . . . ."). Further, although *McMann* was decided before *Strickland* and *Hill*, those two cases were built upon and reaffirmed *McMann*. "In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson* and *McMann v. Richardson*." *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985). McMann informed the creation of the first part of the two-part test in *Strickland*. *See* 466 U.S. at 687 ("[T]he proper standard for attorney performance is that of reasonably effective assistance. The Court indirectly recognized as much when it stated in *McMann v. Richardson* that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not a 'reasonably competent attorney' and the advice was not 'within the range of competence demanded of attorneys in criminal cases.' " (quoting *McMann*, 397 U.S. at 770-71)); *see also Kimmelman*, 477 U.S. at 377-78 (citing *McMann*); *Hill*, 474 U.S. at 57-58; *accord Langford v. Day*, 110 F.3d 1380, 1386-87 (9th Cir. 1996) (applying *McMann*, as interpreted by *Hill*, in case alleging ineffective assistance of counsel based on failure to file various suppression motions). Indeed, the question in *McMann* and the question here are *identical*: whether a reasonably competent attorney would have foregone the suppression motion and advised the client to plead guilty. If *McMann* means anything, it means that counsel's advice on the admissibility of a confession is not unreasonable simply because two federal judges disagree with it years later.

The majority cites two cases that it holds out as establishing that we have recognized "*Kimmelman*-type *Strickland* claims . . . in cases in which the defendant pled rather than going to trial." Maj. Op. at 9787 n.14. These cases provide, at best, weak support for the majority's assertion that *McMann* should not inform our analysis here. In both cases, we concluded that the defendant's claim of ineffective assistance failed because the decision not to file the motion was a strategic one or because the defendant insisted on forgoing the motions. *See Weaver v. Palmateer*, 455 F.3d 958, 972 (9th Cir. 2006); *Langford*, 110 F.3d at 1386-88.

to explain the risks of trial in light of a plea offer is far more nuanced than the majority's new mandatory scorched-earth-litigation strategy. Moore's trial counsel has carefully explained by affidavit his reasons for not filing the motion to suppress:

> I did not fail to review [Moore's] statement to the police. I read it many times and discussed it at length and in detail with Mr. Moore. He affirmed to me that it was true, and that it was accurate.

> I did not file a Motion to Suppress. My reasons for doing this were two-fold. First of all, [Moore's] interview with the police, which was taped and transcribed . . . makes it abundantly clear that Mr. Moore was not in custody. He never believed that he was in custody and admitted to me that he realized he was not in custody when he and his brothers and another friend voluntarily came to the police department to give the recorded statement. . . .

> [I]n the second place, he had previously made a full confession to his brother [Raymond] and to Ms. [Debbie] Ziegler, either one of whom could have been called as a witness at any time to repeat his confession in full detail. . . .

Counsel explained to Moore, as any competent counsel would, that there was a possibility that the state might charge Moore with aggravated murder because

> [t]he victim in this case had been assaulted, bloodied, bound with duct tape, placed in the trunk of a car, taken to an isolated rural location, marched into the woods while still bound, and shot. Furthermore, the victim had an extremely large protruding abdominal hernia for which he always wore a truss. I discussed with Mr. Moore the possibility that if he were

ever charged with aggravated murder that the jury
might, after taking into account all of the facts of the
case, conceivably find that he had engaged in "tor-
ture" of a helpless and somewhat disabled victim.

For this and other reasons, counsel feared severe conse-
quences if his client went to trial:

Mr. Moore always claimed his actual shooting of
the victim was an accident, but there was never the
smallest doubt that it occurred during a kidnap [sic]
which began with an assault. We discussed at length
the felony murder rule. We also discussed at length
the fact that he had not yet been indicted for any
conduct and that it was possible that when an indict-
ment came down from the grand jury, it could be for
any charge up to . . . aggravated murder. . . .

I discussed at great length with Mr. Moore the
definitions of "aggravated murder," "murder," and
"felony murder." I did tell Mr. Moore that if he were
charged with aggravated murder and if the jury
decided that murder had been committed under [OR.
REV. STAT. § ] 163.095(e), in the course of or as a
result of intentional maiming or torture, that it was
not impossible that he might be convicted of aggra-
vated murder . . . .

I frankly believed if we went to trial he would be
found guilty of assault, kidnapping, and murder (as
was his codefendant, Roy Salyer, who chose trial as
an option),[6] but I did not presume to tell Mr. Moore
what he should do. I only told him what I thought the
result would be of the various choices he had before

---

[6]Unlike Moore, Salyer chose to proceed to trial and was found guilty
of murder, kidnapping, burglary, and assault. *See Salyer v. Belleque*, 2005
WL 555403, at *1 (D. Or. March 4, 2005).

> him. I explained to Mr. Moore that if he chose not to accept the offer which the State had made to him, I expected that the district attorney would charge him with assault in the first degree, kidnapping, and murder,[7] and would go to trial on those charges. At no time during our association did I ever tell Mr. Moore what he should do. I only explained to Mr. Moore as carefully as I could what I thought the result would be of his actions if he chose one option or another.

A conviction of aggravated murder, of course, would have subjected Moore to the possibility of the death penalty or life imprisonment without the possibility of parole. *See* OR. REV. STAT. § 163.105(1)(a). Given the strength of the evidence facing Moore, it is not surprising to learn that counsel and Moore decided to "attempt to secure the best possible resolution of the case" or that counsel, who had nearly three decades of criminal defense experience, thought the plea "was the best we could do under the circumstances."

These strong and obvious strategic reasons to take the plea and forego the suppression motion are protected under *Strickland*, *see* 466 U.S. at 681 ("[S]trategic choices must be respected in these circumstances if they are based on professional judgment."), especially because Moore was so obviously seeking "to save himself the expense and agony of a trial and *perhaps also to minimize the penalty that might be imposed*." *McMann*, 397 U.S. at 767-68 (emphasis added). The majority's opinion sweeps all of these factors away. Had the majority been advising Moore at the time, they might have

---

[7]Very strong circumstantial evidence contradicted Moore's "accidental shooting" explanation and would have justified an intentional murder charge. Moore shot Rogers with a revolver—a gun that would not discharge unless it had been cocked by the shooter. Furthermore, Rogers was shot in the temple, as if he was executed, and not in the back, as might be expected if he had slipped and fallen backward onto Moore.

come to a different conclusion. But even accepting the majority's morning-after conclusion that counsel "misjudged the admissibility of the defendant's confession," *McMann*, 397 U.S. at 770, Moore is not entitled to habeas relief. *See id.* at 770-71.

The majority limits its consideration of counsel's explanation to a mere two paragraphs of the trial counsel's affidavit and refuses to consider many of the reasons that trial counsel gave for pursuing the plea bargain instead of going forward with a trial preparation strategy. The majority erroneously believes that trial counsel offered only two reasons to justify his advice to Moore: (1) because he concluded Moore was not in custody at the time of the confession and (2) because Moore had given a full confession to two other people. *See* Maj. Op. at 9766-67, 9778, 9780, 9784-85 & n.12. The majority summarily concludes that there is no evidence that Moore wanted to press the case to early resolution and, therefore, trial counsel could not have made a reasoned strategic choice to not file the suppression motion so as "not . . . to upend plea negotiations." *Weaver v. Palmateer*, 455 F.3d 958, 972 (9th Cir. 2006); *see* Maj. Op. at 9784-85.

The extensive portions of the affidavit already quoted make clear that counsel's advice to forego the motion and take the plea was based on numerous considerations other than these two factors. *But see* Maj. Op. at 9785-88. And other portions of the affidavit demonstrate that plea negotiations were front and center in both Moore's and trial counsel's mind. Trial counsel reported that Moore indicated his willingness to testify against a co-defendant, which is surely the type of consideration defense counsel weighs during plea negotiations. Two entire paragraphs of the affidavit, paragraphs 13 and 14, discuss how Moore was more worried about the plea agreement that was offered to his brother, Lonnie Woolheiser, than he was about his own plea agreement.[8] Another entire paragraph

---

[8] The affidavit indicates that trial counsel properly informed Moore that the offer to him was independent of the offer made to his brother.

establishes that trial counsel "discussed at *great length* whether it was in [Moore's] best interest to try to press the case to early resolution." (emphasis added). The majority's assertion that "there is no suggestion, let alone any evidence, that Moore expressed a desire to plead guilty and avoid trial, or to forego the filing of his meritorious suppression motion, prior to counsel's decision not to file [a suppression] motion," Maj. Op. at 9790 n.16, ignores the reality of the record evidence.[9]

This kind of meticulous, informed representation, provided by an attorney who had decades of criminal defense experience, does not "show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *McMann*, 397 U.S. at 767-71. More importantly for purposes of this appeal, the state court's decision that it did not constitute deficient representation was not an unreasonable application of clearly established federal law as determined by the holdings of the Supreme Court.

The majority's attempt to parse counsel's advice on whether to take the plea into two distinct decisions—first, whether to file a motion to suppress the confession, and second, whether to accept the offered plea bargain—reflects an almost willful ignorance of the record evidence and the realities of criminal defense representation. *See* Maj. Op. at 9784-90. As counsel's declaration makes clear, *see* Maj. Op. App. B, the decision not to file the suppression motion and the decision to take the plea necessarily informed each other. In fact, trial counsel's affidavit demonstrates that the two decisions—whether to file a motion to suppress and how to advise Moore on the plea—were made contemporaneously. Moore was never indicted, but he pled no contest to an infor-

---

[9]Contrary to the majority's claims, *see* Maj. Op. at 9785-87, the record does not reflect whether the plea negotiations occurred before or after trial counsel advised Moore that a suppression motion would be unlikely to succeed or would otherwise be useless. The record does reflect that Moore wanted to press for an early resolution.

mation negotiated as part of the plea. Counsel simply could not have moved to suppress a confession at any time before the plea, unless the majority means to find counsel ineffective for not *threatening* to file such a motion in the plea negotiations.

The net effect of the majority's approach is pernicious: Instead of deciding whether counsel's conduct fell below an objective standard of reasonableness, the majority asks whether the motion had merit and collapses the entire first step of *Strickland* into the question of prejudice. *See* Maj. Op. at 9780 ("[O]ur inquiry with respect to deficient performance substantially overlaps with our inquiry regarding prejudice."). In doing so, it largely ignores the obvious strategic reasons detailed in counsel's affidavit that counsel had to advise Moore to take the plea, and the dispositive question becomes whether the motion to suppress had merit. Paired with the majority's unprecedented reading of *Arizona v. Fulminante,* 499 U.S. 279 (1991)*, see* Maj. Op. at 9795-96 ("*Fulminante* stands for the proposition that the admission of an additional confession ordinarily . . . is therefore prejudicial."), which I address in detail *infra*, the implication is that *if* the motion had merit, then counsel was *obligated* to bring it, irrespective of any other considerations or strategy. It forces defense counsel to file any motions to suppress a confession that a panel of federal judges later might determine to be meritorious, lest the court of appeals find that counsel "failed to recognize the clear merit of that motion" or "to assess properly the damaging nature of the tape-recorded formal confession." Maj. Op. at 9784.

The majority's application of the *Strickland* standard does not accord with the realities of defending a criminal defendant. Defense counsel must balance competing factors when selecting a defense strategy: for example, the likelihood of success on the motion to suppress, the likelihood of prevailing at trial given the other available evidence, the deal that the state is offering, the potential penalties that a defendant can

avoid by taking an offered deal, and, of course, the defendant's own wishes. *Strickland* gave "wide latitude" to counsel to avoid unhelpful judicial nosiness in plea negotiations:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland*, 466 U.S. at 688-89. A requirement that defense counsel file any potentially meritorious pre-trial motions or risk being found incompetent on collateral review will skew plea negotiations where the considerations promoting negotiation include whether the defendant will file a motion to suppress. If, in response to the majority's new rule, counsel must file all motions, defense counsel loses a bargaining chip and will almost certainly face a much less cooperative prosecutor. And if defense counsel loses the motion to suppress, counsel will be in a much weaker bargaining position when he returns to the negotiation table. In those cases, the post-motion deal will nearly always be worse than the pre-motion deal.[10]

The majority would leapfrog over all of those considerations—if the motion to suppress had merit, then counsel *must* bring it (even if counsel does not think it will

---

[10]Moreover, if, as the majority effectively holds today, defense counsel must always move to suppress a confession or risk a claim of ineffective assistance of counsel, there is no end to the second-guessing game. If counsel moved to suppress and lost on that motion, then, by the majority's reading, counsel must see the case through trial and take an appeal. And if he loses on appeal, then he must file for habeas—all so that he can be in the best position to negotiate a plea bargain. The bottom line is that counsel, in defense of his own reputation, will not seek plea agreements or will counsel against accepting a plea bargain. This makes no sense.

serve the client's best interests). *Strickland* and its progeny simply do not allow this new presumption of deficient conduct whenever a potentially "meritorious" suppression motion might have been filed—least of all in habeas proceedings governed by AEDPA.

* * * *

In short, I cannot agree with the majority that counsel's thorough representation constituted deficient performance. Even assuming the involuntariness of Moore's confession, counsel gave a detailed explanation why pursuing the plea was in Moore's strategic interest. We can second-guess counsel's decisions, but we have no basis for concluding that those decisions were constitutionally deficient, let alone that clearly established Federal law, as announced by the Supreme Court, compels such a finding.

## II.   WHETHER COUNSEL'S CONDUCT PREJUDICED MOORE

Even if Moore's counsel was ineffective, Moore is only entitled to habeas relief if he can demonstrate that he has suffered prejudice as a result. Unlike the majority, however, I do not believe that Moore has demonstrated prejudice. To demonstrate prejudice under *Strickland*, 466 U.S. at 694, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. *In Hill v. Lockhart*, 474 U.S. 52, 57-59 (1985), the Supreme Court applied *Strickland* "[i]n the context of guilty pleas" and held that "to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 58-59.

There is no reason to believe that Moore would have gone to trial. In fact, the state's case against Moore was so strong

that it would have been irresponsible for counsel to lead Moore into thinking he might have gotten a better deal from a jury than he received from the DA. As I explain here, by declining the plea of felony murder and taking the mandatory minimum of twenty-five years, Moore risked getting a life or even a death sentence.

## A. *The Evidence Against Moore*

A straightforward application of the *Hill* standard demonstrates that Moore cannot establish that he has suffered any prejudice.[11] This conclusion flows from two simple facts. First, the state could have called Raymond and Ziegler to testify that Moore confessed his role in the kidnapping and slaying of Kenneth Rogers. We do not need to fret much about what Raymond Moore would have testified had he been called at trial, as the majority does, *see* Maj. Op. at 9773-74; *id.* at 9797 (suggesting Raymond and Ziegler "would undoubtedly be reluctant to do unnecessary harm to [Moore's] case"); *id.* at 9799 ("[I]t is far from clear what [Raymond and Ziegler] would have said or to what extent their testimony would have been persuasive to a jury . . . ."); *id.* at 9799 ("Critically, the state court made no findings as to the contents of what Moore had told Raymond or Ziegler or what details they might have been able to recount at trial."), because the record contains Raymond's testimony at the state court post-conviction evidentiary hearing. In it, Raymond confirms that, before he took his brothers to the police station where their confessions were recorded, Moore confessed to him the details of what happened. Here is how Raymond described it, under oath, to the state court:

> [W]hen [Roy Salyer] got back from Texas and dis-

---

[11]Judge Berzon argues in her concurrence that Moore had the option of meeting the prejudice standard under either *Strickland/Kimmelman* or *Hill* and, further, that he meets both of those standards. *See* Concurring Op. at 9824-25. I address her arguments in Part II.C, *infra*.

covered [that Rogers had burglarized Salyer's home, Salyer] showed up over at Lonnie [Woolhiser's] house where Randy [Moore] was that morning and . . . there was a couple cases of beer and started drinking and basically, to my understanding . . . instigated them into going up and, as they put it, spanking their other friend because friends do not rob friends. And in the process of this, I guess, to make an example and put some scare into Mr. Rogers so he did not do this thing again, they had blindfolded him to duct taped him and put him in the trunk of the car and took him out to a place that's a little remote, not a lot. The gentleman was a large size guy and didn't walk much and stuff. And their intent was to leave him there and make him walk home, you know, after he freed himself. This here, of course, is the kidnapping that's involved in this case because they took him somewhere against his will . . . . [D]uring this period of time, Lonnie who is a little rowdier—he's a good boy but he's just a little rowdy. He'll fight at the drop of a hat. He had in his possession a .22 magnum pistol in which Mr. Rogers had given to him previously—given or traded, I'm not sure which. And Randy, while they were pushing Mr. Rogers up the hill, kind of muddy, it's during the winter and we have a lot of red mud down there, Randy had taken the revolver from Lonnie and at the time he had taken it, Mr. Rogers had slipped backwards on the mud and the gun discharged. I'm not sure of all the exact details because this is basically hearsay. It's what was stated in court *and it's what they had basically told me after the incident, too, before I took them in, or on the way in.*

(emphasis added). The majority thus is disingenuous in stating that "[t]he state court found only that Moore had 'confessed' to" Raymond and Ziegler but did not make specific findings concerning the content of that confession, Maj. Op.

at 9774, particularly because trial counsel's affidavit—which the state court credited—stated that Moore had made a "full confession to his brother and to Ms. Ziegler." The record clearly showed that Raymond, at least, knew what happened because Moore told him about the details. With this testimony, the state court reasonably concluded that any failure on the part of trial counsel would not have resulted in prejudice to Moore. Trial counsel, the state court, and the district court all recognized that Raymond could have testified about what Moore told him concerning the murder. In its selective treatment of the record, the majority irresponsibly ignores this testimony.

Second, even without his confession to Raymond and Ziegler, the state's case against Moore would likely have been airtight. I emphasize that the case "would likely have been airtight" because counsel had to judge the strength of the state's case before the state put it on. Nevertheless, as I show, the case for felony murder was not a difficult one at all.

Under section 163.115 of the Oregon Revised Statutes, Rogers's killing was a felony murder if "it [was] committed by a person, . . . who commit[ted] or attempt[ed] to commit [kidnapping or assault] and [the death occurred] in the course of and in furtherance of the crime the person [was] committing or attempting to commit." It is undisputed that Moore, Salyer, and Woolhiser went to Rogers's home, that Rogers was beaten, that he was bound with duct tape, and that he was thrown into the trunk of the car they had borrowed, driven to a remote location, and shot in the temple. It is indisputable that Moore, Salyer, and Woolhiser, by virtue of their involvement in the felonies of kidnapping and assault, were guilty of felony murder under Oregon law. It is equally indisputable that Moore had no affirmative defense. Thus, to convict Moore of felony murder, all that the state needed to do was prove that he took part in Rogers's kidnapping and that the murder furthered the kidnapping.

This would not have been hard. The state had both Roy Salyer and Lonnie Woolhiser in custody, and both could have been called to testify that Moore took part in the attack. The state court found that Moore and Woolhiser had also confessed to their older brother Raymond Moore as well as to Woolhiser's girlfriend, Debbie Ziegler.[12] Since all of these witnesses were Moore's close relatives or good friends, their testimony would likely have been very credible.

---

[12]The majority spends a great deal of time discounting the value of these two confessions by speculating on what the witnesses would or would not have done. It finds that "Raymond would likely have been a hostile witness" and that "it is unlikely that [the state] would have been able to elicit much of the information it desired from him." Maj. Op. at 9799 & n.24. This is raw speculation, and it is belied by the testimony Raymond actually provided to the state court. It is also patently absurd. Because the broad outlines of what happened were very clear *i.e.,* that Rogers was beaten in his home, bound, kidnapped, taken to a remote location and shot in the head while still bound—the state needed to establish very little to convict Moore of felony murder. Focusing on statements made by Ziegler during Moore's initial questioning, the majority states that "there is little evidence that Ziegler could have contributed anything." Maj. Op. at 9799-9800. But the state court did not rest its finding that Ziegler could have repeated Moore's confession solely on the statements she made at questioning. The state court *explicitly* found that Moore's trial counsel's affidavit, including the paragraph explaining that no motion to suppress was filed because Ziegler or Raymond Moore could have been called to testify, was truthful. As already noted, *see supra* at 9843-44, the affidavit clearly states that Moore admitted to making a full confession to Ziegler. Contrary to the majority's assertions, *see* Maj. Op. at 9799-9800 & n.24, the state court's ruling that Moore confessed to Ziegler did not conflict with the interrogation transcript: Just because Ziegler learned of the murder on the day *of* the interrogation does not mean that she learned of it *at* the interrogation.

I find it remarkable that the majority, twelve years after the incidents in question, and without knowing any of the parties involved, can divine what Raymond and Ziegler were thinking and what they would or would not have done. I also find it remarkable that the majority brushes aside, with almost no discussion, the state court's factual findings concerning these confessions.

And yet this only scratches the surface of the damning testimony available to the prosecution. Before they left for Rogers's residence, Salyer, Moore, and Woolhiser had been drinking with others at Ziegler's residence. Salyer was "ranting and raving" about how Rogers had broken into his cabin and slashed his tires. This was what prompted the trio to head to Rogers's residence—to confront him about the robbery and to scare him out of ever committing another one. *Four* witnesses, including Ziegler, observed this entire interaction and then observed the trio drive off to confront Rogers—in a car that Salyer had borrowed from another one of the guests.

When the trio arrived at Rogers's residence, other people were there. These people witnessed Moore, Woolhiser, and Salyer arrive, and at least one of those people spoke with Woolhiser about what they were doing there. Another was able to identify all three defendants from a photo lineup. These people would also have been able to testify that at this point the car's license plates had been covered over with duct tape. Shortly after the defendants arrived, these people all drove away, leaving Rogers alone with Moore, Woolhiser, and Salyer.[13]

There was also highly inculpatory physical evidence in this case. The day before Moore confessed, Salyer led police to the location of the revolver they had used. The police were

[13]With the exception of the lineup identification, the prosecution could establish *all* of the facts in the last two paragraphs by relying solely on statements made by Moore, the admissibility of which has never been questioned. The day before the interrogation at issue in this case, the police approached Moore and Woolhiser while they were eating at a local restaurant, and the pair agreed to come by the station house and answer questions after they had finished their dinner. After arriving at the station house, Moore gave a description of events that was largely accurate up until the point that Woolhiser and Salyer began beating Rogers. The next day, Woolhiser admitted to asking the owner of the car if he had anything that they could use to tie Rogers up, to which the owner responded that he had some duct tape.

unable to find it in the dark, but Woolhiser led them back to the same area the next day, at which point they recovered the weapon. When police found the car that the trio had used, they found blood in the trunk, as well as hair. Although the record does not state that either the blood or the hair was ever scientifically tested, a visual inspection of the hair suggested that it may have been the victim's, who had long hair that he wore in a ponytail.

So, to summarize, *even without Moore's confession to the police, or his confession to Raymond Moore or Debbie Ziegler, or the testimony of his co-defendants*, the prosecution had testimony from *multiple* witnesses, as well as unchallenged statements from Moore, that: (1) An intoxicated Salyer had been ranting and raving about how Rogers had stolen from his cabin and slashed his tires; (2) Moore had left with Salyer and Woolhiser to confront Rogers; (3) the trio arrived at Rogers's residence, and that soon thereafter they were alone with Rogers; and (4) the trio returned from Rogers's residence together. Rogers was found murdered the next day. Woolhiser and Salyer were clearly involved, as they knew where the gun was, and blood and hair were found in the trunk of the car that the trio had borrowed. The police could prove that Moore had lied about what had transpired when he went to Rogers's residence. Add the testimony of Raymond and Ziegler, and the case is airtight. The state's felony murder case against Moore could hardly have been any stronger unless the murderers had brought along a camera crew.

Moreover, the evidence was such that Moore could have been tried for a variety of other crimes instead of or in addition to felony murder. Had Moore not pled to felony murder, the DA could have tried Moore for aggravated murder, which carries a sentence of life imprisonment, life imprisonment without the possibility of parole, or death. *See* OR. REV. STAT. §§ 163.095(1)(e), 163.105. Likewise, Moore could have been tried for other types of criminal homicide, any of which would carry a sentence of life imprisonment. *See id.*

§ 163.115(5)(a). In addition to the homicide charge, Moore could and likely would have also been charged with other crimes, including kidnapping. Finally, the possibility of Moore's being charged with such crimes was forefront in counsel's mind when he discussed the plea with Moore. As counsel testified:

> We discussed at length the felony murder rule. We also discussed at length the fact that he had not yet been indicted for any conduct and that it was possible that when an indictment came down from the grand jury, it could be for any charge up to . . . aggravated murder. . . .

> I discussed at great length with Mr. Moore the definitions of "aggravated murder," "murder," and "felony murder." I did tell Mr. Moore that if he were charged with aggravated murder and if the jury decided that murder had been committed under [OR. REV. STAT. § ] 163.095(e), in the course of or as a result of intentional maiming or torture, that it was not impossible that he might be convicted of aggravated murder . . . .

All of this evidence—the witnesses, the duct tape, the gun, Moore's confession to others—were known to Moore and his counsel. They knew what the majority cannot fathom—that the state had a rock-solid case against Moore and his best shot was to strike a plea deal. However, the majority's formal opinion completely fails to consider almost *any* of this evidence or its implications for the deal Moore struck. *See, e.g.*, Maj. Op. at 9814 ("Without the fruits of Moore['s] . . . confession[ ], the prosecution would have had tremendous difficulty meeting the high burden it faced. In view of the weaknesses in the state's case, it is highly unlikely that, in the absence of his own recorded confession, Moore would have pled to felony murder. We thus cannot have any confidence

that the outcome would have been the same had counsel filed
a motion to suppress.").

In parts of the majority's formal opinion as well as its
appendix, the majority also criticizes my reading of the
record; these criticisms lack force. For example, the majority
questions my placing any reliance on the testimony of Salyer
and Woolhiser, "without any evidence in the record as to the
substance or availability of such testimony, or, even more
important, its *admissibility*," Maj. Op. at 9803 (emphasis in orig-
inal),[14] in contrast to its own reliance on "the arguments made
by the state on appeal," *id.* at 9802-03. First, it is Moore, not
the state, who bears the burden of establishing that he has suf-
fered prejudice; his failure to address evidence in the record
does not entitle us to ignore it in making our decision. It is
utterly absurd for us to put on blinders and pretend that obvi-
ously damning evidence—such as the testimony of co-
defendants who have pled guilty—simply does not exist.[15]
Indeed, Moore himself does not expect us to do so; he specifi-

[14]This criticism seems particularly strange in light of the extensive dis-
cussion that the majority provides of why, in its opinion, Ziegler and Ray-
mond would not have made good prosecution witnesses. *See, e.g.*, Maj.
Op. at 9796-98; *see also supra* at 9853 n.11.

[15]The majority's criticism on this score seems all the more hypocritical
because it has no hesitation, apparently, in manufacturing new arguments
on behalf of Moore, who did not cite on appeal the two cases most impor-
tant to the majority's opinion, *Kimmelman* and *Fulminante*, or make any
argument related to the theories on which the majority bases its decision.
*But see* Maj. Op. at 9805 ("The forfeiture rule (sometimes erroneously cal-
led the waiver rule) applies equally to arguments, factual assertions, and
legal theories that were not urged below."). To borrow from the majority
opinion, I "recognize that [my] colleague[s] believe[ ] that Moore deserves
to [get a less harsh penalty], but disregarding the [appellate] arguments as
well as the state court record and findings, and substituting one's own, is
hardly the manner in which federal appellate courts are supposed to deter-
mine appeals," Maj. Op. at 9768 n.1, and "[w]e may not as appellate
judges manufacture such arguments from scratch, especially where, as
here, the facts in the record are directly contrary to the theory we are seek-
ing to create on behalf of one of the parties," Maj. Op. at 9791.

cally addresses the issue of Salyer's testimony in his brief. Second, the record leaves little doubt that Salyer and Woolhiser's testimony would have been admissible, available, and adequate: Both Salyer and Woolhiser were imprisoned by the State of Oregon, so they could easily be produced if necessary.[16] As to the substance of their testimony, even if it were not as complete as their formal confessions to police, had Moore been on trial for *felony murder*, the state needed to prove precious few details of the day's events to secure a conviction.[17]

But the most important point is this: Where we are reviewing the state court's denial of an ineffective assistance of counsel claim, it would be irresponsible for us not to review the record to apprise ourselves of what *counsel* likely knew. We can only speculate as to what testimony the witnesses actually would have offered had this case actually gone to trial. But it is naive for us to ignore the other evidence in the record.

The majority's opinion correctly quotes the applicable standard of prejudice for ineffective assistance of counsel claims arising from guilty pleas: the petitioner must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. The Supreme Court reaf-

---

[16]The majority's inadmissibility argument—an argument that Moore himself only makes in passing and, even then, only with reference to Salyer—fails for the same reason. The majority's claim that any of the evidence I cite above flowed from "Woolhiser's involuntary confession[ ]," Maj. Op. at 9811, and is therefore inadmissible is simply wrong because Woolhiser could have been called to testify directly.

[17]The majority cites *Lee v. Illinois*, 476 U.S. 530, 545 (1986), for the proposition that testimony by co-defendants is "inherent[ly] unreliab[le]." *See* Maj. Op. at 9775 n.4. This citation is misleading both because *Lee* involved application of hearsay law, which is not implicated by Salyer and Woolhiser's potential testimony, and because it relied on *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), which is no longer good law. *See Crawford v. Washington*, 541 U.S. 36 (2004).

firmed *Hill* in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), stating:

> [i]n *Hill*, we considered an ineffective assistance of counsel claim based on counsel's allegedly deficient advice regarding the consequences of entering a guilty plea. Like the decision whether to appeal [presented here], the decision whether to plead guilty (i.e., waive trial) rested with the defendant and, like this case, counsel's advice in *Hill* might have caused the defendant to forfeit a judicial proceeding to which he was otherwise entitled.

*Id.* at 485. The Court proceeded to cite *Hill* for the proposition that "when, in connection with a guilty plea, counsel gives deficient advice regarding a potentially valid affirmative defense, the prejudice inquiry depends largely on whether that affirmative defense might have succeeded, leading a rational defendant to insist on going to trial." *Id.* at 486.

The majority's position, then, is that there is a reasonable probability that, but for his counsel's failure to move to suppress the taped confession, Moore would not have pled to felony murder, but instead would have insisted on going to trial. The majority speculates that it is likely the state would have been unable to secure a plea bargain with "only" the two confessions and other evidence catalogued above.[18] In support of

---

[18]The majority claims that if Moore's taped confession had been suppressed, the state may have offered Moore a better plea bargain. Maj. Op. 9802 n.26. This possibility is both unlikely and irrelevant. Considering the weight of the evidence, it is speculative and unlikely that the state would have offered Moore a different plea bargain had one of multiple confessions been suppressed. Moreover, the lost possibility of negotiating a more favorable plea bargain, which I do not believe exists here in any event, does not constitute prejudice under any Supreme Court authority. The Supreme Court has held unequivocally that "in order to satisfy the 'prejudice' requirement, the defendant must *show* that there is a reasonable probability that, but for counsel's errors, he *would not have pleaded guilty and would have insisted on going to trial*." *Hill*, 474 U.S. at 59 (emphasis added).

this proposition, the majority points out that we don't know with certainty what Raymond and Ziegler would have testified to at trial, so we can't know that their testimony would have been sufficient to cause Moore to accept a plea bargain. Maj. Op. at 9799-9800.

Moore's counsel did not have the benefit of the majority's *ipse dixit* power; when advising Moore on the plea offer, he had to judge his case on the basis of the evidence he thought the state had and the likelihood of various witnesses testifying. No one knows with prescient certainty how a trial will play out, so a defendant and his counsel must weigh their options and decide whether the certainty of a plea is preferable to the gamble one takes by being tried.

The majority also makes much of the fact that Salyer went to trial and received the same sentence as Moore did from his plea bargain: twenty-five years.[19] Maj. Op. at 9788, 9789 n.15, 9802. This simply is not relevant. First, Moore's counsel did not have the benefit of this knowledge at the time he was discussing the plea bargain with Moore. Additionally, one cannot infer with any certainty how one defendant will fare in a trial from how a different defendant fared. And, Salyer is not a good test case of what would have happened had Moore gone to trial because Salyer was not the one who pulled the trigger; it was Moore who marched Kenneth Rogers up the hill and it was Moore who held the gun that shot Rogers through the temple. Thus, there is every reason to expect Moore to be susceptible to more serious charges and a harsher sentence and little reason to think that Moore would be charged only with the same crimes as Salyer. Maj. Op. at 9789 n.15. Moreover, the majority uses Moore's and Salyer's similar sentences as evidence of the raw deal Moore got by

[19]Salyer was sentenced to twenty-five years for murder, ninety months for kidnaping, seventy months for assault, and twenty-two months for burglary, all of which ran concurrently. *See Salyer v. Belleque*, 2005 WL 555403, at *1 (D. Or. 2005).

accepting a plea bargain. However, Moore's plea bargain of twenty-five years is no harsher than the sentence Salyer received. If Salyer's fate suggests anything, it is that, at the least, Moore did no worse by accepting the plea bargain than he would have done by going to trial. The majority claims that Moore suffered prejudice because a less culpable co-conspirator, who did not pull the trigger, received the same sentence. Maj. Op. at 9811. How this constitutes prejudice is beyond me.

This much is clear: There was more than enough admissible evidence, easily obtainable by the state, to convict Moore of (at least) felony murder—especially and most importantly, as the state court recognized, the likely testimony of Raymond Moore and Debbie Ziegler. When we consider the surfeit of evidence against Moore, it is plain that not only was counsel's advice to accept the plea not deficient or prejudicial, but it was very good advice. Moore may not have received a lesser sentence than his codefendant who went to trial, but he did avoid a potential death sentence. There is good reason why *Strickland* requires us to defer to counsel's on-the-ground judgments over the majority's own " '*post hoc* rationalization.' " Maj. Op. at 9791 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003)). In short, there is no reason to think that removing one brick in the state's wall of evidence would have caused Moore to subject himself to a high-stakes trial and therefore no reason to conclude that he suffered any prejudice.

B.   *The Majority's Reliance on* Fulminante

Ultimately, the majority opinion rests on the premise that the state court's decision resulted in an unreasonable application of *Arizona v. Fulminante*, 499 U.S. 279 (1991), *a case*, I note once again, *that Moore does not even cite*. According to the majority, "*Fulminante* stands for the proposition that the admission of an additional confession ordinarily reinforces and corroborates the others and is therefore prejudicial." Maj. Op. at 9796-97. *Fulminante* does no such thing. It

did not, as the majority's characterization suggests, adopt a per se rule that the improper admission of a confession is prejudicial;[20] in fact, *Fulminante* explicitly held that the improper admission of a confession is subject to harmless error analysis. *See* 499 U.S. at 310. Nor does the fact that the Supreme Court found that the admission of the confession at issue in *Fulminante* was prejudicial compel the same result here.

The fact that Moore's confession to the police was probative does not make it prejudicial. Indeed, it is fair to say that the formal, tape-recorded confession that Moore gave to police in their interrogation room was probably more probative than Fulminante's confession, which he made to a friend while they were both incarcerated. All of the quotations that the majority pulls from *Fulminante* to establish the damaging, probative value of a confession—that "[a] confession is like no other evidence," Maj. Op. at 9798 (alteration in original), that a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him," *id.*, that "[t]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct," *id.*—are statements that were originally made by the *Fulminante* Court about confessions like those Moore made to Raymond and Ziegler *i.e.*, those that are made to third parties who then testify about them in court. Thus, *Fulminante* does not suggest— let alone *hold*—that Moore was prejudiced because his confession to police was not suppressed. In fact, it supports the exact opposite conclusion—that Moore's two confessions to Raymond and Ziegler were already so damaging to his case

---

[20]The majority attempts to conceal its mischaracterization of *Fulminante*, assuring its readers that it does not adopt a per se rule that improperly admitted confessions are prejudicial. Maj. Op. at 9796 n.20. That is a remarkably contradictory claim to make, as footnote 20 of the majority's opinion is appended to a sentence that says, "*Fulminante* stands for the proposition that the admission of an additional confession ordinarily . . . is therefore prejudicial." Maj. Op. at 9796. If that sentence does not adopt a per se rule, it comes dangerously close.

that the admission of his confession to police would do him
no further harm. By the majority's own logic, Moore's con-
fessions to Raymond and Ziegler were "like no other evi-
dence" and were "probably the most probative and damaging
evidence . . . against [Moore]." Maj. Op. at 9798.

The majority tries to avoid the implications of its own argu-
ment by comparing the relative value of Moore's confession
to the police with his confession to Raymond and Ziegler. The
majority states that "Moore's lawyer . . . thought that the
taped confession was not prejudicial because Moore had told
his brother and his half-brother's girlfriend about the crime."
Maj. Op. at 9766. According to the majority, "[s]uch a formal
confession would, without question, be far more persuasive to
a jury than Moore's statements to two lay witnesses." *Id.* at
9796. The majority concludes that the state courts' "determi-
nation that the taped confession was harmless was contrary to
clearly established Supreme Court law as set forth in *Fulmi-
nante*." *Id.* at 9808; *see also id.* at 9794 ("[The state court's]
determination that counsel's failure to suppress the formal
taped confession was not prejudicial because Moore had pre-
viously told his relative and a relative's girlfriend about his
participation in the killing of the victim was contrary to
clearly established Supreme Court law."). In the majority's
mind, the question under *Fulminante* comes down to "deter-
mining whether the difference between the weight of Moore's
statements to his brother and his half-brother's girlfriend and
his formal taped confession to the police is such that the
exclusion of the latter undermines our confidence that Moore
would have entered into so harsh a plea agreement." Maj. Op.
at 9807. This approach misstates the law in at least two ways.

First, *Fulminante* says nothing about determining the rela-
tive weight of the two confessions. Rather, it says that harm-
less error analysis applies to determine whether an
erroneously admitted confession is harmless. *Fulminante*, 499
U.S. at 308. The *Fulminante* Court found the admission of the
first confession not to be harmless, not because it was more

weighty than the second one, but because of a unique relation-ship between the two confessions—the veracity of the second was bolstered by the existence of the other. *Id.* at 298-300. Here, no such relationship exists.[21]

Second, *Fulminante* concerned the application of harmless error after a trial had taken place, not after a guilty plea had been entered, as here. The question under clearly established Supreme Court precedent is thus not whether we are confident that Moore "would have entered into so harsh a plea agree-ment," Maj. Op. at 9807, but whether Moore can show that, but for the failure to file the suppression motion, Moore would not have pled but would have insisted on going to trial. No other standard of prejudice is clearly established Supreme Court law in the guilty plea context. *See Hill*, 474 U.S. at 58-59. *But see* Maj. Op. at 9799 ("[T]he record falls far short of establishing that the potential testimony of Raymond and Ziegler would have been sufficient to cause Moore to accept so harsh a plea agreement . . . ."); *id.* at 58 ("[W]e are left only with determining whether the difference between the weight of Moore's statements to his brother and his half-brother's girlfriend and his formal taped confession to the police is such that the exclusion of the latter undermines our confidence that Moore would have entered into so harsh a plea agreement."). If we were dealing with a jury verdict, the majority's objection that a "confession is probably the most probative and damaging evidence that can be admitted against [Moore]" would carry more force because "it is impossible to know what credit and weight the jury gave to the confession." *Fulminante*, 499 U.S. at 292 (White, J., dissenting) (internal quotations and citations omitted). But we are dealing with a plea bargain here. The question is whether a reasonably com-petent attorney would have advised Moore differently when

---

[21]The majority's accusation that, under my logic, *Fulminante* "would have come out the opposite way," Maj. Op. at 9801, is thus flatly incor-rect.

faced with this evidence, and, if so, whether that would have led Moore to go to trial instead of pleading guilty.

Yet even if we assume *Fulminante* applies, its facts are so different from those presented here that it is absurd to suggest that it supports the proposition that the state court's determination violated clearly established federal law. Fulminante was convicted of murdering his eleven-year-old stepdaughter. He made two confessions: one to Anthony Sarivola, a fellow inmate who befriended him, and another to Donna Sarivola, Anthony's wife. Fulminante had no accomplices, and "the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict." *Fulminante*, 499 U.S. at 297. Thus, unlike here, where the case against Moore was exceptionally strong even without his confessions, "both the trial court and the State recognized that *a successful prosecution depended on the jury believing the two confessions*." *Id.* (emphasis added). The question before the Supreme Court was whether Fulminante was prejudiced by the improper admission of the first confession at trial in light of the properly admitted second confession. The Supreme Court found that Fulminante suffered prejudice because, under the unique circumstances of that case, the jury likely would not believe that the second confession (to Donna Sarivola) had been made if it had not already heard about the first confession (to Anthony Sarivola). *See id.* at 298-300.

The facts of *Fulminante* are simply not analogous to those presented here. Moore's confessions do not need the same kind of background explanation that Fulminante's confession to Donna Sarivola required because Raymond and Ziegler were not strangers to Moore in the way that Donna Sarivola was to Fulminante. Under the circumstances, it only made sense that Fulminante would have confessed to her if he had already confessed to her husband. Moore's confessions to Raymond and Ziegler *preceded* his confession to the police, and the confessions were not linked in the same way that Ful-

minante's confessions to the two Sarivolas were.[22] Moore confessed to his older brother Raymond because Raymond himself had once been in a similar situation and Moore wanted his advice. Ziegler and Moore were good friends; he was at her house with her before he left to confront Rogers, he returned to her house afterwards, and he was at her house when Rogers's murder was reported in the news. Moreover, Raymond and Ziegler did not have the same incentives to lie that Donna Sarivola did. Also unlike *Fulminante*, here there was other evidence—for example, the duct tape used to bind Rogers, and the blood and hair found in the trunk—to corroborate the details of the testimony that Raymond and Ziegler would have given.[23]

---

[22]On the contrary, the confessions in this case bear far more resemblance to the confessions in *Milton v. Wainwright*, 407 U.S. 371 (1972), the case that the *Fulminante* Court cited as an example of a case where confessions were made independently of each other. The challenged confession in *Milton* was made to a police officer who was posing as a fellow murder suspect incarcerated with the defendant. The defendant had previously made three separate confessions that were not related to the confession he made in prison, other than in the sense that the confessions all corroborated each other. *Id.* at 372-73. To the extent that the majority distinguishes *Milton* because Moore's confession at issue was his only formal confession, it misses my point. *See* Maj. Op. at 9797 n.21. The *Fulminante* Court held that admission of the confession was prejudicial, even though a second confession was also admitted, because the credibility of each confession was strongly related and each could easily be attacked independently. This was not the case in *Milton*, and, accordingly, the Court did not find prejudice; similarly, it is not the case here.

[23]The majority claims that *Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008) (en banc), supports its remarkable reading of *Fulminante*. *See* Maj. Op. at 9801-02. It cites *Anderson* for the proposition that a habeas court applying *Fulminante* need "not . . . consider the other evidence the state had presented to tie the defendant to the crime, or whether the confession would have repeated such evidence." Maj. Op. at 9801. That is an inappropriate reading of *Anderson*, which simply did not discuss any of the additional evidence that was present before the state court. Its entire discussion of prejudice is basically a single sentence: "The confession was central to the conviction." *Anderson*, 516 F.3d at 792. *Anderson* provides no support for the majority's broad reading of *Fulminante*. If the majority's reading of Anderson and *Fulminante* is correct, it would swallow the *Fulminante* rule that harmless error analysis applies to erroneously admitted confessions.

**Volume 3 of 3**

Finally, regardless of how *Fulminante* is read, it certainly does not hold that an attorney who declines to file a motion to suppress the challenged confession in favor of advising his client to take a plea on the basis of the presence of the second confession—which the *Fulminante* Court acknowledged was admissible, *see Fulminante*, 499 U.S. at 298, 300, 302—has provided ineffective assistance.

I close by returning to a common theme of my dissent. I do not believe that the majority's reading of *Fulminante* is correct. However, even if I am wrong and the majority is correct, under AEDPA this is not enough to permit us to grant Moore habeas relief. We may only do so if the state court's decision was contrary to any law that was "clearly established" by the Court in *Fulminante*. The majority's reading simply does not meet this standard.

C.  *The Concurrence's Prejudice Standard*

Judge Berzon's concurring opinion argues that Moore could choose to satisfy the *Strickland* prejudice prong either under *Hill* or directly under *Strickland* as applied through the lens of *Kimmelman*. *See* Concurring Op. at 9824-25. However, Judge Berzon views the *Kimmelman/Strickland* framework as more appropriate for resolving this case because *Hill* governs prejudice determinations in plea bargains concerning counsel's advice on whether to take the plea, after "motions practice and discovery have set the legal landscape." *Id.* at 9825. On the other hand, *Strickland* and *Kimmelman*, in her view, "deal with counsel's failure to *create* a proper legal landscape—by, [for example], failing to file a plainly meritorious suppression motion." *Id.* at 9825. Judge Berzon concludes that the *Kimmelman* standard, applied in the plea context, permits prejudice to be established by showing that had defense counsel properly shaped the legal landscape prior to the plea proceedings, the defendant might have obtained a more favorable plea bargain from the prosecutor. *Id.* at 9827. The distinction she attempts to draw is precluded not only by

*Hill* itself, but also by the vast weight of precedent in both the courts of appeals and the district courts. Her "legal landscape" argument is interesting but it has never been "established," much less clearly established, by the Supreme Court. It also raises substantial concerns about federalism and separation of powers.

The concurrence's critical mistake is its failure to consider fundamental principles governing the appeal of guilty pleas. A criminal defendant who has entered a plea generally waives his right to challenge defects in the pre-plea proceedings. Instead, a defendant who has entered a plea "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann* [*v. Richardson*, 397 U.S. 759, 770-72 (1970)]." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *see also McMann*, 397 U.S. at 770-71 ("Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends . . . not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases."); *Ortberg v. Moody*, 961 F.2d 135, 137-38 (9th Cir. 1992) ("Petitioner's nolo contendere plea precludes him from challenging alleged constitutional violations that occurred prior to the entry of that plea." (citing *Tollett*, 411 U.S. at 266-67)).

With that fundamental principle of pleas in mind, it becomes obvious that *Hill* provides the only appropriate standard for evaluating claims of ineffective assistance in the plea context. The only thing that *can* be challenged after a plea is the advice to enter a particular plea, for all other defects are waived by the plea. To be sure, *Strickland* is not irrelevant to the analysis under *Hill*; the *Hill* Court explicitly adopted the

*Strickland* standard in the context of guilty pleas. "We hold, therefore, that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill*, 474 U.S. at 58. But the process of applying *Strickland* to guilty pleas was set forth in *Hill*, and there is no reason to use a different prejudice analysis than that established in *Hill*.

In *Hill*, the Court wrote that "[i]n many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." *Id.* at 59. "[W]here the alleged error of counsel is a failure to investigate . . ., the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that . . . [counsel] would have . . . change[d] his recommendation as to the plea." *Id.* But this inquiry only goes to the question of whether the advice to enter the plea caused prejudice—i.e., whether the defendant would not have pled guilty with better advice—not whether the prosecution might have offered a different plea agreement. Put differently, even accepting Judge Berzon's proposed distinction between the advice to enter a plea and the process of creating the legal landscape in which plea bargaining occurs, if a defendant still would have pled guilty or nolo contendere despite trial counsel's unprofessional errors in crafting the legal landscape in which the plea was entered, then there is no constitutional prejudice.

Judge Berzon's response that *Hill* did not deal with the creation of pre-trial landscapes while *Kimmelman* did, *see* Concurring Op. at 9827-28, only highlights why the *Hill* standard is the correct one. Under *Hill*, if it was reasonable to advise a defendant to take a plea, there is no deficient conduct. If counsel has been unreasonable in giving that advice, then we proceed to ask whether the defendant would have taken the plea anyway. In other words, Judge Berzon's concerns about

the pre-plea landscape are adequately addressed in the first step of *Hill*.

There is good reason for us to follow *Hill* in these circumstances. Judge Berzon would have us consider the "legal landscape" and ask whether "the plea bargain outcome would have been improved upon the filing of the meritorious suppression motion that was not filed because of ineffective assistance of counsel." Concurring Op. at 9828-29. We have no way of evaluating whether the prosecutor, having been forced to answer the motion to suppress, would even be willing to offer a new plea bargain, much less whether the prosecutor would have offered an "improved" "plea bargain outcome." *Id.*

Given the multiplicity of factors that a prosecutor must consider when offering a plea bargain, it is highly doubtful that a federal court, reviewing a state prosecutor's decision to offer a particular plea bargain, even has the tools necessary to decide what bargaining posture a prosecutor would take in the face of a hypothetical motion to suppress. When deciding what plea bargain to offer a particular criminal defendant, for example, a prosecutor might consider the willingness of the defendant to cooperate, the defendant's past criminal history, department resources, and pressure from the public in high profile or emotionally charged cases. *See Wayte v. United States*, 470 U.S. 598, 607 (1985); *see also United States v. Estrada-Plata*, 57 F.3d 757, 760 (9th Cir. 1995) ("[T]here is no constitutional right to a plea bargain, and the decision whether to offer a plea bargain is a matter of prosecutorial discretion." (citation omitted)). To further complicate Judge Berzon's proposed counterfactual analysis, all of this second-guessing will be conducted, in most cases, years after the decision to offer the challenged plea bargain. Political winds may have shifted or a new prosecutor may have taken office. Permitting a habeas petitioner to demonstrate prejudice simply by showing that a different plea bargain might have been offered calls for an answer to an impossible question, and will

have the effect of unsettling scores of negotiated state convictions, encouraging needless litigation, and creating a mass printing press in the federal courts for writs of habeas corpus.

Were this the only side effect of Judge Berzon's method, perhaps it would be tolerable. But there are at least two additional problems. First, it places federal courts in the role of instructing state prosecutors—members of the *state executive* branch—of how to conduct plea negotiations, or at least how much prison time a prosecutor is permitted to offer if the state decides to proceed with reprosecution after the writ of habeas corpus issues. To put it mildly, this kind of interference with a state executive branch function raises substantial federalism concerns. *Cf. Printz v. United States*, 521 U.S. 898, 933 (1997).

Second, and related to the federalism problem, Judge Berzon's approach implicates the separation of powers with potential effects far beyond the current case.[24] Conducting this type of inquiry into whether a better plea bargain would have been available would require the kind of judicial review of prosecutorial decisions that courts have almost uniformly shunned. We have previously described the reasons for avoiding judicial review of the plea bargaining decision:

> Prosecutorial charging and plea bargaining decisions are particularly ill-suited for broad judicial oversight. In the first place, they involve exercises of judgment and discretion that are often difficult to articulate in a manner suitable for judicial evaluation. Such decisions are normally made as a result of

---

[24]Although the current case does not involve a direct extension of the judiciary's constitutional powers vis-a-vis coequal branches of the federal government because this case is before us on review of a state court's judgment, Judge Berzon's novel prejudice analysis, if adopted, also would apply to review of federal convictions, either under 28 U.S.C. § 2255 or on direct review.

careful professional judgment as to the strength of the evidence, the availability of resources, the visibility of the crime and the likely deterrent effect on the particular defendant and others similarly situated. Even were it able to collect, understand and balance all of these factors, a court would find it nearly impossible to lay down guidelines to be followed by prosecutors in future cases. We would be left with prosecutors not knowing when to prosecute and judges not having time to judge.

Assuming these problems of guidance and understanding could be overcome—and it is unlikely that they could be—there is an added constitutional consideration based on the peculiar relationship between the Office of the United States Attorney and the federal district courts: The United States is necessarily a party to every criminal case presented to a district court. It would raise serious separation of powers questions—as well as a host of virtually insurmountable practical problems—for the district court to inquire into and supervise the inner workings of the United States Attorney's Office.

The very breadth of the inquiry . . . would require that the government divulge minute details about the process by which scores, perhaps hundreds, of charging decisions are made. The court would also have to consider the validity of various rationales advanced for particular charging decisions, which would enmesh it deeply into the policies, practices and procedures of the United States Attorney's Office. Finally, the court would have to second-guess the prosecutor's judgment in a variety of cases to determine whether the reasons advanced therefor are a subterfuge.

*United States v. Redondo-Lemos*, 955 F.2d 1296, 1299-1300 (9th Cir. 1992) (footnotes and citations omitted), *overruled on*

*other grounds*, *United States v. Armstrong*, 48 F.3d 1508, 1515 n.5 (9th Cir. 1995) (en banc)*; see also Wayte*, 470 U.S. at 607-08 (recognizing that the "broad discretion" afforded the executive to evaluate such factors is "not readily susceptible to the kind of analysis the courts are competent to undertake"); *United States v. Banuelos-Rodriguez*, 215 F.3d 969, 976 (9th Cir. 2000) (en banc) ("Courts generally have no place interfering with a prosecutor's discretion whom to prosecute, what charges to file, and whether to engage in plea negotiations.").

To be sure, prosecutorial discretion, including the discretion to negotiate plea bargains, does not give the executive branch license to violate a criminal defendant's due process rights, and courts widely agree that a prosecutor cannot hide discriminatory motives under the guise of prosecutorial discretion. *See United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003) ("One important restriction on prosecutorial discretion, however, is that 'the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification.' " (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)) (internal quotations removed)); *Redondo-Lemos*, 955 F.2d at 1299 ("Given the significance of the prosecutor's charging and plea bargaining decisions, it would offend common notions of justice to have them made on the basis of a dart throw, a coin toss or some other arbitrary or capricious process."). But it is one thing to say that the executive branches of either the federal or state governments cannot prosecute selectively, for there are methods through which the judiciary can evaluate such claims. It is an entirely different, and far more bothersome, thing to instruct district courts to ask whether "the plea bargain outcome would have been improved upon the filing of the meritorious suppression motion." Concurring Op. at 9828-29. That analysis would require inquiry into the precise questions that this court has said courts should avoid and which the Constitution likely protects from judicial intrusion. *See Redondo-Lemos*, 955 F.2d at 1299-1300.

Judge Berzon responds by claiming that this is the type of inquiry that courts regularly undertake in ineffective assistance of counsel claims. *See* Concurring Op. at 9833-34. Rather than considering the prosecution's actions, Judge Berzon says that her approach would focus on "the defendant's and defense counsel's choices, defense counsel's judgment, and defense counsel's actions." *Id.* at 9833. But if the question posed is whether "the plea bargain outcome would have been improved upon the filing of the meritorious suppression motion," as she says it ought to be, *id.* at 9828, I fail to see how that could be done without looking at the prosecution's decisions "in the first instance." *Id.* at 9833. In an ineffective assistance of counsel claim following a trial, where the counterfactual question posed to the court concerns evaluating what a jury might have done, at least the evidence presented to the jury and the legal instructions it was given are available for review. In contrast, in a plea bargain situation, there is no record at all about what other deals the prosecution might have offered.[25]

If, in contrast, "the question is whether, but for counsel's ineffective assistance, a defendant would [be] in a better position to negotiate with the prosecutor," as Judge Berzon articulates the test later on, *id.* at 9833, the new standard would entirely swallow *Hill*. Numerous cases decided under *Hill* can also be characterized as "deal[ing] with counsel's failure to *create* a proper legal landscape" by failing to take some strategic action. Concurring Op. at 9825. *See, e.g., Weaver*, 455 F.3d at 970-71 (9th Cir. 2006) (applying *Hill* to counsel's failure to investigate mental defect defense); *Langford*, 110 F.3d at 1386-87 (using *Hill* in guilty plea case alleging ineffective

---

[25]I note that this problem is avoided under the *Hill* standard of prejudice: If the question is whether the defendant would have insisted on going to trial instead of taking the plea, that question *is* amenable to a reasoned answer by looking at the evidence presented by trial counsel and the defendant on habeas review about the defendant's discussions and choices. The *Hill* prejudice standard depends not at all on the prosecutor's considerations.

assistance of counsel based on failure to file various suppression motions). And filing a potentially meritorious suppression motion will *always* strengthen defense counsel's bargaining position (at least until a potentially adverse ruling is handed down). If the possibility that a more favorable plea bargain might have been offered if a potentially meritorious motion was not filed is sufficient to establish *Strickland* prejudice after a guilty plea, virtually every plea bargain in the country is now open to habeas relief.

Viewed within the proper standard of review under AEDPA, it was not an unreasonable application of Supreme Court law for the Oregon courts to evaluate Moore's claim under *Hill*. The case fits squarely within the rule of *Hill*: Moore asserts that his trial counsel failed to advise him that a motion to suppress might be successful. On the basis of that advice, Moore pled no contest to the charge of felony murder. Other courts considering such claims have uniformly looked to *Hill* for the correct standard.[26] Given that the federal courts

---

[26]*See, e.g., Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) ("[G]iven that he was convicted based on his own plea, Gilbert was obliged to complete the demonstration of prejudice by showing that had his confession been suppressed, it is reasonably likely that he would have gone to trial rather than plead guilty." (citing *Hill*, 474 U.S. at 59)); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003) (applying *Hill* to determine if defendant who pled guilty "should be allowed to pursue his suppression claim"); *Langford*, 110 F.3d at 1386-88; *Banks v. Hanks*, 41 F.3d 1187, 1189 (7th Cir. 1994); *Hale v. Lockhart*, 903 F.2d 545, 548-50 (8th Cir. 1990); *United States v. Carasis*, 863 F.2d 615, 616 (8th Cir. 1988) ("[B]ecause Davis' lawyer did not unreasonably forego filing a suppression motion on behalf of his client, we cannot say Davis has shown 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " (quoting *Hill*, 474 U.S. at 59)); *Hibbert v. Poole*, 415 F. Supp. 2d 225, 232-33 (W.D.N.Y. 2006) (applying *Hill* to prejudice determination when counsel advised defendant to plead guilty before court ruled on suppression motion); *United States v. Hawkins*, 973 F. Supp. 825, 828 (S.D. Ill. 1997) ("Even if counsel's failure to file a motion . . . to suppress the evidence was unreasonable, defendant has not . . . alleged that he would have pled differently had the motions been filed, and had they later succeeded."); *Friedman v. Gamble*, 919 F. Supp. 1440, 1447 (D. Mont. 1995).

have been applying *Hill*'s prejudice requirement to situations similar to the one presented by this case, it is difficult to see how a state court should have been able to divine this kind of extension of *Strickland* and *Kimmelman*. Judge Berzon's prejudice standard is not only not clearly established Supreme Court law; it is also contrary to all other federal authority. I therefore puzzle over Judge Berzon's objection that I do not cite to any case holding that her reading of the prejudice standard is precluded by *Hill*, *see* Concurring Op. at 9832, for all the cases she cites applying the *Kimmelman* standard occurred after a trial and did *not* involve the plea context. She also fails to respond to the numerous cases I have cited which apply *Hill* in the guilty plea context, other than to say that "[s]ome other cases . . . assume (as Judge Reinhardt does today) that *Hill* also applies in the motions context when a plea bargain is involved, as well as in the advice context." *Id.* From that, despite the absence of *any* case applying her proposed distinction to a guilty plea case, she draws the inexplicable conclusion that "these cases do not provide support for using *Hill* as the exclusive standard in such circumstances." *Id.*

The Supreme Court would have had difficulty being more clear than it was in *Hill* about the proper prejudice standard for guilty pleas. It said, "We hold, therefore, that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, . . . to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." The *Hill* Court did not recognize Judge Berzon's distinction between pre-trial landscape setting ineffective assistance claims and advice to enter guilty plea claims, and she cannot point to a single federal court since *Hill* that has done so. Until the Supreme Court tells us otherwise, her proposed distinction is foreclosed by *Hill*. *See Carey v. Musladin*, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court

. . ., it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' " (quoting 28 U.S.C. § 2254(d)(1))).

The concurrence's argument is a disguised attempt implicitly to extend *Hill* to permit satisfaction of *Strickland*'s prejudice prong by demonstrating simply that a more favorable plea might have been obtained. Although Judge Berzon couches her argument as giving defendants the choice of proving prejudice under what is commonly perceived as the more difficult *Strickland* standard rather than proving prejudice under *Hill*, her approach actually achieves the opposite effect: Instead of being required to demonstrate that he would not have pled guilty but would have insisted on going to trial, Moore would only be required to demonstrate that he *might* have obtained a more favorable plea agreement. This attempt misconceives the nature of plea bargaining, potentially violates principles of federalism and separation of powers, and ignores Supreme Court precedent on how to conduct the prejudice inquiry following plea agreements. Even if I were to agree that an ambiguity about the relationship between *Hill*, *Kimmelman*, and *Strickland* existed, it is not our job on AEDPA review to resolve it.

## III.   CONCLUSION

I cannot join anything the majority has written. For the reasons I have stated, I believe the majority to be wrong on the facts and the law, and I believe that it fails to accord the state court's decision the deference that AEDPA commands. At the end of the day, it is not clear what the majority has accomplished, for Moore or for anyone else. The majority grants Moore a writ of habeas corpus and orders the state either to permit Moore to withdraw his plea or to release him. Oregon will surely allow Moore to withdraw his plea and then prosecute him to the hilt. When it does, Oregon will be under no obligation to offer Moore any kind of a deal, and if it does decide to bargain, it has no obligation to offer Moore a plea

bargain as attractive as what he got in this case. It may even decide to seek the death penalty. And even if Oregon were to offer a new plea deal, Moore's counsel must reject it until he has filed every conceivable pre-trial motion he can. After today's decision, no conscientious defense attorney should even consider accepting a plea deal—no matter how good the bargain and no matter what other evidence the prosecutor has —if there are potentially "meritorious" motions that can be filed.

Oregon will try Moore and, given his confessions to family and friends, the available eyewitnesses, and other incontrovertible evidence, Moore will likely be found guilty of murder. For that, he is likely to receive a sentence well in excess of the bargain he negotiated. It is quite possible that Moore will be worse off for having prevailed here. Nor is it clear that anyone else after Moore will actually benefit from today's ruling. In fact, defendants whose counsel cannot negotiate plea agreements until after exhausting their pre-trial motions are likely to be worse off for the majority's effort.

Today's decision is not a liberty-enhancing decision. It will actually hamper defense counsel's ability to avoid trial and negotiate plea agreements. And our decision is so unnecessary. Moore is plainly guilty of felony murder, or worse. He took a fair deal from the prosecutor on the advice of competent counsel. Justice was served. There is no reason for us to up-end the orderly administration of justice in Oregon in this way.

I respectfully dissent.

CALLAHAN, Circuit Judge, with whom KLEINFELD, TALLMAN, BYBEE, BEA, and N.R. SMITH, Circuit Judges, join, dissenting from denial of rehearing en banc:

I respectfully dissent from the order denying rehearing en banc. The panel's opinion fails to follow the standard for determining ineffective assistance of counsel set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In particular, it fails to follow Supreme Court guidance on deference and improperly conflates the distinct concepts of deficient performance and prejudice, holding, in essence, and incorrectly, that because counsel's performance was deficient, it was also prejudicial. Furthermore, the majority fails to accord the state court decision the deference the Supreme Court has held it is due under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1). *See Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419-20 (2009). We should have reheard this case en banc to correct these departures from the Supreme Court's guidance and to ensure that the panel's opinion not give rise to a wave of new post-conviction petitions second-guessing acts by defense counsel engaged in prior to the defendants' pleas.

I

Several salient facts control this case and undermine the panel's findings of deficient performance and prejudice. First, we should focus on the reasons proffered by counsel for not filing a motion to suppress, not because the motion would not have been successful, but because the reasons bear on the real issue in this case: whether the attorney rendered ineffective assistance by counseling Moore to accept the plea bargain. The first two reasons were that (1) Moore did not think he was in custody, and (2) Moore had previously made a full confession to his brother, Raymond, and a woman named Debbie Ziegler. Affidavit of Kim Jordan, pp. 1-2. The third reason, which is also set forth in the attorney's affidavit, is

that Moore affirmed to counsel that the confession he had given to the police was accurate.[1]

Second, any evaluation of counsel's decisions should take into account the quantum of evidence that counsel could reasonably have expected the prosecutor to have gathered, even if Moore's confession were suppressed. As persuasively set forth by Judge Bybee in his dissent, counsel recognized that the prosecutor had a very strong, if not air-tight case, regardless of Moore's confession.[2] When these essentially undis-

---

[1]Counsel's affidavit states:

> I do not recollect any material statement of fact in the police report with which Mr. Moore disagreed. Mr. Moore always claimed his actual shooting of the victim was an accident, but there was never the smallest doubt that it occurred during a kidnap which began with an assault.

Jordan Affidavit pp. 2-3. She further states:

> Mr. Moore believed that he was guilty of murder under the felony murder rule, although he felt that it was very unfortunate and lamentable that he was guilty since he always maintained that the actual firing of the shot was an accident rather than a premeditated act.

Jordan Affidavit p. 5.

[2]Judge Bybee notes:

> Under section 163.115 of the Oregon Revised Statutes, Rogers's killing was a felony murder if "it [was] committed by a person, . . . who commit[ted] or attempt[ed] to commit [kidnaping or assault] and [the death occurred] in the course of and in furtherance of the crime the person [was] committing or attempting to commit." It is undisputed that Moore, Salyer, and Woolhiser went to Rogers's home, that Rogers was beaten, that he was bound with duct tape, and that he was thrown into the trunk of the car they had borrowed, driven to a remote location, and shot in the temple. It is indisputable that Moore, Salyer, and Woolhiser, by virtue of their involvement in the felonies of kidnaping and assault, were guilty of felony murder under Oregon law. It is equally indisputable that Moore had no affirmative defense. Thus, to convict Moore of felony murder, all that the state needed

puted facts are considered, counsel's decision not to file a motion to suppress, even though based on a mistaken understanding of the law, was neither unreasonable nor prejudicial.

Furthermore, in light of the other evidence that counsel reasonably expected the prosecutor to gather legally, it is important to recognize that the charge Moore pled to was felony-

---

to do was prove that he took part in Rogers's kidnaping and that the murder furthered the kidnaping.

This would not have been hard. The state had both Roy Salyer and Lonnie Woolhiser in custody, and both could have been called to testify that Moore took part in the attack. The state court found that Moore and Woolhiser had also confessed to their older brother Raymond Moore as well as to Woolhiser's girlfriend, Debbie Ziegler. . . . . Before they left for Rogers's residence, Salyer, Moore, and Woolhiser had been drinking with others at Ziegler's residence. Salyer was "ranting and raving" about how Rogers had broken into his cabin and slashed his tires. This was what prompted the trio to head to Rogers's residence — to confront him about the robbery and to scare him out of ever committing another one. *Four* witnesses, including Ziegler, observed this entire interaction and then observed the trio drive off to confront Rogers — in a car that Salyer had borrowed from another one of the guests.

When the trio arrived at Rogers's residence, other people were there. These people witnessed Moore, Woolhiser, and Salyer arrive, and at least one of those people spoke with Woolhiser about what they were doing there. Another was able to identify all three defendants from a photo lineup. These people would also have been able to testify that at this point the car's license plates had been covered over with duct tape. . . . . There was also highly inculpatory physical evidence in this case. The day before Moore confessed, Salyer led police to the location of the revolver they had used. The police were unable to find it in the dark, but Woolhiser led them back to the same area the next day, at which point they recovered the weapon. When police found the car that the trio had used, they found blood in the trunk, as well as hair.

*Moore v. Czerniak*, 534 F.3d 1128, 1181-82 (9th Cir. 2008) (Bybee, J., dissenting) (footnotes omitted).

murder. Counsel's concern had to be that Moore would be charged with aggravated murder, which would have potentially subjected him to the death penalty or life imprisonment. *See Moore v. Czerniak*, 534 F.3d 1128,1176-77 (9th Cir. 2008) (Bybee, J., dissenting). Moore admitted that he had held the gun and had fired a single shot through Rogers's temple, causing his death.[3] Moore's claimed lack of intent is hardly compelling, and his counsel thought it "would have been malpractice" not to alert Moore to the possibility that he might be charged with aggravated murder. *See* Jordan Affidavit pp. 3-4. Thus, counsel had very good tactical reasons, even compelling reasons, for advising Moore to plead no-contest to the charge of felony-murder.[4]

The fact that Moore had substantial, if not compelling, reasons to accept the plea bargain of felony-murder makes it very difficult to reconcile the majority's opinion with the Supreme Court's recent opinion in *Mirzayance*. In that case, the Supreme Court overruled our holding that counsel had rendered ineffective assistance of counsel by withdrawing a not guilty by reason of insanity (NGI) plea after the jury convicted Mirzayance of first-degree murder because the defen-

---

[3]Even the panel's description of Moore's version of the facts fails to place Moore in a good light:

> At some point during this walk, Woolhiser handed Moore a loaded gun. Moore explained that they had no intention of killing Rogers; they were simply going to frighten him by leaving him on top of the hill and forcing him to find his way back home. As the four climbed the hill, however, Rogers stumbled and fell back into Moore, causing the gun in his hands to discharge. As a result, Rogers died of an accidental gunshot wound to the head.

*Moore*, 534 F.3d at 1133.

[4]The panel cites the fact that Salyer went to trial and received the same twenty-five year sentence as Moore as suggesting that Moore did not benefit from his plea bargain. *See Moore*, 534 F.3d at 1143 n.15. This assertion, however, overlooks the fact that Moore, not Salyer, held the murder weapon and fired the single shot that killed Rogers. Thus, Salyer did not face the same risk as Moore did of being charged with aggravated murder.

dant had nothing to lose from pursuing the NGI plea. *Mirzayance*, 129 S. Ct. at 1418. Here, however, counsel, by arranging for Moore to plead no-contest to felony-murder, spared Moore from facing the possibility of the death penalty or life in prison. While a twenty-five year prison term may appear to be a long sentence, the finite nature of the term presents significant advantages to Moore. Moore saves his life and is assured of release from prison when he completes his twenty-five year term or is released early on parole or for good behavior. Unlike the situation in *Mirzayance*, where the defendant would not have been worse off if counsel had pursued the NGI plea, here, a failure to accept the plea bargain could have subjected Moore to a trial for aggravated murder with the possibility of the death penalty or life imprisonment.

The panel's concern with the motion to suppress rather than the plea also fails to appreciate *McMann v. Richardson*, 397 U.S. 759 (1970) and *United States v. Ruiz*, 536 U.S. 622 (2002). In *McMann*, the Supreme Court reasoned:

> In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases.

397 U.S. at 770-71 (footnote omitted). In *Ruiz*, the Court, in reversing the Ninth Circuit's holding that required impeachment evidence to first be disclosed before a plea agreement would be held voluntary, observed "that the Constitution, in respect to a defendant's awareness of relevant circumstances,

does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." 536 U.S. at 630. Here, regardless of the propriety of his confession to the police, Moore was informed of all the circumstances of the underlying crime, and his counsel reasonably understood that the state had more than sufficient evidence to convict Moore even without his confession. Pursuant to *McMann* and *Ruiz* there are no grounds for disturbing Moore's plea of no contest.

The Supreme Court has repeatedly stated that the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms," that "[j]udicial scrutiny of counsel's performance must be highly deferential," and that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Mirzayance*, 129 S. Ct. at 1420 (quoting *Strickland*, 466 U.S. at 688-89). Even accepting that counsel should have filed a motion to suppress, and that it would have been granted, the case against Moore would have remained overwhelming and accordingly, counsel's advice to plead no-contest to the charge of felony-murder was neither deficient nor prejudicial.

II

Furthermore, our own views of counsel's competence are only tangentially relevant. As the panel recognizes, "we may grant habeas relief only when the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. 2254(d)." *Moore*, 534 F.3d at 1136. In *Mirzayance*, the Supreme Court noted that under AEDPA, determinations of ineffective assistance of

counsel are entitled to double deference. 129 S. Ct. at 1420. The question " 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable — a substantially higher threshold.' " *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Moreover, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Mirzayance*, 129 S. Ct. at 1240.

Here, the state court held a hearing on Moore's post-conviction petition and denied relief. *Moore*, 534 F.3d at 1134. The state court thought that counsel's failure to file a motion to suppress was reasonable, and it also found that the motion would have been "fruitless" because Moore had previously confessed to Raymond and Debbie Ziegler. *Id.* When Moore filed his federal habeas petition, the district court also found that there was no ineffective assistance of counsel because of Moore's prior confession and the potential adverse testimony of Salyer. *Id.* at 1135.

The panel argues that Raymond's and Ziegler's testimony would not have been as powerful as Moore's confession. *See id.* at 1148. Whether or not true, the panel does not answer the critical question: whether it was reasonable for the state court to determine that in light of Raymond's and Ziegler's potential testimony, as well as all the other evidence connecting Moore to the kidnaping and shooting, the motion to suppress would have been "fruitless." In light of the other evidence available to the prosecutor, the fact that Moore had admitted that he committed the underlying crime to his counsel (and others), and the possibility that Moore could be charged with aggravated murder in addition to felony-murder, counsel's decision to forego the motion to suppress and to recommend a no-contest plea to a charge of felony-murder, was certainly a reasonable decision.

It follows under the Supreme Court's reading of AEDPA in *Mirzayance*, that even when the panel concluded that the state court's determination that the motion to suppress would be fruitless was incorrect, it should nonetheless have deferred to that decision because it is not objectively unreasonable. *See Mirzayance*, 129 S. Ct. at 1420. Here, for the reasons well articulated by Judge Bybee in his dissent to the panel's opinion, the state court's and the district court's determinations that Moore did not receive ineffective assistance of counsel if not correct are nonetheless clearly not unreasonable.[5]

## III

The panel's erudition cannot hide the problematic nature of its decision when the case is reviewed on its stark facts. In 1995, Moore admitted to participating in the kidnaping of Rogers and subsequently told at least two persons that during the kidnaping he had fired the single shot that had killed Rogers. Counsel managed to secure a no-contest plea to a charge of felony-murder that resulted in a twenty-five year prison term. Now, some fourteen years later, the majority would vacate the conviction and sentence because counsel failed to file a motion to suppress Moore's confession to the police. This confession, however, was made after Moore had confessed to two other persons. Moreover, Moore and his counsel did not think that his confession had been coerced, and Moore has never questioned the veracity of his confession.

The panel argues that a motion to suppress the confession should have been made and would have been successful. But under the Supreme Court's opinions in *McMann*, 397 U.S. at 770-71, *Ruiz*, 536 U.S. at 630, and *Mirzayance*, 129 S.Ct. at 1420, such a determination does not entitle Moore to relief.

---

[5]In *Mirzayance*, the Supreme Court commented: "[b]ut, courts of appeals may not set aside a district court's factual findings unless those findings are clearly erroneous. Fed. Rule Civ. Proc. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 573-574 . . . (1985)." 129 S. Ct. at 1421.

Rather, he must show that (a) counsel's overall performance, particularly the advice to plead no-contest to felony-murder, was deficient, (b) counsel's performance and advice was prejudicial, and (c) the state court's contrary determination was objectively unreasonable. The underlying facts in this case simply do not support such determinations. We should have taken this case en banc to correct the panel's conflation of the performance and prejudice prongs of the *Strickland* standard for ineffective assistance of counsel and its failure to follow the Supreme Court's guidance on deferring to counsel and to the reasonable determinations of state courts and district courts.

Finally, and equally important, the practical implications of our failure to take this case en banc are significant. The panel opinion creates out of whole cloth a new area of potential habeas relief where defense counsel is faced with a "Morton's Fork" — a choice between two equally unpleasant alternatives. Filing a motion to suppress might have weakened the prosecutor's hand, possibly, but not necessarily or even probably, resulting in the prosecutor offering a better deal. However accepting the plea bargain when offered protected the defendant from exposure to a much harsher sentence. As if labeling as ineffective defense counsel's resolution of such an impossible dilemma weren't bad enough, the panel opinion also sanctions federal habeas relief on this basis even where the strategy foregone has been declared "fruitless" by a state court. We should have taken this case en banc to ensure that the panel's opinion does not give rise to a wave of new post-conviction petitions second guessing defense counsel's every forbearance.

BEA, Circuit Judge, with whom, KLEINFELD, TALLMAN, CALLAHAN, BYBEE, and N.R. SMITH, Circuit Judges, join, dissenting from the order denying the petition for rehearing en banc:

One of two things must be true. Either (1) the majority's conclusion that Randy Moore suffered prejudice depends on some egregious and highly creative appellate fact-finding by which the majority concludes that Moore's confessions to his brother and a friend lacked inculpatory detail; or (2) the majority has invented a new, virtually *per se* rule that counsel's failure to file a meritorious motion to suppress a defendant's confession to the police *always* entitles a habeas petitioner to relief under *Strickland*, no matter how many other people the defendant confesses to. In either case, rehearing was warranted to correct the panel's error. I join fully in Judge Callahan's dissent from the order denying rehearing en banc, but write separately to emphasize my concern with the majority's treatment of the state court's factual determinations.

The facts, briefly, are these: Randy Moore, along with two accomplices, Lonnie Woolhiser and Roy Salyer, assaulted Kenneth Rodgers, tied him up, threw him in the trunk of their car, drove him to an isolated spot, blindfolded him, marched him into the woods, and then 'accidentally' shot him in the temple at point-blank range. Moore pleaded guilty to felony murder and was sentenced to 300 months' imprisonment. Despite the fact that Moore confessed to being the trigger man, not once, not twice, but three times, and despite the fact that Moore told his counsel that these confessions were true, and despite the fact that the state court found that a motion to suppress would have been fruitless, the majority holds that Moore's counsel's failure to file a motion to suppress *one of the three* separate confessions constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

The majority concludes the state court's determination Moore did not receive ineffective assistance of counsel was unreasonable, at least in part, because the record is devoid of evidence about which details of the crime Moore divulged in his confessions to Ziegler and Raymond Moore. *Moore v. Czerniak*, 534 F.3d 1128, 1131 (9th Cir. 2008); *id.* at 1147 n.21 ("Moore's taped confession would have been the only full account of the events . . . ."); *id.* at 1148 ("[I]t is far from clear what those witnesses would have said [if called to testify]. . . ."); *id.* at 1148-49 n.24. This, charitably put, is imaginative appellate fact-finding made possible only by ignoring some inconvenient facts in the record.

To the contrary, Moore's counsel, Kim Jordan, averred Moore had given "full"[1] confessions to both Ziegler and Raymond Moore. Jordan used this word—"full"—three times in his affidavit. Jordan's statement is some of the most probative evidence we could have of the extent and content of these confessions—counsel's knowledge is based, at least in part, on communications with the defendant, and it is, after all, Jordan's performance we are now evaluating.

The state court credited Jordan's affidavit and found "[b]oth Raymond Moore and the friend [Ziegler] could have been called as witnesses to repeat petitioner's confession. A motion to suppress would have been fruitless." In doing so, the state court even cited to the portion of Jordan's affidavit describing the confessions as "full."

The majority first concludes this finding is inadequate because the state court did not expressly find that the two prior confessions were "full." This cramped reading is both incorrect and contrary to longstanding, controlling precedent regarding implied findings. "[N]ot every finding of fact need be stated on the record in infinite detail and clarity. . . . When

---

[1]Full: "2. Complete in every detail <a *full* account of the incident>." Webster's II New Riverside University Dictionary 511 (1984).

a state trial court holds a hearing on a motion to suppress evidence and rules on the motion, a federal district court may assume that the state court found the facts necessary to support the state court's decision . . . ." *Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir. 1986).

In any case, says the majority, such a finding of fact, had it been made, would have been unreasonable under *Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9th Cir. 2004), because the state court ignored "highly probative" and "relevant" evidence that contradicts Jordan's statement that Ziegler heard a full confession. *Moore*, 534 F.3d at 1149 n.24. This "highly probative" and "relevant" evidence consists, in its entirety, of Ziegler's statement to police that she had not heard the details of Moore's confession until the day of the police interrogation. That Ziegler heard Moore's confession for the first time that day hardly proves she didn't hear the confession until she was in the police interrogation room itself; that interrogation did not begin until the late afternoon. Moore had ample opportunity to confess to her before he arrived at the police station. Even Moore's briefs describe Ziegler's statements about when she heard the confession as "ambiguous" and "equivocal."

As important as the evidence that is in the record as to the fullness of Moore's confession to Ziegler is the evidence that isn't. Moore has not provided a shred of evidence to support his claims that his confessions to Ziegler and to his brother Raymond lacked inculpatory detail, that Moore did not confess to Ziegler prior to the police interrogation, or that Ziegler and Raymond would have been reluctant witnesses at trial. For example, Moore could have, but did not, offer proof by way of affidavits or declarations from Ziegler or Raymond to corroborate his present contentions. As Moore's habeas counsel explained, "Nobody knows what Raymond Moore, Mrs. Ziegler, or [Roy] Salyer would have said" at trial. Our ignorance on this score is entirely caused by Moore and he must bear the consequences, for on all aspects of the *Strickland*

inquiry, Moore bears the burden of proof. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). The state court reasonably could have inferred the falsity of Moore's present claims that his confessions to Ziegler and brother Raymond lacked critical details, and hence probative force, from his failure to offer evidence to buttress them.

The majority was not free to ignore the state court's findings as to the completeness of Moore's confessions to Raymond and Ziegler unless it could point to record evidence showing such findings of completeness to be objectively unreasonable. 28 U.S.C. § 2254(d)(2). Here, the panel has simply substituted its own view of the facts for that of the state court. Doing so in this case is especially troubling. As is often the case in habeas proceedings, the record the petitioner has provided is thin and leaves many gaps to be filled by the finder of fact. But we cannot do so ourselves; that is the role of the state courts and, under appropriate circumstances, the federal district court. It is never our role.

If the panel majority's expressed doubts about the fullness of Moore's confessions are unnecessary to the decision, then the need for rehearing is all the more obvious. If such is the case, the majority has created a new, virtually *per se* rule that the failure to file a meritorious motion to suppress a defendant's confession to the police is always prejudicial. If the existence of *two* separate, independent, and mutually corroborating confessions, given to persons to whom the defendant was personally close, is insufficient to establish harmless error, little will be. After all, a "confession is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

The majority correctly observes that there were also multiple confessions in *Fulminante*. But the differences between this case and *Fulminante* are stark. The second confession in *Fulminante* was given: (1) to a single individual; (2) to a virtual stranger, whose only connection to Fulminante was the fact that she was the wife of the investigating officer; (3) to

a person whose credibility was made dubious by her failure to report Fulminante to the authorities and by the fact that, after Fulminante confessed, she voluntarily associated with him despite her stated disgust at his actions; and (4) to a person who reported the confession to authorities under highly suspicious circumstances. *Id.* at 298-99. Here, Moore's twin confessions to close associates—one of them his own brother—whose testimony the jury would have had little reason to doubt, bear little resemblance to the single confession in *Fulminante*.

Even if, on direct appeal, we might conclude that Moore's counsel's failure to file a motion to suppress the confession to the police entitled Moore to relief under *Strickland*, it strains credulity to claim that the state court's decision was contrary to, or an unreasonable application of, the *Fulminante* decision.

For these reasons, and the reasons persuasively set forth by Judges Bybee and Callahan, I respectfully dissent from the denial of rehearing en banc.